## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KAREN MORALES POSADA, AMANDA SARMENTO FERREIRA GUIMARAES, WILLIANA ROCHA, and SARA BARRIENTOS, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| | ) | No. 1:20-CV-11862-IT |
| Plaintiffs, | ) ) | **ORAL ARGUMENT REQUESTED** |
| v. | ) ) | |
| CULTURAL CARE, INC., a Massachusetts Corporation, | ) ) | **LEAVE TO FILE GRANTED ON MARCH 3, 2021** |
| | ) | |
| Defendant. | ) ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

    A.    The Regulatory Role of EVP Designated Sponsors .................................5

    B.    The Au Pair Exchange Visitor Program .................................................8

    C.    Plaintiffs' Allegations .........................................................................13

LEGAL STANDARD ........................................................................................................17

ARGUMENT .....................................................................................................................18

I.    Cultural Care Is Entitled to Derivative Sovereign Immunity ...............................18

II.    Comprehensive Federal Regulations Governing Exchange Program Sponsors Preempt Plaintiffs' State Law Claims ..................................................................22

    A.    Federal Preemption Prevents State Regulation of Federal Programs. ..................23

    B.    Field Preemption Bars Plaintiffs' Efforts to Impose State Law on Au Pair Program Sponsors' Administration of the Federal Au Pair Program. ...................24

    C.    Conflict Preemption Bars Plaintiffs' State Law Claims ........................................26

III.    The Complaint Does Not and Cannot Allege Facts Showing That Cultural Care Is Plaintiffs' Employer .............................................................................................28

IV.    Plaintiffs Fail to Identify or State a Deceptive Trade Practices Claim .............................29

CONCLUSION ...................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................... 24, 25

*ASSE Int'l, Inc. v. Kerry*,
    803 F.3d 1059 (9th Cir. 2015) ..................................................................... 4, 5, 25

*Bai Haiyan v. Hamden Pub. Sch.*,
    875 F. Supp. 2d 109 (D. Conn. 2012) ........................................................... 5

*Bank One, Tex., N.A. v. Montle*,
    964 F.2d 48 (1st Cir. 1992) ........................................................................... 18

*Beltran v. Interexchange, Inc.*,
    No. 14-cv-03074, 2016 WL 695967 (Feb. 22, 2016) ................................... 26

*Beltran v. Interexchange, Inc.*,
    176 F. Supp. 3d 1066 (D. Colo. 2016) .......................................................... 26

*Boyle v. United Techs. Corp*,
    487 U.S. 500 (1988) ....................................................................................... 26

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001) ................................................................................... 24, 27

*Campbell-Ewald Co. v. Gomez*,
    577 U.S. 153 (2016) ................................................................................... 19, 22

*Capron v. Office of Att'y Gen. of Massachusetts*,
    944 F.3d 9 (1st Cir. 2019) ....................................................................... passim

*Centennial Puerto Rico License Corp. v. Telecomms. Regulatory Bd. of Puerto Rico*,
    634 F.3d 17 (1st Cir. 2011) ........................................................................... 22

*Crosby v. Nat'l Foreign Trade Council*,
    530 U. S. 363 (2000) ..................................................................................... 23

*Cultural Care, Inc. v. Off. of Att'y Gen. of Massachusetts*,
    No. 16-cv-11777-IT, 2017 WL 3272011 (D. Mass. Aug. 1, 2017) .............. 3

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*,
    888 F.3d 640 (4th Cir. 2018) ..................................................................... 19, 20

*DeCanas v. Bica,*
    424 U.S. 351 (1976) ................................................................................ 25

*Farina v. Nokia,*
    578 F. Supp. 2d 740 (E.D. Pa. 2008) ...................................................... 23

*Fitzgerald v. Harris,*
    549 F.3d 46 (1st Cir. 2008) ..................................................................... 18

*Flinn v. Minnesota Life Ins. Co.,*
    353 F. Supp. 3d 110 (D. Mass. 2018) ..................................................... 18

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
    505 U.S. 88 (1992) .................................................................................. 27

*Galvin v. U.S. Bank, N.A.,*
    852 F.3d 146 (1st Cir. 2017) ................................................................... 30

*Hamilton v. Partners Healthcare Sys., Inc.,*
    209 F. Supp. 3d 379 (D. Mass. 2016) ..................................................... 18

*Hamilton v. Partners Healthcare Sys., Inc.,*
    879 F.3d 407 (1st Cir. 2018) ................................................................... 18

*Hillsborough Cnty, Fla. v. Automated Med. Labs., Inc.,*
    471 U.S. 707 (1985) ................................................................................ 24

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) .................................................................................. 26

*Ivanov v. Sunset Pools Mgmt. Inc.,*
    567 F. Supp. 2d 189 (D.D.C. 2008) ....................................................... 29

*Lozano v. City of Hazleton,*
    724 F.3d 297 (3d Cir. 2013) ................................................................... 25

*Lussier v. Runyon,*
    50 F.3d 1103 (1st Cir. 1995) ..................................................................... 9

*Marentette v. Abbot Labs., Inc.,*
    886 F.3d 112 (2d Cir. 2018) ................................................................... 26

*Massachusetts v. Westcott,*
    431 U.S. 322 (1977) ................................................................................ 10

*Nat'l Fed'n of the Blind v. United Airlines Inc.,*
    813 F.3d 718 (9th Cir. 2016) ................................................................... 25

*Nat'l Foreign Trade Council v. Natsios*,
  181 F.3d 38 (1st Cir. 1999) ............................................................................. 23, 27

*Ocasio-Hernández v. Fortuño-Burset*,
  640 F.3d 1 (1st Cir. 2011) ...................................................................................... 18

*O'Hara v. Diageo-Guinness, USA, Inc.*,
  306 F. Supp. 3d 441 (D. Mass. 2018) ..................................................................... 9

*O'Hara v. Diageo-Guinness, USA, Inc.*,
  370 F. Supp. 3d 204 (D. Mass. 2019) ..................................................................... 9

*Palmer v. Liggett Grp., Inc.*,
  825 F.2d 620 (1st Cir. 1987) .................................................................................. 23

*Skwira v. United States*,
  344 F.3d 64 (1st Cir. 2003) .................................................................................... 17

*Small Sponsors Working Grp. v. Pompeo*,
  No.19-cv-02600, 2020 WL 2561780 (W.D. Tenn. May 20, 2020) ........................... 8

*SPGGC, LLC v. Ayotte*,
  488 F.3d 525 (1st Cir. 2007) ............................................................................. 23, 24

*Sw. Research Inst. v. Unemp. Ins. Appeals Bd.*,
  81 Cal. App. 4th 705 (2000) .................................................................................. 29

*Torrens v. Lockheed Martin Servs. Grp., Inc.*,
  396 F.3d 468 (1st Cir. 2005) .................................................................................... 9

*United States v. Locke*,
  529 U.S. 89 (2000) ................................................................................................. 23

*Valentin v. Hospital Bella Vista*,
  254 F.3d 358 (1st Cir. 2001) .................................................................................. 18

*Virginia Uranium, Inc. v. Warren*,
  139 S. Ct. 1894 (2019) ........................................................................................... 23

*Watterson v. Page*,
  987 F.2d 1 (1st Cir. 1993) ........................................................................................ 9

*City of Worcester v. HCA Management. Co.*,
  753 F. Supp. 31 (D. Mass. 1990) ........................................................................... 19

*Yearsley v. W.A. Ross Const. Co.*,
  309 U.S. 18 (1940) ...................................................................................... 19, 21, 22

**Statutory Authorities**

20 Cal. Gov't Code § 12920 ........................................................................ 28

22 U.S.C. § 2451 ............................................................................... 1, 4, 20

22 U.S.C. § 2452 ................................................................................. 4, 5, 20

775 ILCS 5/1-101 et seq .............................................................................. 28

N.J. Stat. Ann. § 10:5-4 ............................................................................... 28

N.Y. Exec. Law §291 .................................................................................. 28

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2 .............................................................................. 22

**Rules and Regulations**

Fed. R. Civ. P. 12(b)(1) ........................................................................ 17, 18

Fed. R. Civ. P. 12(b)(6) ................................................................................ 18

22 C.F.R. § 62.1 ......................................................................................... 28

22 C.F.R. § 62.2 ................................................................................ 6, 7, 20

22 C.F.R. § 62.5 .................................................................................... 6, 7

22 C.F.R. § 62.6 ................................................................................. 6, 20

22 C.F.R. § 62.7 ......................................................................................... 6

22 C.F.R. § 62.10 ................................................................................. passim

22 C.F.R. § 62.12 ....................................................................................... 16

22 C.F.R. § 62.13 ............................................................................. 6, 8, 17

22 C.F.R. § 62.14 ................................................................................ 7, 16

22 C.F.R. § 62.15 ......................................................................................... 6

22 C.F.R. § 62.28 ......................................................................................... 5

22 C.F.R. § 62.31 ................................................................................. passim

## <u>INTRODUCTION</u>

The Mutual Educational and Cultural Exchange Act of 1961 (the "Fulbright-Hays Act" or the "Act"), 22 U.S.C. § 2451, *et seq.*, created "J visas" that permit foreign nationals to visit the United States and partake in educational and cultural exchange programs under the direction of the United States Department of State (the "Department" or "State Department").  The Act expressly vests the State Department with the discretion to fulfill the Act's diplomatic purpose by creating, funding, and delegating the administration of cultural "Exchange Visitor Programs" ("EVPs") to private parties.  In fulfilling that mandate, the Department promulgated regulations that create fifteen J-1 visa EVPs and delegate responsibility for running all but one of them to third-party program "sponsors."  The Department's regulations expressly define the role sponsors play, extensively detail sponsors' responsibilities, and task sponsors with, among other things, screening, selecting, certifying, acculturating, and monitoring the welfare and regulatory compliance of EVP participants during their stay in the United States.

Defendant Cultural Care, Inc. ("Cultural Care" or "CCI") is one of fifteen designated sponsors administering the State Department's au pair EVP, through which young foreign nationals live with and provide limited child care services to an American host family, participate in American home life, and attend post-secondary school in the United States.  The State Department regulations strictly define the program's requirements and expressly delegate primary oversight and responsibility to third-party sponsors like Cultural Care.  Pursuant to those regulations, Cultural Care must ensure, among other things, that (i) each host family enters into a written agreement with their au pair that limits the au pair's obligation to provide child care services to not more than 10 hours per day or 45 hours per week, and (ii) host families are aware of and agree to pay their au pairs at least a Department-mandated minimum weekly stipend of $195.75.

1

Plaintiffs are four au pairs sponsored by Cultural Care who contend that Cultural Care is their "employer" under state and federal law, based on conduct that Cultural Care performed at the direction of—and as required by—the State Department regulations.  This is insufficient to state a claim under each of Plaintiffs' legal theories.  The Court need not look beyond the Plaintiffs' complaint and the Department's regulations to reach this conclusion, and should dismiss the suit with prejudice.

First, Cultural Care is shielded from the entirety of this suit under the doctrine of derivative sovereign immunity.  Derivative sovereign immunity protects private entities from suits based on conduct authorized and directed by the United States.  That is the case here, where Plaintiffs allege nothing but conduct *expressly* required by State Department regulations.

Second, Plaintiffs' state law claims are preempted by the State Department's regulations. The Department exhaustively regulates sponsor responsibilities through pervasive and detailed regulations that literally created the role of EVP sponsor and demonstrate an intent to occupy the entire field of sponsor responsibilities.  As such, imposing the varying labor law regimes of the fifty states on EVP sponsors like Cultural Care would unquestionably burden and conflict with the federal scheme through which sponsors administer EVPs on the Department's behalf.  The First Circuit has already said as much, recognizing that the State Department has tasked sponsors like Cultural Care "to be responsible for requiring compliance only with clearly established <u>federal</u> statutory wage and hour standards," and that sponsors are "not obliged to ensure that host families comply with [state] wage and hour laws . . . ."  *Capron v. Office of Att'y Gen. of Massachusetts*, 944 F.3d 9, 34, 38 (1st Cir. 2019) (herinafter, "*Capron*") (emphasis added).

Finally, Plaintiffs fail to state a claim under wage and hour laws because their allegations arise solely out of Cultural Care's compliance with federal regulations which cannot, without

more, establish an employment relationship, as a matter of law.  Sponsors like Cultural Care do not employ exchange visitors, but comply with the mandates of the State Department's federal regulations.

Both this Court and the First Circuit previously addressed the au pair program in a declaratory judgment action that dealt with distinct but related issues.  *See Cultural Care, Inc. v. Off. of the Att'y Gen. of Massachusetts,* No. 16-cv-11777-IT, 2017 WL 3272011 (D. Mass. Aug. 1, 2017) ("*Cultural Care*") (*aff'd sub nom Capron*).  In those proceedings, two host families and Cultural Care sought a declaratory judgment that the State Department's EVP regulations globally preempted the Massachusetts Fair Wage Law as applied to the entire au pair program.  *See Capron*, 944 F.3d at 20 (describing the "nature" of that suit as challenging application of state law to the "Au Pair Program").  This Court dismissed that suit on the pleadings, emphasizing "an employment relationship . . . between au pairs and ***host families.***"  *Cultural Care*, 2017 WL 3272011, at *8 (emphasis added).  The Court described federal EVP sponsors as fulfilling a distinctly regulatory and supportive role: "[d]esignated sponsors oversee the au pair programs and provide support to the au pairs and host families."  *Id.* at *2.  This Court did not hold that federal EVP sponsors such as Cultural Care are au pair "employers," nor did it address whether claims specifically against sponsors are preempted.

On appeal, the First Circuit limited its holding to claims against host families, repeatedly remarking that the federal regulations govern the activities of the sponsors, not the host families. In making this distinction, the First Circuit recognized that the State Department's "regulations address only the obligations that sponsors must meet," and in contrast, "do not . . . purport to define the obligations of the <u>employers themselves</u>"—*i.e.*, host families.  *Capron*, 944 F.3d at 40 (emphasis added).  The First Circuit expressly refrained from holding that EVP regulations do not

preempt the wage and hour claims against sponsors like those asserted here, *id.* 21 n. 5, and recognized that "a sponsor was not obliged [by the Department regulations] to ensure that host families comply with those [state] wage and hour laws" providing for compensation above the Department's minimum stipend requirement. *Id.* at 34. Instead, the First Circuit held that the State Department "le[ft] the employer-host families responsible for ensuring that they complied with any generally applicable state wage and hour law requirements that might emerge," as the au pairs' employers. *Id.* at 38. If sponsors are not obliged to ensure that host families pay au pairs at least the various states' minimum wage and overtime, it stands to reason that sponsors are not "employers" required to oversee the au pairs' work and pay those wages themselves.

Accordingly, the Court should dismiss the Second Amended Class Action Complaint (Feb. 19, 2021) (Dkt. 43) (hereinafter, "SAC") with prejudice for the reasons below.

## **BACKGROUND**

The Fulbright-Hays Act called for the creation of a new category of cultural exchange programs through which foreign nationals could visit the United States and "increase mutual understanding between the people of the United States and the people of other countries" and "thus to assist in the development of friendly, sympathetic, and peaceful relations between the United States and the other countries of the world." 22 U.S.C. § 2451. To achieve that diplomatic purpose, the Act expressly "vests the State Department with discretion to create and fund exchange programs to the extent that the Department 'considers that they would strengthen international cooperative relations.'" *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015) (quoting 22 U.S.C. § 2452(a)). The Act also expressly permits the State Department to delegate administration of such programs to third parties "by grant, contract, or otherwise." 22 U.S.C. § 2452(a).

In fulfillment of that congressional mandate, the State Department created fifteen exchange programs and delegated responsibility for running all but one of them to program to "sponsors" through regulations codified at C.F.R. Tit. 22, Ch. I, Subch. G, Pt. 62 (the "EVP Regulations").[1] As both the State Department and courts have recognized, the EVP Regulations establish a "comprehensive scheme" pursuant to which sponsors "administer" each exchange program on behalf of the Department.  *ASSE Int'l*, 803 F.3d 1070-71; *see also Bai Haiyan v. Hamden Pub. Sch.*, 875 F. Supp. 2d 109, 115 (D. Conn. 2012) ("Under these regulations and the Act . . . the State Department designates legal entities known as 'sponsors' to conduct exchange visitor programs"); Department of State Amicus Curiae Brief (*Capron*, 17-2140), at 4 (Sept. 25, 2018) (hereinafter, "DOS Br.")[2] ("Although the State Department oversees the EVP, the exchange programs are conducted by organizations known as 'sponsors' that the State Department designates for that purpose.").  Because a review of these regulations demonstrates that Plaintiffs allege nothing beyond conduct expressly required and directed by the State Department, they are set forth in detail below.

### A.      The Regulatory Role of EVP Designated Sponsors

As authorized by 22 U.S.C. § 2452(a), the State Department designates sponsors to conduct EVPs on its behalf.  A sponsor cannot act as a sponsor without the State Department's authorization, and by regulation, it can do only what the Department has authorized it to do.  To

---

[1]  Sponsors administer all but one EVP, the International Visitor category, which involves "foreign nationals who are recognized or potential leaders and are selected by the Department of State to participate in observation tours, discussions, consultation, professional meetings, conferences, workshops, and travel." 22 C.F.R. § 62.28

[2]   A docketed version of the DOS Brief is attached as Ex. A to the Declaration of Harvey J. Wolkoff in Support of Defendant's Motion to Dismiss (Mar. 22, 2021) (hereinafter, "Wolkoff Decl.").  A Westlaw version is also available at 2018 WL 4740081.  Page references to the DOS Brief herein refer to the docketed version of the brief.

obtain and retain that authorization, a sponsor must comply with a detailed set of regulations, including regulations dictating how it must administer virtually every facet of the exchange program(s) for which it has been designated.  *See* 22 C.F.R. § 62.10 ("Sponsors are responsible for the effective administration of their exchange visitor program(s)."); *id.* § 62.2 (defining "sponsor" as "a legal entity designated by the Secretary of State to conduct an exchange visitor program").

     ***Designation***.  Only "designated" sponsors may conduct EVPs.  To receive designation, sponsors must meet demanding eligibility requirements and submit applications through the Department of Homeland Security ("DHS") electronic visitor tracking system. [3]  Upon determination that all regulatory and statutory eligibility requirements are met, the State Department "may, in its sole discretion, designate the applicant as an [EVP] sponsor."  *Id.* § 62.6(a), (b).[4]  Importantly, "[a] sponsor may engage only in the activity or activities specifically authorized in its written letter of designation."  *Id.* § 62.6(c).  Sponsors must also meet demanding reporting and auditing requirements and seek redesignation every two years.  *See id.* §§ 62.7, 62.15, 62.13.

     ***Gate-Keeping Responsibilities***.  Once designated, sponsors are responsible for screening, selecting, and certifying foreign nationals as eligible for each exchange program.  *See id.* § 62.4 (requiring sponsors to "select foreign nationals to participate" in exchange programs according to

---

[3]   Student and Exchange Visitor Information System ("SEVIS") is the internet-based system imposed by the DHS used to maintain information regarding EVP sponsors and participants.  22 C.F.R. § 62.5(a); *see also* 9 U.S. Dep't of State, Foreign Affairs Manual § 402.5-4(B), 2021 WL 591933 (explaining that "the SEVIS record is the definitive record of student or exchange visitor status and visa eligibility").

[4]   22 C.F.R. § 62.6(b) further provides: "Initial designations are effective for one or two years at the sole discretion of the Department of State."

criteria governing each program category); *id.* § 62.10 ("Sponsors must establish and utilize a method to screen and select prospective exchange visitors to ensure that they are eligible"). After a sponsor determines that an EVP participant is eligible under Department regulations, the sponsor is then responsible for issuing a DS-2019 "Certificate of Eligibility" listing the EVP category for which an applicant has qualified.[5]  *See id.* § 62.2.

*Orientation Responsibilities*.  State Department regulations also direct sponsors to "offer and record participation in orientation for all exchange visitors," which must include information selected by the Department on life and customs in the United States, local community resources, healthcare, "[s]ponsor rules that exchange visitors are required to follow while participating in their exchange visitor program," and emergency contact information for "Responsible Officer[s]" designated by the sponsor for that purpose.  *Id.* § 62.10(c).  Sponsors "also must make clear to prospective exchange visitors in the exchange categories with a work component that their stipend or wages might not cover all of their expenses and that they should bring additional personal funds," *id.* § 62.9, and ensure that all exchange visitors have insurance in effect that covers them for "sickness or accidents" during the time of their program, *id*. § 62.14.

*Monitoring Responsibilities*.  State Department regulations also require that sponsors monitor the progress, welfare, and compliance of exchange visitors.[6]  *See, e.g.*, *id.* § 62.10(d);

---

[5]  Sponsors must create DS-2019 Certificates through a certified DHS SEVIS account, in which sponsors profile each EVP participant they select, and which sponsors must update pursuant to monitoring obligations discussed below.  DS-2019 Certificates permit exchange visitors to request J-1 visa issuance at U.S. consulates in their home countries.  *See* 22 C.F.R. §§ 62.2, 62.5.

[6]  Among other things, "[s]ponsors must:"

> (1) Ensure that the activities in which exchange visitors are engaged are consistent with the category and activity listed on their Forms DS–2019;
>
> (2) Monitor the physical location (site of activity), and the progress and welfare of exchange visitors to the extent appropriate for the category;
>
> (3) Require that exchange visitors report to the sponsor within ten calendar

*Small Sponsors Working Grp. v. Pompeo*, No.19-cv-02600, 2020 WL 2561780, at *1 (W.D. Tenn. May 20, 2020) ("[I]t is the sponsors' responsibility to . . . oversee the visitors' stays, and monitor their welfare.").  Attendant to those monitoring requirements, sponsors must notify the State Department through the DHS SEVIS system of the beginning of each visitor's program, and any "no-show," early withdrawal, termination, "[c]hange of circumstance," or "[s]erious problem or controversy" during participation in their designated EVP.  22 C.F.R. § 62.13.

In sum, State Department regulations delegate to federal EVP sponsors primary responsibility for administering EVPs on the State Department's behalf, from initial screening to monitoring exchange participants' well-being and compliance throughout their visit in the United States—all responsibilities the State Department would otherwise have to carry out itself to administer these federal programs.  Consistent with the reality that everything a sponsor does in administering an EVP is pursuant to the authorization and direction of the State Department, the governing regulations comprehensively and pervasively regulate how sponsors must carry out their delegated federal responsibilities.

### B. The Au Pair Exchange Visitor Program

As with every other program, the Department's regulations covering the Au Pair Program comprehensively regulate every aspect of how sponsors must administer that federal program on the federal government's behalf.  *See* 22 C.F.R. § 62.31.  By its terms, that regulation "governs

---

> days any changes in their telephone numbers, email addresses, actual and current U.S. addresses (*i.e.*, physical residence), and site(s) of activity (if the exchange visitor is permitted to make such change without prior sponsor authorization); [and]
>
> (4) Report in SEVIS within ten business days of notification by an exchange visitor any change in the exchange visitor's actual and current U.S. address, telephone number, email address, and/or primary site of activity.

22 C.F.R. § 62.10(d).

Department of State-designated exchange visitor programs under which foreign nationals are afforded the opportunity to live with an American host family and participate directly in the home life of the host family." *Id.* § 62.31(a).

In addition to the screening and selection responsibilities described above, designated Au Pair Program sponsors must ensure that all participants are between 18 and 26 years of age, are secondary school graduates, are proficient in spoken English, have satisfactorily completed a physical examination, have been personally interviewed in English by an organizational representative, and have successfully passed a background investigation. *See id.* § 62.31(d).

Sponsors must also ensure that, prior to their departure from their home country, au pair participants receive comprehensive documentation including "all operating procedures, rules, and regulations," a detailed profile about the host family and its community, a profile of the education institution where the au pair will be placed, a summary of travel arrangements, and a "copy of the Department of State's written statement and brochure regarding the au pair program." *Id.* § 62.31(f), (i)(1).  That brochure explains, *inter alia*, that sponsors "carry out the day-to-day operation of their Au Pair Programs" and "have the responsibility for administering the program, within the regulations set by the Department of State."  Au Pair Exchange Program Brochure, U.S. Dep't of State (Oct. 2011) (https://j1visa.state.gov/wp-content/uploads/2012/09/au-pair-program-brochure-sept-2011.pdf) (last accessed Mar. 19, 2021) (Wolkoff Decl., Ex. D).[7]

---

[7]   The Court may take judicial notice of the State Department brochure because it is an official government document.  *See, e.g.*, *O'Hara v. Diageo-Guinness, USA, Inc.*, 306 F. Supp. 3d 441, 457 (D. Mass. 2018), *on reconsideration*, 370 F. Supp. 3d 204 (D. Mass. 2019) ("[T]he court may take judicial notice of 'official public records' in deciding a motion to dismiss." (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)); *Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005) ("We are free ourselves to take judicial notice of the existence of government records."); *Lussier v. Runyon*, 50 F.3d 1103, 1114 (1st Cir. 1995) ("[G]overnment documents are subject to judicial notice . . . on the ground that information contained therein is

In addition to screening au pair applicants, sponsors must screen and select host families based strictly on criteria established by the State Department. *See* 22 C.F.R. § 62.31(e) ("Sponsors shall secure, prior to the au pair's departure from the home country, a host family placement for each participant."); *id.* § 62.31(e) ("[s]ponsors shall adequately screen all potential host families" pursuant to certain criteria). Specifically, sponsors shall, "at a minimum":

> (1) Require that the host parents are U.S. citizens or legal permanent residents;
>
> (2) Require that host parents are fluent in spoken English;
>
> (3) Require that all adult family members resident in the home have been personally interviewed by an organizational representative;
>
> (4) Require that host parents and other adults living full-time in the household have successfully passed a background investigation including employment and personal character references;
>
> (5) Require that the host family have adequate financial resources to undertake all hosting obligations;
>
> (6) Provide a written detailed summary of the exchange program and the parameters of their and the au pair's duties, participation, and obligations; and
>
> (7) Provide the host family with the prospective au pair participant's complete application, including all references.

*Id.* § 62.31(h).

State Department regulations also mandate that sponsors "fully monitor all au pair exchanges" on an ongoing basis, and "at a minimum" establish and record monthly contact by "local counselor[s]" and "quarterly contact" by "regional counselors," report any "unusual or serious situations or incidents involving either the au pair or host family," and "promptly" report any incidents involving a crime of moral turpitude or violence. *Id.* § 62.31(c), (l). To facilitate

---

'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" (quoting *Massachusetts v. Westcott*, 431 U.S. 322, 323 (1977))).

monthly monitoring and responsiveness in the event of an emergency, au pair sponsors must ensure

that an "au pair participant is placed with a host family within one hour's driving time of the home

of the local organizational representative authorized to act on the sponsor's behalf in both routine

and emergency matters arising from the au pair's participation in their exchange program," and

that local representatives "not devoting their full time and attention to their program obligations

are responsible for no more than fifteen au pairs and host families." *Id.* § 62.31(c)(5)-(8).

The breadth of sponsors' monitoring obligations is plainly stated in the Department's Au

Pair Welcome Letter, which sponsors must provide as part of each au pair orientation. *See* 22

C.F.R. § 62.31(f), *supra*. As that letter explains to au pairs:

> Your U.S. sponsor is your primary point of contact throughout your
> stay in the United States, and you should contact them with any
> issues . . . . If you have any questions about your exchange program,
> if you need assistance of any kind while you are here, if you feel
> your rights are being violated, or if something just does not feel right
> to you, please contact your U.S. sponsor. It is your sponsor's
> responsibility to help you with any issues, needs, or concerns you
> may have.

Au Pair Welcome Letter, U.S. Dep't of State (Feb. 1, 2021) (https://j1visa.state.gov/wp-

content/uploads/2021/02/Au-Pair-welcome-letter-2021.pdf) (last accessed Mar. 18, 2021)

(Wolkoff Decl. Ex. E).[8]

The State Department also tasks au pair sponsors with overseeing compliance with

regulatory limitations on the amount of child care services that au pairs can perform for their host

families, and with ensuring that host families pay their au pairs at least a minimum stipend amount.

Specifically, sponsors must require that host families and au pairs sign a written agreement that

limits the obligation to provide child care services to not more than 10 hours per day or more than

---

[8]   The Court may take judicial notice of the State Department's letter. *See supra* note 7 and
accompanying text.

45 hours per week.  *See* 22 C.F.R. § 62.31(e)(5).  Sponsors must also "require that au pair participants . . . [a]re compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."  *Id.* § 62.31(j)(1).  The State Department determines the minimum weekly stipend that sponsors must ensure host families pay au pair participants, based on the federal minimum wage.  Since 2009, when the federal minimum wage last increased, the State Department has determined this amount is $195.75.  *See* DOS Br. 5-7; U.S. Dep't of State Notice, Federal Minimum Wage Increase (June 14, 2007) (hereinafter, "2007 DOS Notice") (Wolkoff Decl. Ex. B); U.S. Dep't of State Notice, Federal Minimum Wage Increase (June 24, 2009) (hereinafter, "2009 DOS Notice") (Wolkoff Decl. Ex. C).[9]

In summary, Au Pair Program sponsors, like all EVP sponsors, serve in a role created by federal regulation to administer a federal exchange program on behalf of the State Department. They are subject to comprehensive federal regulations that require sponsors to screen, select, train, and monitor the well-being of au pairs according to specific State Department requirements. Sponsors thus exist only by virtue of federal law and for the sole and express purpose of administering exchange programs on behalf of the federal government—programs that the federal government would otherwise have to administer itself—and their ability to operate as sponsors depends on their compliance at all times with the exacting regulations the State Department has promulgated dictating how the federal Au Pair Program should operate.

---

[9]   The Court may take judicial notice of the State Department's Notices regarding federal minimum wage increases.  *See supra* note 7 and accompanying text.

###### C.        Plaintiffs' Allegations

Plaintiffs[10] are four au pairs who received J-1 exchange visas and began participating in the Au Pair Program during the period between October 2018 and January 2020.  SAC ¶¶ 2, 7-11.  As Plaintiffs' EVP sponsor, Cultural Care helped match Plaintiffs with host families in New York, New Jersey, Illinois, and California.  *See id.* ¶¶ 7-10, 32, 34, 38, 42, 52, 61, 73.

Plaintiffs bring this putative class action on behalf of au pairs placed in those states and a putative "Nationwide FLSA Collective," asserting claims that Cultural Care is their "employer" and therefore is liable for their host families' alleged failures to pay them in accordance with the FLSA, and with the minimum wage, overtime, and wage statement requirements of the state laws where the host families live.  *See id.* ¶¶ 123-212, Counts I-XIII.  Plaintiffs also assert a single claim under unspecified state deceptive trade practice laws on behalf of a "Consumer Class," contending that Cultural Care is liable for "materially misleading" au pairs and host families by performing their responsibilities under the Regulations and advising them that "au pair wages should be paid a minimum of $195.75 per week."  *Id.* ¶¶ 213-217, Count XIV.  Stripped of rhetoric and legal conclusions, all of Plaintiffs' allegations in support of their claims state nothing more than that Cultural Care complied with State Department regulations and directives.

*First*, Plaintiffs assert that Cultural Care misrepresented the minimum stipend that the State Department requires that sponsors ensure host families pay au pair participants.  *See id.* ¶¶ 213-217.   Setting aside that Plaintiffs' assertion that Cultural Care "misrepresented" the requirements imposed by federal law is a legal conclusion, not a factual averment, what Plaintiffs allege in support of that conclusion is simply that Cultural Care informed program participants of

---

[10]     Karen Morales Posada, Amanda Sarmento Ferreira Guimaraes, Williana Rocha, and Sara Barrientos.

what federal law in fact requires—*i.e.*, that host families must pay au pairs a minimum stipend of $195.75 per week.  Since 2009, the Department has instructed sponsors that the minimum stipend amount is $195.75 per week.  *See* DOS Br. 5-7; 2007 DOS Notice; 2009 DOS Notice.  A sponsor's legal obligation with regard to the minimum stipend amount ends there.  As the First Circuit has observed, sponsors are "not obliged to ensure that host families comply with [state] wage and hour laws."  *Capron*, 944 F.3d at 34.

    *Second*, the remaining factual averments in the Second Amended Complaint regarding Cultural Care's conduct largely track, often word-for-word, the State Department's regulations dictating how sponsors must administer the Au Pair Program:

| **Allegation** | **State Department Regulation** |
|---|---|
| CCI "Requires that, if an infant less than three months old is in the home, a parent or other responsible adult shall be present at all times, and a parent or responsible adult shall stay in the home for the first three days of an au pair's assignment" ¶ 24(a) | 22 C.F.R. § 62.31(e)(2):  "Sponsors shall secure . . . a host family placement [but] shall not . . . . [p]lace an au pair with a family having a child aged less than three months unless a parent or other responsible adult is present in the home"<br><br>22 C.F.R. § 62.31(e)(1): "Sponsors shall not . . . . [p]lace an au pair with a family unless the family has specifically agreed that a parent or other responsible adult will remain in the home for the first three days following the au pair's arrival" |
| CCI "Requires that the au pair's schedule be limited to 45 hours per week, with a maximum of 10 hours per day and no more than 5.5 days per week of work." ¶ 24(b) | 22 C.F.R. § 62.31(c)(2): "Sponsors . . . shall . . . [l]imit the number of hours . . . au pair participants are obligated to provide child care services to not more than 10 hours per day or more than 45 hours per week"<br><br>22 C.F.R. § 62.31(e)(5): "Sponsors shall not . . . [P]lace an au pair with a host family unless a written agreement between the au pair and the host family detailing the au pair's obligation to provide child care has been signed by both the au pair and the host family prior to the au pair's departure from his or her home country. . . . Such agreement |

14

| **Allegation** | **State Department Regulation** |
|---|---|
|  | shall limit the obligation to provide child care services to not more than 10 hours per day or more than 45 hours per week" |
| CCI "Retains the exclusive right to determine that the host family's environment is not suitable and to terminate the host family from the program" ¶ 24 (c) | 22 C.F.R. § 62.31(h): "Sponsors shall adequately screen all potential host families and at a minimum shall . . . ."<br><br>22 C.F.R § 62.31(m): requiring au pair sponsors to file, "[a]long with the annual report required by regulations set forth at § 62.17," a summation of how sponsors resolved complaints regarding either "host family or au pair participation" in its EVP. |
| CCI "Requires that the host family notify Cultural Care immediately if there is a change in the composition of the family and of any incidents involving law enforcement;" ¶ 24(d) | 22 C.F.R. § 62.31(l): "Sponsors shall fully monitor all au pair exchanges, and at a minimum" maintain records of monthly contacts "[r]equire that all local and regional counselors are appraised of their obligation to report unusual or serious situations or incidents involving either the au pair or host family; and [p]romptly report to the Department of State any incidents involving or alleging a crime of moral turpitude or violence." |
| CCI "Requires that any adults residing in the home must be screened by Cultural Care" ¶ 24(e) | 22 C.F.R. § 62.31(h)(4): "Sponsors shall adequately screen all potential host families and at a minimum shall . . . . [r]equire that host parents and other adults living full-time in the household have successfully passed a background investigation including employment and personal character references;" |
| CCI "Dictates that the au pair will perform childcare services and light housework relating to childcare services and may not do general housekeeping or heavy chores;" ¶ 24(f) | 22 C.F.R. § 62.31(a): "All au pair participants provide child care services to the host family . . . ."<br><br>22 C.F.R. § 62.31(j): "Sponsors shall require that au pair participants . . . [d]o not provide more than 10 hours of child care per day, or more than 45 hours of child care in any one week." |

15

| Allegation | State Department Regulation |
|---|---|
| CCI "Requires that the host family provide automobile insurance for au pairs who drive;" ¶ 24(g) | 22 C.F.R. § 62.14(a): "Sponsors must require that all exchange visitors have insurance in effect that covers the exchange visitors for sickness or accidents during the period of time that they participate in the sponsor's exchange visitor program." |
| CCI "Requires that the au pair must contact Cultural Care if the family wishes to take the au pair out of the country on vacation;" ¶ 24(h) | 22 C.F.R. § 62.12: "Sponsors must . . . facilitate the re-entry into the United States of an exchange visitor. . .who travel[s] outside the United States during the exchange visitor's program" by issuing updated DS-2019 Certificates needed for reentry into the United States. |
| CCI "Requires the host family notify Cultural Care if the au pair needs medical attention;" ¶ 24(i)¶ | 22 C.F.R. § 62.31(l)(3): "Sponsors shall fully monitor all au pair exchanges, and at a minimum shall . . . [r]equire that all local and regional counselors are appraised of their obligation to report unusual or serious situations or incidents involving either the au pair or host family;" |
| CCI "vests [itself] with the right to determine, in its sole judgment, if the au pair is unable to perform her duties for an extended period of time—in which case Cultural Care will send the au pair home and end her assignment." ¶ 24(j) | 22 C.F.R. § 62.10(a): "Sponsors must establish and utilize a method to screen and select prospective exchange visitors to ensure that they are eligible for program participation"<br><br>22 C.F.R. § 62.31(m): requiring au pair sponsors to file an annual report explaining how it resolved complaints regarding either "host family or au pair participation" in its EVP. |
| "Cultural Care retains the right to reject any au pair application for any reason it deems advisable." ¶ 25 | 22 C.F.R. § 62.4: "Sponsors select foreign nationals to participate in exchange visitor program(s) in the United States. Participation is limited to foreign nationals who meet" specific regulatory criteria. |

16

| Allegation | State Department Regulation |
|---|---|
| "Cultural Care retains the right to end any au pair's employment if the au pair engages in conduct that Cultural Care believes is not in the best interest of the program." ¶ 26 | 22 C.F.R. § 62.13(a): requiring sponsors to notify the Department of "involuntary termination" of any visitor's program.<br><br>22 C.F.R. § 62.31(m):  requiring au pair sponsors to file an annual report explaining how it resolved complaints regarding either "host family or au pair participation" in its EVP. |
| CCI maintains "records of meetings with Cultural Care's regional points of contact, documents regarding au pairs' immigration status and visa status, and other employment-related information." ¶ 28 | 22 C.F.R. § 62.31(c)(6): "Sponsors . . . shall . . . [r]equire that [a] local organizational representative maintain a record of all personal monthly contacts (or more frequently as required) with each au pair and host family for which he or she is responsible and issues or problems discussed;" |
| "Cultural Care requires all its au pairs to attend four days of training prior to traveling to their host family." ¶ 29 | 22 C.F.R. § 62.31(g):  Sponsors shall provide the au pair participant with child development and child safety instruction, including "not less than eight hours of child safety instruction no less than 4 of which shall be infant-related; and . . . not less than twenty-four hours of child development instruction of which no less than 4 shall be devoted to specific training for children under the age of two." |

Because Plaintiffs in relevant part allege nothing but Defendant's compliance with State Department regulations, they fail to state a claim for the reasons explained below.

## LEGAL STANDARD

A defendant may move to dismiss an action under Fed. R. Civ. P. 12(b)(1) for lack of federal subject matter jurisdiction.  The party asserting jurisdiction has the burden of demonstrating its existence.  *See Skwira v. United States*, 344 F.3d 64, 71 (1st Cir. 2003).  Plaintiffs invoking federal jurisdiction have the burden of showing that the court from which they seek redress has jurisdiction over their claims.  If the existence of federal subject matter jurisdiction

involves a factual dispute, the proponent of federal jurisdiction must prove subject matter jurisdiction by a preponderance of the evidence. *See Bank One, Tex., N.A. v. Montle*, 964 F.2d 48, 50 (1st Cir. 1992). Rule 12(b)(1) is a "large umbrella, overspreading a variety of different types of challenges to subject-matter jurisdiction," including sovereign immunity. *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 362-63 (1st Cir. 2001).

Under Fed. R. Civ. P. 12(b)(6), a complaint must be dismissed if it fails to state a claim upon which relief can be granted. *See Hamilton v. Partners Healthcare Sys., Inc.*, 209 F. Supp. 3d 379, 386 (D. Mass. 2016), *aff'd*, 879 F.3d 407 (1st Cir. 2018). Although courts accept a plaintiff's allegations as true at the pleading stage, this tenet "is inapplicable to legal conclusions." *Id.* Claims that rest solely on "'legal conclusion[s] couched as . . . fact[ ]' or '[t]hreadbare recitals of the elements of a cause of action'" must be dismissed. *Id.* at 386-387 (citing *Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1, 12 (1st Cir. 2011)). Moreover, courts will grant motions to dismiss "premised on preemption where the complaint does not plead a 'plausible entitlement to relief' because the relief sought is preempted as a matter of law." *Flinn v. Minnesota Life Ins. Co.*, 353 F. Supp. 3d 110, 118 (D. Mass. 2018) (citing *Fitzgerald v. Harris*, 549 F.3d 46, 52 (1st Cir. 2008)).

## ARGUMENT

## I.   CULTURAL CARE IS ENTITLED TO DERIVATIVE SOVEREIGN IMMUNITY

As an initial matter, Plaintiffs' claims are all foreclosed by the doctrine of derivative sovereign immunity. Sponsors are entities formally designated by the federal government to administer the Au Pair Program subject to the direction and control of the State Department. Federal law creates their role, defines their responsibilities, and strictly governs their performance. Cultural Care is nothing more than the government's representative and agent in operating the Au Pair Program as the federal government has instructed in order to achieve the federal government's foreign policy goals. Just as the State Department would be immune from suit if it administered

18

the Au Pair Program itself, Cultural Care is entitled to derivative sovereign immunity for its activities in administering the Au Pair Program on the State Department's behalf.

Derivative sovereign immunity shields a private entity from liability for actions "authorized and directed by the Government of the United States." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016) (quoting *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20 (1940)).  As the Supreme Court explained in *Yearsley*, derivative sovereign immunity shields a private entity from liability for actions "authorized and directed by the Government of the United States."  309 U.S. at 20.  There, a landowner had asserted a claim for damages against a private entity based on its work building dikes on the Missouri River pursuant to its contract with the federal government. *See id.* at 19-20.  The Supreme Court held that the private entity was immune from plaintiff's claim, as "it is clear that if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."  *Id.* at 20-21; *see also Campbell-Ewald*, 577 U.S. at 167.

Judge Young applied the principles set down in *Yearlsey* in *City of Worcester v. HCA Management Co.,* recognizing that "pursuant to sovereign immunity, a private company which contracts with the federal government to perform the duties of the government will not be held liable for its actions on behalf of the government."  753 F. Supp. 31, 37-38 (D. Mass. 1990).  As Judge Young wrote: "Since the private party is performing delegated duties pursuant to governmental authority, suit against the private party would be tantamount to suit against the government itself."  *Id*. at 38.  Other courts are in accord.  As the Fourth Circuit has held, "[t]his immunity derives from the government's unquestioned need to delegate governmental functions, and the acknowledgement that imposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work."  *Cunningham*

19

*v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 643 (4th Cir. 2018) (brackets and quotation marks omitted).

*First*, there can be no serious question that Cultural Care is exercising a delegated federal function administering the Au Pair Program.  Congress authorized the State Department to create exchange programs to facilitate the federal government's goal to "increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange."   22 U.S.C. § 2451; *see also id.* § 2452 (authorizing creation of "educational" and "cultural exchanges").   Congress also authorized the State Department to delegate administrative responsibilities to third parties "by grant, contract, or otherwise."  *Id.* § 2452(a).  The Department could have chosen to administer the Au Pair Program itself, using its own personnel and resources to match au pairs with host families and supervise their interactions. Instead, the Department determined, in its discretion, that the Au Pair Program would be administered by designated sponsors, and duly delegated responsibility for the day-to-day operations of the Au Pair Program to private sponsors such as Cultural Care.  *See* 22 C.F.R. § 62.31(b); *see also id.* § 62.10 (explaining that sponsors "are responsible for the effective administration of . . . exchange visitor program(s)").

That delegation is clear from the extensive regulatory scheme governing sponsors.  As those regulations lay out, a sponsor administers federal exchange programs on behalf of the State Department.  A sponsor like Cultural Care is, by federal definition, no more than "[a] legal entity designated by the Secretary of State to conduct an exchange visitor program."  *Id.* § 62.2.  Cultural Care thus derives its role expressly and exclusively from federal law, and it "may engage only in the activity or activities specifically authorized in its written letter of designation."  *Id.* § 62.6(c). As such, a sponsor may not conduct a foreign exchange program however it sees fit, but rather

must conduct the program as the federal government has commanded.  Those commands are both exhaustive and detailed.  *See, e.g., id.* §§ 62.10(a), 62.10(c), 62.31(d), 62.31(f)-(g).

The regulations governing the Au Pair Program are themselves exhaustive, dictating, *inter alia*, the criteria sponsors must use to evaluate host families, how close a sponsor must ensure an au pair will be to a local organizational contact (less than one hour's drive), how often the sponsor must contact the au pair (at least monthly), how many au pairs an organizational contact can supervise (no more than 15 unless full time), the kinds of accommodations a sponsor must ensure an au pair receives (a private bedroom), the records a sponsor must maintain, and more.  *See generally id.* § 62.31.  The State Department has also imposed extensive reporting requirements on sponsors, *see id.* § 62.31(m), and can revoke a sponsor's designation to administer the Au Pair Program if the sponsor violates the Department's regulations, *see id.* § 62.31(n).

This regulatory scheme confirms that when acting as a sponsor in the Au Pair Program, Cultural Care is "executing [the government's] will."  *Yearsley*, 309 U.S. at 20-21.  Indeed, Cultural Care could not continue to be designated as a sponsor if it were *not* carrying out the State Department's will.  Simply put, when the State Department assigned Cultural Care responsibility to operate the Au Pair Program in accordance with the State Department's instructions, that responsibility carried with it the same federal sovereign immunity that would apply if the agency had chosen to administer that federal program itself.  Therefore, Cultural Care is entitled to derivative sovereign immunity.

*Second*, Plaintiffs do not (and could not) allege that Cultural Care acted beyond the scope of its delegated responsibilities.  To the contrary, Plaintiffs allege little more than *compliance* with the exacting federal regulations governing Cultural Care's role as sponsor (*see* table *supra* pp. 14-17), and ask that Cultural Care be sanctioned for not performing responsibilities beyond those

regulations as the Plaintiffs' purported "employer."  To the extent Plaintiffs contend that Cultural Care has misrepresented the Department's stipend requirements, that claim flies in the face of the State Department's own position, for the Department has explained that its regulation only requires sponsors to inform host families that the minimum stipend must be at least $195.75, *see* DOS Br. at 5-8, which Plaintiffs agree Cultural Care has done here.  *See* SAC ¶¶ 16-17, 23, 193, 208, 214-215.  And the First Circuit has likewise agreed that the same regulation "plainly does not" require sponsors to ensure "that au pair participants receive the minimum wage that a state would require that they be paid."  *Capron*, 944 F.3d at 32.

This case presents precisely the type of situation in which derivative sovereign immunity applies: where a private entity has been "authorized and directed" by the federal government to carry out a federal program, and the private entity has merely "performed as the Government directed."  *Campbell-Ewald*, 577 U.S. at 167 (quoting *Yearsley*, 309 U.S. at 20).  Indeed, it would create federalism concerns of the first order if state law could be invoked to hold federal delegees liable for operating federal programs in accordance with the federal government's instructions, rather than a state's preferences.  Because Cultural Care's actions under federal government designation and direction to carry out federal government objectives are protected by derivative sovereign immunity, Plaintiffs' claims must be dismissed.

## II.    COMPREHENSIVE FEDERAL REGULATIONS GOVERNING EXCHANGE PROGRAM SPONSORS PREEMPT PLAINTIFFS' STATE LAW CLAIMS

Separate and apart from immunity, the State Department's detailed regulations preempt Plaintiffs' state law claims under the doctrines of field and conflict preemption.  *See* SAC Counts I-IX, XIII.  Federal regulations are federal law, and under the Supremacy Clause they have the same power as federal statutes to preempt state law.  *See* U.S. Const. art. VI, cl. 2; *Centennial Puerto Rico License Corp. v. Telecomm. Regul. Bd. of Puerto Rico*, 634 F.3d 17, 31 (1st Cir. 2011);

*SPGGC, LLC v. Ayotte*, 488 F.3d 525, 530 (1st Cir. 2007) ("Federal statutes and the regulations adopted thereunder have equal preemptive effect.").

The doctrines of field and conflict preemption "are not rigidly distinct" categories. *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n. 6 (2000)). Rather than attempting to fit a case into one of those "pre-cast mold[s]," a court should consider the potential effect on the "the federal scheme set up by Congress." *Palmer v. Liggett Grp., Inc.*, 825 F.2d 620, 626 (1st Cir. 1987). "If the state law disturbs too much [of] the congressionally declared scheme—whether denominated as 'occupying the field' or 'actually conflicting with federal law'—it will be displaced through the force of preemption." *Id.* "Preemption will be more easily found where states legislate in areas traditionally reserved to the federal government, and in particular where [as here] state laws touch on foreign affairs." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 73 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).

### A.  Federal Preemption Prevents State Regulation of Federal Programs.

As an initial matter, federal preemption is particularly appropriate where state law is invoked "in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000); *see also Farina v. Nokia*, 578 F. Supp. 2d 740, 756 (E.D. Pa. 2008) (rejecting presumption against preemption in light of "significant federal regulatory presence" in field of technical standards for radio communications). That is undeniably the case here. This suit seeks to hold the federal government's delegee liable for having administered a federal program in accordance with the federal government's dictates, rather than those of various states. In other words, it seeks to impose state laws on the relationship between the federal government and one of its delegees—a relationship that "is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."

23

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001). That "is hardly a field which the States have traditionally occupied." *Id.* Indeed, it is difficult to conceive of an area less suited to state regulation than how an entity designated by the federal government to administer a federal program goes about carrying out that delegated task. Given the "inherently federal" relationship between the State Department and the sponsors it has designated to administer the Au Pair Program, Plaintiffs' attempt to impose different and additional state-law burdens on those sponsors faces a presumption in favor of preemption, not against it. *See id.*

**B. Field Preemption Bars Plaintiffs' Efforts to Impose State Law on Au Pair Program Sponsors' Administration of the Federal Au Pair Program.**

Under the doctrine of field preemption, state law in a field that has been wholly occupied by federal law is "invalid even if it does not directly conflict with federal laws or regulations." *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 530 (1st Cir. 2007); *see also Arizona v. United States*, 567 U.S. 387, 399 (2012) ("States are precluded from regulating conduct in a field that Congress has determined must be regulated by its exclusive governance."). "[W]hether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme." *Hillsborough Cnty, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 714 (1985). "The intent to displace state law altogether can be inferred from [1] a framework of regulation so pervasive . . . that Congress left no room for the States to supplement it or [2] where there is a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399; *see also Capron*, 944 F.3d at 21-22. Here there are both.

The federal government has a "dominant" interest in how a private party designated by the federal government to operate a federal program carries out that task; after all, a sponsor carries out that task with the imprimatur of the federal government itself. Consistent with that strong

federal interest, the State Department has comprehensively regulated sponsors, leaving no room for states to alter or supplement their obligations. As detailed *supra* pp. 4-12 and 14-17, State Department regulations literally create the role of sponsor for the express and exclusive purpose of "conducting" and "administering" the Au Pair Program (and other EVPs) on the Department's behalf. *ASSE Int'l, Inc.*, 803 F.3d at 1070-71 (describing a "comprehensive scheme" under which sponsors "administer" EVPs on the government's behalf). As the First Circuit repeatedly acknowledged in *Capron*, the Department has issued "detailed and comprehensive regulations" that "directly regulate only . . . sponsors." 944 F.3d at 15, 24. And the State Department exercises control of sponsors at all times by reserving the power to sanction them, including by revoking their designation, for failure to comply with any of those requirements. *See id.* at 24. State regulation of the inherently federal relationship between the State Department and its designated sponsors is thus field preempted twice over.

To be sure, the First Circuit held in *Capron* that the State Department's regulations do not preempt application of state law to *host families*. But the court explicitly premised that holding on its view that those regulations "focus on the obligations of sponsors" rather than host families. *Id.* at 41. That distinction was crucial to its analysis, and provides a road map to the resolution of the preemption issues here. The scope of the relevant field under field preemption is determined by the reach of federal regulation and its underlying intent (*see Arizona*, 567 U.S. at 399; *see also DeCanas v. Bica*, 424 U.S. 351, 360 (1976)), and the federal government is just as free to preempt narrow fields as it is to preempt broad ones. *See, e.g.*, *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 734 (9th Cir. 2016) (field of airport "kiosk accessibility" preempted); *Lozano v. City of Hazleton*, 724 F.3d 297, 316 (3d Cir. 2013) (field of "alien harboring" preempted). While the First Circuit concluded that the State Department did not directly regulate *host families*, it

reached the opposite conclusion as to *sponsors*—which is precisely why it reserved judgment on whether federal law preempts application of state law to sponsors even if it does not preempt its application to host families.  The State Department may not have comprehensively regulated host families, but there is no denying that it has comprehensively regulated sponsors—as one would expect given the inherently federal role it has assigned them.  That comprehensive regulatory regime simply does not leave room for states to compel sponsors to administer the Au Pair Program in accordance with state, rather than federal, law.  Federal law thus clearly preempts Plaintiffs' attempt to add additional and varying state law duties to the "detailed and comprehensive" set of sponsor obligations defined by federal law.  *Capron*, 944 F.3d at 15.[11]

## C.      Conflict Preemption Bars Plaintiffs' State Law Claims

For similar reasons, Plaintiffs' state law claims are also preempted by conflict preemption, which invalidates the application of state laws that "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  To determine whether state law conflicts with federal law, courts must "examin[e] the federal [law] as a whole and identify . . . its purpose and intended effects."  *Marentette v. Abbot Labs., Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (citations and  quotations omitted).  Where, as here, the application of state law implicates significant federal interests, "[t]he conflict with federal policy need not be as sharp" as might be necessary in areas of traditional state concerns.  *Boyle v. United Techs. Corp*, 487 U.S. 500, 507 (1988).  "The crucial inquiry is whether a state law impedes

---

[11]   To the extent Plaintiffs may rely on the District of Colorado's decisions in *Beltran v. Interexchange, Inc.*, No. 14-cv-03074, 2016 WL 695967 (Feb. 22, 2016), *report and recommendation adopted in part*, 176 F. Supp. 3d 1066 (D. Colo. 2016), such reliance would be misplaced.  The *Beltran* court did not have the benefit of the First Circuit's opinion in *Capron*, which, as explained, repeatedly emphasized the distinction between how the State Department regulates host families only indirectly and how it regulates sponsors directly.  The *Beltran* court also did not have the benefit of the State Department's views in its amicus brief in *Capron*.

the federal effort." *Natsios*, 181 F.3d at 77.  "A state law also is pre-empted if it interferes with the methods by which the federal [law] was designed to reach th[at] goal." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992).

Allowing states to regulate Au Pair Program sponsors as "employers" who must comply with state labor laws would conflict with many aspects of the federal government's comprehensive regulatory scheme.  The State Department did not create a regime in which it made sponsors themselves the employers of au pairs.  It could have created such a regime, but it did not.  It instead tasked sponsors with a different role: administering the program.  Converting sponsors into employers would conflict with the State Department's careful efforts to confine sponsors' obligations to the obligations the Department itself would have if it administered the program itself.

Converting sponsors into employers who must simultaneously comply with fifty different state wage and hour law regimes would also "dramatically increase the burdens facing [sponsors]—burdens not contemplated by [the State Department] in enacting" the Au Pair Program regulations.  *Buckman*, 531 U.S. at 350.  As the First Circuit has acknowledged, the Department "plainly do[es] not" require au pair sponsors to ensure host family compliance with state minimum-wage and overtime laws.  *Capron*, 944 F.3d at 32.  And yet Plaintiffs would not merely make sponsors responsible for ensuring compliance with those laws—they would make sponsors *themselves liable* for payment of those very same state-law wages.  *See, e.g.*, SAC ¶¶ 131-34, 154-61, 168-71,176-82 (asserting overtime claims under California, New York, New Jersey, and Illinois law).  The Department plainly did not envision a regime in which sponsors must not only administer the Au Pair Program, but also take on the obligations of the host families themselves. And understandably so, as imposing responsibility to record the exact hours worked inside each

host family household according to fifty different state law regimes—at risk of massive financial liability—would make it extremely difficult for the Department to attract sponsors to "facilitate[]" the international cultural exchanges that Congress intended the Fulbright-Hays Act to promote.  22 C.F.R. § 62.1(b).

Moreover, many state labor laws directly conflict with the federal requirements that the State Department requires sponsors to follow in administering the program.  For instance, State Department regulations require sponsors to limit participation in the Au Pair Program to a particular profile—to young adults and foreign nationals, to those who demonstrate proficiency in English, and to those that pass a physical and psychological exam.  *See* 22 C.F.R. § 62.31(d). Those restrictions are critical to fostering the kind of family environment from which the program's cultural benefits emanate, but would constitute impermissible discrimination under many state laws in an ordinary employment relationship.  *See, e.g.*, N.Y. Exec. Law § 291 (prohibiting national origin and age discrimination); N.J. Stat. Ann. § 10:5-4 (same); 20 Cal. Gov't Code § 12920 (same); 775 ILCS 5/1-101 *et seq.* (same).  Requiring sponsors to conform the Au Pair Program to such state laws would make it impossible for them to comply with their obligation to administer the program as the *State Department* instructs, and would subject them to sanctions under federal law for following state law.  That is textbook conflict preemption.

Plaintiffs' attempt to impose state law duties on entities that are acting as the federal government's delegees in carrying out a federal program, under federal supervision and direction, is barred by preemption.  Plaintiffs' state law claims must therefore be dismissed.

## III.   THE COMPLAINT DOES NOT AND CANNOT ALLEGE FACTS SHOWING THAT CULTURAL CARE IS PLAINTIFFS' EMPLOYER

Even assuming that federal law left some room to convert Cultural Care into an "employer," Plaintiffs' claims fail because they do not and cannot allege facts showing that

Cultural Care is their employer.

While Plaintiffs attempt to invent an employment relationship by suggesting that Cultural Care exercised control over the child-care services that Plaintiffs provided for their host families, their allegations on their face make clear that Cultural Care merely stood in for the State Department in administering the Au Pair Program, supervising the relationship between host families and au pairs in precisely the way that the State Department itself would have otherwise had to do.  It is the host families, not Cultural Care, who are responsible for paying their au pairs and who determine, set, and receive the services supporting that payment.  SAC ¶¶ 3, 17-20.  Aside from the conclusory assertion that Cultural Care "employs" au pairs (SAC ¶ 2), Plaintiffs allege nothing but compliance by Cultural Care with the legal obligations that the Department imposed upon and *delegated* to Cultural Care in its role as a designated EVP sponsor.  *See supra* pp. 14-17 (table comparing Plaintiffs' allegations and the governing regulations).  Performing those federally-mandated responsibilities cannot establish—and indeed does not even suggest—the kind of "control" necessary to create an employer/employee relationship.  *See, e.g.*, *Ivanov v. Sunset Pools Mgmt. Inc.*, 567 F. Supp. 2d 189, 195 (D.D.C. 2008) (sponsoring EVP participants and "keeping tabs" on EVP visitors is not indicative of a "joint employment relationship"); *Sw. Research Inst. v. Unemployment. Ins. Appeals Bd*., 81 Cal. App. 4th 705, 709 (2000) ("[W]here the method of performing a task is dictated by . . . regulations imposed by the government, the principal is not exercising the manner and means of control as an employer.").

## IV.   PLAINTIFFS FAIL TO IDENTIFY OR STATE A DECEPTIVE TRADE PRACTICES CLAIM

Plaintiffs also fail to state any deceptive trade practices claim.  *See* SAC ¶¶ 213-217.  They premise this claim on the conclusory and legally incorrect assertion that Cultural Care "materially

mislead[s]" host families and au pairs by "instruct[ing] . . . that au pair wages should be a minimum of $195.75 per week."  *Id.* ¶¶ 214-215.

As an initial matter, Plaintiffs' allegations are insufficient to even provide minimal notice of the legal basis for this claim.  They vaguely assert "claims for deceptive trade practices under the consumer protection laws of the states where they provided au pair services," including two states in which Plaintiffs were never even placed with host families.  *Id.* at ¶ 213 (citing the laws of Connecticut and Washington, where none of the named plaintiffs were placed).  They also fail to identify a single relevant statute or common law rule.  *See id.* ¶¶ 213-217.  Allegations that a defendant "failed to comply with 'applicable law'" without specifying "the law with which the defendants allegedly failed to comply" are "too vague and conclusory to state a claim for which relief can be granted."  *Galvin v. U.S. Bank, N.A.*, 852 F.3d 146, 160 (1st Cir. 2017).

In any event, Plaintiffs cannot state any viable deceptive trade practices claim.  As the First Circuit has expressly recognized, the State Department's regulations "plainly do not" require sponsors to ensure compliance with minimum wage and overtime requirements above the Department's minimum stipend requirement.  *Capron*, 944 F.3d at 32; *see also* DOS Br. 5-7.  And conversely, Cultural Care was complying with the regulations when it informed host families about the federal stipend.  As a matter of law, Cultural Care did not commit any deceptive trade practice by administering the federal Au Pair Program in the manner that the federal government instructed.

## <u>CONCLUSION</u>

For all these reasons, the Court should dismiss the Complaint in its entirety, with prejudice.

Dated: March 22, 2021

Respectfully submitted,

CULTURAL CARE, INC.,

By its attorneys,

/s/ Harvey J. Wolkoff
Harvey J. Wolkoff (BBO #532880)
Matthew Mazzotta (BBO #679230)
Quinn Emanuel Urquhart & Sullivan LLP
111 Huntington Ave., Suite 520
Boston, MA  02199-3600
harveywolkoff@quinnemanuel.com
matthewmazzotta@quinnemanuel.com
(617) 712-7100

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document filed today through the Court's ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent by U.S. Mail to those indicated as non-registered participants on March 22, 2021.

Dated:  March 22, 2021

/s/ Harvey J. Wolkoff
Harvey J. Wolkoff