UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

| | | |
|---|---|---|
| KAREN MORALES POSADA, | ) | |
| AMANDA SARMENTO FERREIRA | ) | |
| GUIMARAES, WILLIANA ROCHA, | ) | |
| and SARA BARRIENTOS, | ) | Civil Action No.  1:20-CV-11862-IT |
| individually and on behalf of | ) | |
| all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| CULTURAL CARE, INC., a Massachusetts | ) | |
| Corporation, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES .........................................................................................iii

I.    INTRODUCTION .................................................................................................. 1

II.   PROCEDURAL HISTORY.................................................................................... 2

III.  FACTUAL ALLEGATIONS .................................................................................. 3

IV.  ARGUMENT ......................................................................................................... 8

    A.    Standard of Review ......................................................................................... 8

    B.    Cultural Care is Not Entitled to Derivative Sovereign Immunity ................................ 9

       i.   Cultural Care is not entitled to derivative sovereign immunity from Plaintiffs' FLSA claims. ........................................................................................................... 10

       ii.  Cultural Care is not entitled to derivative sovereign immunity from Plaintiffs' state law claims. ....................................................................................................... 11

    C.    The Federal Au Pair Program Regulations Do Not Preempt Plaintiffs' State Law Claims against Cultural Care ..................................................................................... 16

       i.   The presumption against preemption applies here. .................................................... 17

       ii.  There can be no field preemption as to sponsor agencies because states may regulate host families. ...................................................................................................... 17

       iii.  There is no conflict preemption because the regulations do not set a ceiling on wages. 20

    D.    Plaintiffs Have Adequately Pled that Cultural Care is their Employer ...................... 23

    E.    Plaintiffs Have Adequately Pled Their State Deceptive Trade Practices Claims....... 24

V.   CONCLUSION..................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Alvarez v. Hill*, 518 F.3d 1152 (9th Cir. 2008) .......................................................................... 25

*Arizona v. United States*, 567 U.S. 387 (2012) .......................................................................... 18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................... 25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................................... 9

*Beltran v. InterExchange Inc.,* No. 14-cv-03074-CMA-KMT, 2016 WL 695967

      (D. Colo., Feb. 22, 2016) ............................................................................... 16, 18, 23

*Betancourt v. Cultural Care, Inc*., Case No. 2081CV0056

      (Mass. Sup. Ct., Nov. 16, 2020) ............................................................. 16, 19, 23, 24

*Boyle v. United Techs. Corp*, 487 U.S. 500 (1988) ...................................................................... 20

*Buckman v. Plaintiffs' Legal Committee,* 531 U.S. 341 (2001) ................................................... 17

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720 (9th Cir. 2015) ........................ 9

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) ................................................. 10, 11, 13, 14

*Capron v. Off. of Att'y Gen. of Massachusetts*, 944 F.3d 9 (1st Cir. 2019) .......................... passim

*Conley v. Gibson*, 355 U.S. 41(1957) .......................................................................................... 25

*Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001)..................................................................... 13

*Cultural Care, Inc. v. Off. of the Att'y Gen. of Massachusetts*, No. 16-CV-11777-IT,

      2017 WL 3272011 (D. Mass. Aug. 1, 2017) ..................................................... 1, 8, 16, 17

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640 (4th Cir. 2018) ......................... 12

*DeCanas v. Bica*, 424 U.S. 351 (1976)................................................................................... 18, 19

*Filarsky v. Delia*, 566 U.S. 377 (2012)........................................................................................ 11

*Freeman v. Town of Hudson*, 714 F.3d 29 (1st Cir. 2013) ........................................................ 25

*Galvin v. U.S. Bank, N.A.*, 852 F.3d 146 (1st Cir. 2017) ......................................................... 25

*In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018) ........................................................ 27

*In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986 (9th Cir. 2008) ..................................... 9

*In re Katrina Canal Breaches Litig.*, 620 F.3d 455 (5th Cir. 2010) ........................................... 13

*In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326 (4th Cir. 2014) ................................................. 11

*In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169 (2d Cir. 2008) ..................................... 9

*Johnson v. City of Shelby,* 135 S. Ct. 346 (2014) ................................................................ 24, 25

*Kudlacz v. Cultural Care, Inc.*, Case No. CGC-20-584567

    (Cal. Sup. Ct. Sept. 3, 2020) ............................................................... 16, 19, 23, 24

*Lozano v. City of Hazleton*, 724 F.3d 297 (3d Cir. 2013) ......................................................... 19

*Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718 (9th Cir. 2016) ............................. 19

*Nwauzor v. GEO Group, Inc.,* No. 17 Civ. 5769, 2020 WL 1689728

    (W.D. Wash, April 7, 2020) ............................................................................. 12

*Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1 (1st Cir. 2011) ............................................. 25

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) ................................................................. 20

*Padron v. GreatAuPair, LLC*, Case No. CGC-20-587057

    (Cal. Sup. Ct. Feb. 16, 2021) ............................................................... 16, 23, 24

*Saintcome v. Tully*, 296 F. Supp. 3d 377 (D. Mass. 2017) ....................................................... 25

*Skinner v. Switzer*, 562 U.S. 521 (2011). ........................................................................... 24

*United States v. Testan*, 424 U.S. 392 (1976) ...................................................................... 10

*Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940) .......................................................... 9, 13

**Statutes**

22 U.S.C. § 2451 ........................................................................................................ 21

29 U.S.C. § 218(a) ..................................................................................................... 15

815 Ill. Comp. Stat. Ann. § 505/2 ............................................................................. 26

9 U.S.C. § 203(d)(2)(a)(ii) ......................................................................................... 10

Conn. Gen. Stat.§ 42-110b(a) .................................................................................... 26

22 U.S.C. § 2452(a)(1) ................................................................................................. 4

N.J. Stat. Ann. § 56:8-2 ............................................................................................. 26

N.Y. Gen. Bus. Law §§ 349(a) .................................................................................. 26

N.Y. Gen. Bus. Law §§ 350-a(1) ............................................................................... 26

Wash. Rev. Code § 19.86.020 .................................................................................... 26

**Regulations**

22 C.F.R. § 62.1(a) ...................................................................................................... 4

22 C.F.R. § 62.1(b) ...................................................................................................... 4

22 C.F.R. § 62.10 ......................................................................................................... 4

22 C.F.R. § 62.10(a) ..................................................................................................... 4

22 C.F.R. § 62.10(b) ................................................................................................... 27

22 C.F.R. § 62.10(c) ..................................................................................................... 5

22 C.F.R. § 62.11 ................................................................................................... 4, 21

22 C.F.R. § 62.13(a)(5) ................................................................................................ 6

22 C.F.R. § 62.2 ........................................................................................................... 4

22 C.F.R. § 62.31 ....................................................................................................... 12

22 C.F.R. § 62.31(a) ..................................................................................................... 5

v

22 C.F.R. § 62.31(d) ........................................................................................................... 5, 11, 15

22 C.F.R. § 62.31(g) ................................................................................................................ 5, 11

22 C.F.R. § 62.31(h) ..................................................................................................................... 5

22 C.F.R. § 62.31(j) ................................................................................................................... 15

22 C.F.R. § 62.31(j)(1) ..................................................................................................... 7, 12, 15

22 C.F.R. § 62.6(c) .................................................................................................................... 13

22 C.F.R. § 62.9 ............................................................................................................... 4, 15, 21

22 C.F.R. §§ 62.13(a)(5) ........................................................................................................... 12

22 C.F.R. §§ 62.31 (e) ................................................................................................................. 5

22 C.F.R. §62.31(m)(3) ............................................................................................................... 7

22 C.F.R. 62.31(e) ....................................................................................................................... 6

22 CFR § 61.10(d)(1) .................................................................................................................. 6

## I.    INTRODUCTION

Cultural Care's motion to dismiss advances many arguments it previously raised to this Court in seeking to enjoin enforcement of Massachusetts state law. *See Cultural Care, Inc. v. Off. of the Att'y Gen. of Massachusetts*, No. 16-CV-11777-IT, 2017 WL 3272011, at *1 (D. Mass. Aug. 1, 2017), *aff'd sub nom. Capron v. Off. of Att'y Gen. of Massachusetts*, 944 F.3d 9 (1st Cir. 2019). The Court rejected Cultural Care's arguments the first time around, and the First Circuit affirmed. *See id.* Although *Capron* addressed the applicability of state law to host families, and Plaintiffs here seek to hold Cultural Care liable, the result should be no different now.

Each of Cultural Care's arguments rests on the premise that Plaintiffs fail to allege any employment-related activity beyond the regulatory obligations the Department of State placed on Cultural Care. But that is not true. On the contrary, Plaintiffs allege that Cultural Care exerted far more control over the employment relationship than the regulations required, by 1) reserving the right to deny employment for *any* reason, as opposed to merely screening applications for the basic regulatory requirements; 2) determining the substance of its training program; 3) outlining specific job duties; 4) retaining the right to terminate au pairs for any reason; and 4) exercising control over wages.

On the specific legal claims, Cultural Care begins with an argument not raised in *Capron*—that it is entitled to derivative sovereign immunity from Plaintiffs' suit. That argument fails for two reasons: first there can be no derivative sovereign immunity from suit under the Fair Labor Standards Act ("FLSA"), since the federal government itself can be sued under the FLSA. And second, there is no derivative sovereign immunity when a private actor exceeds the required governmental actions or violates the law—both of which are true here.

1

Cultural Care then turns to preemption arguments this Court and the First Circuit rejected in *Capron*. Even though this case involves the agency as employer, and not host families, *Capron* still leaves no room for the Court to hold that the state laws at issue are preempted. It would be illogical to hold that Congress intended to occupy the field of an au pair's right to overtime and minimum wage from a *sponsor*, when the First Circuit already held that Congress did not occupy the field of an au pair's right to wages from a *host family*. No authority divides the "field" in that way. Similarly, since the First Circuit already held that State Department regulations do not put a cap on the weekly stipend, there can be no conflict preemption between state law requiring a higher minimum wage and federal regulations requiring compliance with the FLSA (which contains a savings clause permitting state law to be more protective).

Lastly, the Court should reject Cultural Care's argument that Plaintiffs fail to state a claim under state wage and hour or deceptive trade practices laws. Plaintiffs allege that Cultural Care retained more control over the employment relationship than is mandated by federal regulations, and therefore state a claim that Cultural Care acted as their employer. And Plaintiffs are not, as Cultural Care argues, required to outline the specific state consumer statutes under which they hope to recover (although Plaintiffs do so now in this brief), nor must Plaintiffs perform work in each of the states where Cultural Care's deceptive trade practices were felt. For all of these reasons, the Court should deny Cultural Care's motion in its entirety.

## II.   PROCEDURAL HISTORY

On October 15, 2020 Plaintiff Karen Morales filed a collective and class action complaint against Defendant Cultural Care, Inc. ("Cultural Care") for its failure to pay minimum and overtime wages in violation of the FLSA, its violation of relevant stage wage and hours laws, and its violations of consumer protection laws. (ECF No. 1.) On December 24, 2020 Cultural

Care filed its Motion to Dismiss the Complaint. (ECF No. 11.)  On January 14, 2021 Plaintiffs filed their First Amended Class Action Complaint adding Plaintiffs Williana Rocha and Amanda Sarmento Ferreira Guimaraes as class representatives for New Jersey and New York. (ECF No. 23.) On February 19, 2021 Plaintiffs filed their Second Amended Class Action Complaint (Second Amended Comp., ("SAC")) adding Sara Barrientos as a class representative for Illinois. (ECF No. 43.) On March 22, 2021 Cultural Care filed this Motion to Dismiss the Second Amended Complaint ("Motion"). (ECF No. 67.)

## III.    FACTUAL ALLEGATIONS

Cultural Care, a Massachusetts corporation, operates throughout the United States by employing in-home childcare workers who work in the United States on J-1 au pair visas. (SAC ¶¶ 2, 3, 12, 13.) Plaintiffs Karen Morales Posada, Amanda Sarmento Ferreira Guimaraes, Williana Rocha, and Sara Barrientos, along with those similarly situated, ("Plaintiffs") worked as au pairs for Cultural Care in California, New York, New Jersey, and Illinois. (*Id.* ¶¶ 7-10.) Cultural Care employs at least 10% of all J-1 visa au pairs working in these states. (*Id.* ¶13.) Au pairs working for Cultural Care typically worked at least 40 hours per week for 50 weeks per year. (*Id.* ¶14.)  Cultural Care's business model is premised on attracting host families who pay thousands of dollars in fees in exchange for access to the au pairs vetted, selected, and trained by Cultural Care. (*Id.* ¶ 3.) Cultural Care directly profits for each au pair it matches, receiving approximately $9,570.00 in fees[1] from each host family. (*Id.* ¶ 17.) It entices host families to choose Cultural Care as their agency with the promise of cheap childcare—instructing them to

---

[1] The U.S. Department of State's Au Pair Exchange Program Brochure recognizes sponsors' control over the fees they choose to charge, noting the fees "may vary from sponsor to sponsor." (ECF No. 68-4 at 4.)

pay the au pairs a weekly "stipend" of only $195.75. (*Id.* ¶ 17.) In doing so it violates state and federal wage laws. (*Id.* ¶¶ 16-17.)

Pursuant to the Mutual Educational and Cultural Exchange Act of 1961, 22 U.S.C. § 2452(a)(1), the State Department, by regulation, created the Exchange Visitor Program to promote educational and cultural exchanges between the people of the United States and of other nations. 22 C.F.R. § 62.1(a). The State Department does not carry out Exchange Visitor Programs itself, but rather "facilities activities . . . by designating public and private entities to act as sponsors of the Exchange Visitor Program.*"* 22 C.F.R. § 62.1(b). A sponsor is a legal entity designated to "conduct an exchange visitor program." 22 C.F.R. § 62.2. Although the government requires that sponsors conform to certain regulations, "sponsors are responsible for the effective administration of their exchange visitor program(s)." 22 C.F.R. § 62.10. As a sponsor, Cultural Care "must remain in compliance with all local, state, and federal laws, and professional requirements necessary to carry out the activities for which it is designated . . . ." 22 C.F.R. § 62.9. For exchange programs like the au pair program, sponsor agencies must designate Responsible Officers with a "detailed knowledge of federal, state, and local laws pertaining to employment . . . ." 22 C.F.R. § 62.11

As a sponsor Cultural Care "carr[ies] out the day-to-day operation of [its] Au Pair Program[]." (ECF No. 68-4, at 3.) In so doing, Cultural Care's actions regarding the selection, training, job duties, and termination of au pairs go far beyond the minimum obligations required by State Department regulations.

<u>Selection</u>. State Department regulations governing all exchange visitor programs require that sponsors "establish and utilize a method to screen and select prospective exchange visitors to ensure that they are eligible for program participation." 22 C.F.R. § 62.10(a). State Department

regulations specific to au pairs require au pairs meet age, English language, education, physical, personality and background investigation requirements. *See* 22 C.F.R. § 62.31(d). Cultural Care exercises much broader discretion in its selection process—retaining the right to reject an au pair application for *any reason* it deems advisable, not solely for failure to meet State Department eligibility requirements. (SAC ¶ 25.)

Similarly, State Department regulations require that host families are: U.S. Citizens, fluent in English, able to pass a background investigation, able to bear the financial cost, and able to provide a suitable private bedroom. *See* 22 C.F.R. §§ 62.31 (e), (h). Beyond these basic screening requirements, Cultural Care "retains the exclusive right to determine that the host family's environment is not suitable and to terminate the host family from the program." (SAC ¶ 24(c).) Cultural Care further requires the host family inform it of any "change in the composition of the family" despite no regulatory requirement to do so. (*Id.* ¶ 24(c).)

Training.  State Department regulations governing all exchange programs require orientation on life and customs in the U.S., local community resources, and a description of the exchange visitor program. 22 C.F.R. § 62.10(c). The au pair specific regulations require sponsors provide "eight hours of child safety instruction . . . [and] not less than twenty-four hours of child development instruction." 22 C.F.R. § 62.31(g). The regulations do not dictate the specific content of the training; that is left to the sponsor agency's discretion. *See id.* Cultural Care requires its au pairs attend four days of in-person training in Tarrytown, New York. (SAC ¶ 29.) The training is uncompensated. (*Id.* at 30.)

Duties. State Department regulations state that "all au pair participants provide child care services." 22 C.F.R. § 62.31(a). The regulations governing all exchange programs require sponsors "ensure that the activities in which exchange visitors are engaged are consistent with

5

the category and activity listed on their Forms DS–2019." 22 CFR § 61.10(d)(1). The regulations

also impose certain placement restrictions, such not allowing an au pair to be placed with a

family having a child "aged less than three months unless a parent or other responsible adult is

present in the home" or "with a host family having children under the age of two, unless the au

pair has at least 200 hours of documented infant childcare experience." 22 C.F.R. 62.31(e).

Cultural Care implements these restrictions. (SAC 24 ¶ (a).)  But Cultural Care exerts further

control over the working conditions of au pairs and communicates with them regarding the

performance of their job duties. (*Id.* ¶¶ 22, 24.)  Cultural Care permits au pairs to perform "light

housework relating to childcare services" but prohibits them from performing "general

housekeeping or heavy chores." (*Id.* ¶ 24(f).)

    <u>Right to Terminate.</u> State Department regulations contain certain reporting requirements,

but do not give sponsors the right to terminate an au pair. The regulations pertaining to all

exchange visitor programs require sponsors "to promptly report in SEVIS the involuntary

termination of an exchange visitor's program." 22 C.F.R. § 62.13(a)(5).  "[S]uch notification in

SEVIS ends a sponsor's programmatic obligations to the exchange visitor." *Id.* Regulations also

contain certain reporting requirements, including reporting any "unusual or serious situations or

incidents involving either the au pair or host family," any incidents involving a crime of moral

turpitude or violence, and the substance and resolution of any complaints by host families or au

pairs. *Id.* § 62.31 (l), (m).

    Beyond these reporting requirements, Plaintiffs plead that Cultural Care "vests [itself]

with the right to determine, in its sole judgment, if the au pair is unable to perform her duties for

an extended period of time—in which case Cultural Care will send the au pair home and end her

assignment." (SAC ¶ 24(j).)  Plaintiffs further pled that Cultural Care "retains the right to end

any au pair's employment if the au pair engages in conduct that Cultural Care believes is not in the best interest of the program." (*Id.* at 26.) Cultural Care's control over termination therefore extends beyond the mere reporting requirements of the regulations.

The regulations contemplate the need for rematches, requiring sponsors provide "a summation of all situations which resulted in the placement of au pair participant with more than one host family." 22 C.F.R. §62.31(m)(3). However, there is no regulation governing the process for an au pair to rematch with a different host family. Rather, while the "host family and the au pair have options if they are not happy . . . the terms of these options are contractual in nature and may vary from one sponsoring organization to another." (Dkt 68-4, p. 4.) As Plaintiffs pled, Cultural Care "maintains the right to . . . reassign au pairs" and "to mediate disputes between au pairs and host families." (SAC ¶ 24.)

Wages. The regulations require that au pairs are "compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act." 22 C.F.R. § 62.31(j)(1). The regulations do not, however, set a required amount for the stipend, nor do they set an upper limit for the stipend. *See id.* Cultural Care instructs host families to pay au pairs a minimum stipend of $195.75 per week. (SAC ¶ 17.) It also tells au pairs that they will receive a $195.75 weekly stipend. (*Id.* ¶ 23.) As evidence of its discretion regarding the stipend amount, Cultural Care advises host families that there is different pricing in Massachusetts, instructing host families in Massachusetts to pay minimum wage and overtime consistent with Massachusetts' state law. (*Id.* ¶ 20.) Cultural Care's website explains that host families in Massachusetts must pay "the MA minimum wage (12.75/hour in 2020) times the number of hours the au pair is on duty for the week up to 40." (*Id.*) It further explains that host families in Massachusetts must pay overtime premiums, stating "[i]f the au pair works

between 41-45 hours during a week, you must pay time-and-a half for the hours worked over the 40 hours limit." (*Id*.) The undisputed record shows that it was Cultural Care, not the State Department, that instructed host families to pay a weekly stipend of $195.75.

Cultural Care's specific disclosures regarding Massachusetts state law highlight its deceptive trade practices. Cultural Care deceives au pairs and host families by claiming it is legal to pay an au pair $195.75 per week for up to 45 hours of work in New York, California, New Jersey, and Illinois. (SAC ¶ 16.)  Cultural Care's pricing for these states says nothing about the applicability of state law. (*Id.* ¶ 21.) Instead, the website states:

> **Minimum au pair stipend payments**
> This calculation is based on a weekly stipend of at least $195.75[1] paid to your au pair for 51 weeks, including 2 weeks of paid vacation.

(*Id.*) Juxtaposed against Cultural Care's specific instructions about the applicability of Massachusetts state law, *id.* ¶ 20, this instruction deceptively suggests that the state minimum wage laws of New York, California, New Jersey, and Illinois are inapplicable to au pairs.

## IV.   ARGUMENT

### A.  Standard of Review

"In ruling on a motion to dismiss, whether for failure to state a claim or lack of standing, the court must accept the plaintiffs' well-pleaded factual allegations and draw all reasonable inferences in the plaintiffs' favor." *Cultural Care, Inc.*, 2017 WL 3272011, at *1. "To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient facts 'to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

8

544, 570 (2007)). Accepting Plaintiffs' allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the Court should deny Cultural Care's motion in its entirety.[2]

### B. Cultural Care is Not Entitled to Derivative Sovereign Immunity

Cultural Care first argues that it is immune from suit under the theory of derivative sovereign immunity. This theory, which generally applies to claims sounding in tort, provides that a private actor will be immune from liability for its actions "if what was done was within the constitutional power of Congress" and the authority to take those actions was "validly conferred . . . ." *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20 (1940). Derivative sovereign immunity is properly limited to cases where "a contractor 'had no discretion in the design process and completely followed government specifications.'" *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015) (quoting *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008)). "Furthermore, derivative immunity will not preclude recovery for injuries occasioned by violation of state statutes if the entity could have abided by those statutes while implementing the agency's specifications." *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 197 (2d Cir. 2008).

Here, the Court should reject Cultural Care's derivative sovereign immunity arguments for at least two reasons. First, there can be no derivative sovereign immunity where there is no actual sovereign immunity, and the federal government is not immune to FLSA claims. Second, there is no derivate sovereign immunity when a private actor exercises discretion outside the confines of regulatory requirements or violates the law, as Cultural Care did here in controlling Plaintiffs' employment.

---

[2] If the Court believes that Plaintiffs' allegations are deficient in any way, Plaintiffs respectfully request that the Court deny the motion without prejudice and with leave to amend.

>    *i.    Cultural Care is not entitled to derivative sovereign immunity from*
>
>           *Plaintiffs' FLSA claims.*

The theory of derivative sovereign immunity rests on the premise that a private actor carrying out government functions pursuant to contract may cloak itself in the federal government's sovereign immunity. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016), *as revised* (Feb. 9, 2016).[3] But the federal government's sovereign immunity is not absolute. The United States is not immune where "Congress has consented to a cause of action against the United States . . . ." *United States v. Testan*, 424 U.S. 392, 399 (1976).  That is a problem for Cultural Care because Congress *has* consented to suit under the FLSA, which expressly applies to "any individual employed by the Government of the United States . . in any executive agency . . . ." 9 U.S.C. § 203(d)(2)(a)(ii).

Cultural Care does not argue (and case law does not provide) that "derivative" sovereign immunity offers greater protections than the underlying federal immunity would provide. *Cf. Campbell-Ewald*, 577 U.S. at 166 ("The United States and its agencies, it is undisputed, are not subject to the TCPA's prohibitions because no statute lifts their immunity.") Instead, Cultural Care simply states, without authority, that "the State Department would be immune from suit if it administered the Au Pair Program itself . . . ." (Def. Mem., ECF No. 67 pp. 18-19[4].) Not so. Because the FLSA applies to the federal government as an employer, there is no "derivative" sovereign immunity with respect to Plaintiffs' FLSA claims.[5]

---

[3] Because Cultural Care does not allege a contractual relationship with the government, it is unclear that derivative sovereign immunity could ever apply.

[4] For purposes of clarity, the citations to Cultural Care's Memorandum refer to the pagination of the brief, not the ECF page number.

[5] Nor can there be any argument that the State Department's interpretation of the FLSA is entitled to deference, since the FLSA falls under the Department of Labor not the Department of State. Moreover, State Department regulations require that au pairs are "paid in conformance

10

> ### ii.   *Cultural Care is not entitled to derivative sovereign immunity from Plaintiffs' state law claims.*

Cultural Care's plea for derivative sovereign immunity from Plaintiffs' state law claims also fails. In *Campbell-Ewald*, the United States Supreme Court made clear that derivative sovereign immunity, unlike the federal government's immunity, "is not absolute." 577 U.S. at 166. The Court rejected the argument that all "private persons performing Government work acquire the Government's embracive immunity," *id.*, holding that there is no derivative sovereign immunity where a private actor exceeds the authority conferred by the government, or if the private actor "knew or should have known that his conduct violated a right 'clearly established' at the time of the episode in suit." *Id.* at 167-68 (quoting *Filarsky v. Delia*, 566 U.S. 377, 394, (2012) (GINSBURG, J. concurring)); *see also In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) (derivative sovereign immunity does not protect a contractor that takes steps "over and beyond acts required to be performed by it under the contract"). Cultural Care's derivate immunity argument fails for both of these reasons.

First, Plaintiffs allege that Cultural Care's employment actions extend beyond those required by State Department regulations. For example, the applicable regulations require screening to ensure au pairs meet the minimum qualifications of the program, but Cultural Care retains the right to reject any au pair application for *any reason* it deems advisable. *Compare* 22 C.F.R. § 62.31(d) *with* SAC ¶ 25. Similarly, State Department regulations require training, but leave it to sponsor agencies to determine the content of that training. *See* 22 C.F.R. § 62.31(g) (defining the length, but not specific content, of training). The regulations require that au pairs

---

with the requirements of the Fair Labor Standards Act as ***interpreted and implemented by the United States Department of Labor***." 22 C.F.R. § 62.31(j) (emphasis added).

perform childcare services, but leave it to sponsor agencies to determine the specific scope of those duties. *See* 22 C.F.R. § 62.31. Cultural Care, for its part, determined that au pairs may perform light housecleaning related to childcare, but may not perform general housework. (SAC ¶ 24(f).) State Department regulations require reporting about au pair activity, but Cultural Care retains the right to terminate au pairs at its sole discretion. *Compare* 22 C.F.R. §§ 62.13(a)(5), 62.31 (l)-(m) *with* SAC ¶ 24(j). And the regulations require compliance with the FLSA, but Cultural Care determines in which states it will also require payment above the minimum stipend to comply with state minimum wage law. *Compare* 22 C.F.R. § 62.31(j)(1) *with* SAC ¶¶ 17, 20, 21,  23.

Cultural Care finds no refuge in the C*unningham* decision from the Fourth Circuit. It cites *Cunningham* for the proposition that it cannot be held liable because it performed the actions pursuant to governmental authority. *See* Def. Mem. p. 19 (quoting *Cunningham v. Gen. Dynamics Info. Tech., Inc*., 888 F.3d 640, 643 (4th Cir. 2018)). But the court in *Cunningham* simply held that derivative sovereign immunity may attach where the government directs the specific violation at issue. *Cunningham*, 888 F.3d at 649 (finding derivative sovereign immunity applied to contractors' alleged violations of the Telephone Consumer Protection Act where the government provided the contractor with the restricted phone numbers, and the contract required the contractor to call them). *Cunningham* is inapposite here because the State Department did not direct Cultural Care to exert the level of employment control Cultural Care chose to exert, nor did the State Department instruct Cultural Care to set the weekly stipend at $195.75. *See Nwauzor v. GEO Group, Inc.,* No. 17 Civ. 5769, 2020 WL 1689728, at *8-9 (W.D. Wash, April 7, 2020) (in a case alleging claims against a government contractor for failure to comply with Washington State minimum wage law regarding work performed by civil detainees, holding that

12

there was no derivative sovereign immunity because the contractor "has not shown that it was directed by the government to pay participants in the VWP [Voluntary Work Program] only $1 per day"); *see also In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 465 (5th Cir. 2010) (finding no immunity where "the Corps did not 'make' [defendant] use the exact backfill material that was utilized, nor did it 'require' [defendant] select the compaction method that was employed. In the absence of reasonably precise Corps specifications, those decisions were made by [defendant]"); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001) (the government contractor defense applies under the "special circumstances" where "the government has directed a contractor to do the very thing that is the subject of the claim").

"At the pretrial stage of litigation, [the court] construes the record in a light favorable to the party seeking to avoid summary disposition . . . ." *Campbell-Ewald Co.*, 577 U.S. at 168. While Cultural Care argues that Plaintiffs' allegations track State Department regulations, "often word-for-word," a close review of the allegations shows that is not true.[6] Cultural Care is a private, for-profit company with discretion to decide how to administer the au pair program on a day-to-day basis, and its control over au pairs terms and conditions of employment were not "directed by the Government". *Campbell-Ewald Co.*, 577 U.S. at 154 (quoting Y*earsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20 (1940)). Because Plaintiffs allege that Cultural Care exceeded the authority conferred by the government, there is no derivative sovereign immunity. *Id.* at 167.

---

[6] Cultural Care argues "it can do only what the Department has authorized it to do," Def. Mem. p. 5 (citing 22 C.F.R. § 62.6(c)). But Section 62.6(c) does not limit the manner in which sponsor agencies administer the programs for which they are authorized, it merely prevents sponsor agencies from administering programs for which they are *not* authorized: "Designation will confer upon a sponsor the authority to engage in one or more activities specified in § 62.4." *Id.* Section 62.4, in turn, defines "categories of participant eligibility." *Id.* § 62.4.

13

Second, Plaintiffs allege facts sufficient to show that Cultural Care knew or should have known that its actions violated a clearly established right. *Campbell-Ewald*, 577 U.S. at 168. Indeed, Cultural Care warned host families that "the U.S. Court of Appeals for the First Circuit issued [a] decision that host families must comply with Massachusetts labor laws applicable to domestic workers . . . ." (SAC ¶ 19.) Cultural Care further disclosed to host families:

## Paid weekly to your au pair:

Au pairs who live with a host family in Massachusetts are entitled to a weekly payment directly from their host family, that is at least the greater of either:

- The minimum federal stipend of $195.75[1]
- The MA minimum wage ($12.75/hour in 2020) times the number of hours the au pair is on duty for the week up to 40. If the au pair works between 41-45 hours during a week, you must pay time-and-a-half for the hours worked over the 40 hour limit. You may be able to deduct from the weekly pay to your au pair under the MA minimum wage laws for a meal credit of up to $42 per week and/or a lodging credit of up to $35 per week if you determine all state requirements for these credits are met.

(*Id.* ¶ 20.) While Cultural Care's disclosure focused on Massachusetts law, presumably to limit its concessions to the narrowest possible reading of *Capron*, there is no legal basis to distinguish *Capron*'s analysis of Massachusetts law from the analysis that would be applicable to other state laws. Cultural Care knew—or should have known—that au pairs are entitled to the minimum wage of the state in which they work. Under *Campbell-Ewald*, this actual or constructive knowledge eliminates any derivative sovereign immunity that would otherwise attach.

As an alternative basis for derivative sovereign immunity, Cultural Care argues that imposing liability under state wage and hour laws would also open the door to age and national origin discrimination claims. The First Circuit rejected this argument in *Capron*:

> The plaintiffs also point out that, although the au pair regulations require that au pair participants be between the ages of 18 and 26, Massachusetts age

> discrimination laws 'prohibit age discrimination against any person over the age of 40.' *See* 40 Mass. Gen. Laws ch. 149, § 24A. But, the fact that the federal scheme might conflict with, and thus preempt, specific sections of Massachusetts law unrelated to a domestic worker's wage and hour rights provides no support for the assertion that the entire field of state wage and hour laws is preempted . . . .

*Capron*, 944 F.3d at 25 n.9. While *Capron* leaves no room for this argument to be repeated here, the First Circuit's analysis highlights an important factual distinction that cuts to the heart of the derivative sovereign immunity analysis. State Department regulations clearly limit the program to au pairs between the ages of 18 and 26. 22 C.F.R. § 62.31(d). When Cultural Care (or other sponsor agencies) so limit their hiring, they do so at the express direction of the federal government. This is an example of a sponsor agency acting in conformity to express federal requirements.

In contrast, the State Department regulations do *not* limit the weekly stipend to $195.75. *See* 22 C.F.R. § 62.31(j). Department of State literature provides that au pairs are entitled to "a weekly payment . . . tied to the minimum wage," which "will increase if the minimum wage increases . . . ." Exh. D at 4-5. The regulations also require that au pairs "are paid in conformance with the requirements of the Fair Labor Standards Act . . . ." 22 C.F.R. § 62.31(j)(1). In turn, the FLSA expressly provides:

> No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum work week lower than the maximum workweek established under this chapter . . . .

29 U.S.C. § 218(a). And Department of State regulations provide that "[a] sponsor must remain in compliance with all **local, state,** and federal laws, and professional requirements necessary to carry out the activities for which it is designated . . . ." 22 C.F.R. § 62.9 (emphasis added). Because the regulations do not mandate payment of only $195.75, there

is no derivative sovereign immunity from state wage and hour claims.[7] The Court should therefore deny Cultural Care's motion.

### C. The Federal Au Pair Program Regulations Do Not Preempt Plaintiffs' State Law Claims against Cultural Care

This Court is familiar with Cultural Care's preemption arguments, having heard and rejected them previously. *See Cultural Care, Inc.*, 2017 WL 3272011, at *3, *aff'd sub nom. Capron*, 944 F.3d 9. Cultural Care attempts to the distinguish *Capron* because that case involved application of state law to host families, and Plaintiffs here seek to apply state law to Cultural Care as a sponsor agency. But as argued more fully below, this is a distinction without a difference. To date at least four trial or appellate courts have heard and rejected similar preemption arguments advanced by sponsor agencies like Cultural Care. *See Beltran v. InterExchange Inc.,* No. 14-cv-03074-CMA-KMT, 2016 WL 695967 (D. Colo., Feb. 22, 2016), *report and recommendation adopted in part, rejected in part* sub nom. *Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066 (D. Colo. 2016) (finding no preemption); *Betancourt v. Cultural Care, Inc*., Case No. 2081CV0056 (Mass. Sup. Ct., Nov. 16, 2020); *Kudlacz v. Cultural Care, Inc.*, Case No. CGC-20-584567 (Cal. Sup. Ct. Sept. 3, 2020); *Padron v. GreatAuPair, LLC*, Case No. CGC-20-587057 (Cal. Sup. Ct. Feb. 16, 2021).[8] The Court should reject them here as well.[9]

---

[7] *See also infra* § IV.C.iii.

[8] Unreported state court decisions are attached to the Helland Declaration as Exhibit 1.

[9] To the extent Cultural Care relies on the Department of State's Amicus Curiae Brief in *Capron*—either expressly or by repeating arguments expressed therein—the Court should heed the First Circuit's rejection of the same. *See Capron*, 944 F.3d at 40 ("the DOS's explanation . . . fails to warrant a finding of either field or obstacle preemption.")

### i.      *The presumption against preemption applies here.*

Cultural Care boldly asserts that, given the federal nature of the relationship between the State Department and Cultural Care, there should be a "presumption in favor of preemption, not against it." Def. Mem. p. 24. That argument, which the First Circuit has already considered and rejected, relies on a misreading of *Buckman v. Plaintiffs' Legal Committee,* 531 U.S. 341 (2001). *See Capron*, 944 F.3d at 23 (distinguishing *Buckman*); Def. Mem. p. 24 (citing *Buckman*).

In *Buckman* the plaintiffs alleged that a regulatory consultant to the manufacturer of a medical device made fraudulent representations to the Food and Drug Administration ("FDA") in the course of obtaining approval to market the device. 531 U.S. at 346-47. In finding the state law "fraud on the FDA" claims were preempted, the Court emphasized that the claims arose "solely by virtue of the FDCA [Federal Food, Drug, and Cosmetic Act] disclosure requirements." *Id.* at 352. In distinguishing *Buckman*, the First Circuit held that au pairs' claims did not arise from a violation of the State Department regulations, but rather from the violation of independent state wage laws. *See Capron*, 944 F.3d at 23 ("[t]he state employment laws that the plaintiffs seek to preempt . . .  are generally applicable to all domestic workers. Thus, they are not predicated on the existence of the federal au pair exchange program regulations.") Because Cultural Care offers no basis to distinguish *Capron*, the presumption against preemption applies here.

### ii.      *There can be no field preemption as to sponsor agencies because states may regulate host families.*

"In cases of field preemption, 'the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.'" *Cultural Care, Inc.*, 2017 WL 3272011, at *3 (quoting *Arizona v.*

*United States*, 567 U.S. 387, 399 (2012)). Field preemption will exist when the regulatory framework is "'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* Acknowledging the First Circuit's rejection of its field preemption arguments, Cultural Care argues that State Department regulations are so pervasive they leave no room for states to regulate *sponsors*' wage and hour obligations, even while conceding that the regulations permit states to regulate those same obligations for host families.

The Court must reject this novel argument. There is no support in case law for the argument that a "field" may be segmented based on the party actor, as opposed to by the subject matter of the regulation, such that federal regulations leave room for states to regulate a specific activity when it is performed by some actors but not when it is performed by others. That argument is adverse to "the basic premise of field preemption—that States may not enter, in any respect, an area the Federal Government has reserved for itself . . . ." *Arizona*, 567 U.S. at 402. Moreover, the First Circuit in *Capron* rejected the argument that the "detailed and comprehensive" State Department regulations evidenced an intent to occupy the field, concluding that "the 'nature and complexity' of the federal subject matter made the 'detailed statutory scheme . . . likely and appropriate, completely apart from any questions of pre-emptive intent.'" *Capron*, 944 F.3d at 24 (quoting *DeCanas v. Bica*, 424 U.S. 351, 360 (1976)).

Finally, while *Capron* pertained to wage violations by host families, other courts have found that the State Department's regulations do not preempt application of state law to sponsors. *See e.g., Beltran*, 2016 WL 695967, at *14 ("the court finds Defendants' contention that an overall federal scheme and/or federal regulations pre-empt the state minimum wage laws

18

in this country as applied to au pairs has no support under federal law"); *Betancourt*, Case No. 2081CV0056, Slip. Op. p. 9 (rejecting Cultural Care's attempt to distinguish *Capron*'s holding because "the reasoning the court applied in rejected the field preemption argument applies with equal force to Defendants if they are characterized as [p]laintiffs' joint employers"); *Kudlacz*, Case No. CGC-20-584567, Slip. Op. p. 2 (finding Cultural Care failed to meet its burden to show field preemption); *Padron*, Case No. CGC-20-587057, Slip. Op. p. 1 (rejecting sponsor agency Great Au Pair's argument that the au pair program regulations preempt state and local wage and hour laws).

Cultural Care's cases do not hold otherwise. For example, in *Nat'l Fed'n of the Blind v. United Airlines Inc.*, the court held that Department of Transportation regulations "occup[ied] the field of airport kiosk accessibility for the blind with regard to timing as well as substantively . . . ." 813 F.3d 718, 737 (9th Cir. 2016). The court did *not* differentiate between separate actors with respect to the same activity. Likewise, in *Lozano v. City of Hazleton*, 724 F.3d 297 (3d Cir. 2013), the court held that state and local governments could not regulate "alien harboring"—it did not hold that some entities could regulate the activity but others could not.

The First Circuit held in *Capron*: "the plaintiffs have failed to meet their burden to show that the federal government intended to preempt a field that would encompass the state law measures that they challenge." *Capron*, 944 F.3d at 26. While the First Circuit's field preemption analysis did discuss the government's regulation of sponsors (not host families), the Court did not split the "field" between sponsors and host families. Instead, the Court noted that the state laws at issue "do not purport—as the ones at issue in *DeCanas* did—to preclude the foreign nationals affected by them from being employed. They merely establish the wage and hour rights

19

that the foreign nationals affected by the federal regulatory scheme enjoy if they are employed." *Id.* at 25 (internal citation omitted). There is no reason to reach a different result here.

### iii.    *There is no conflict preemption because the regulations do not set a ceiling on wages.*

The First Circuit also rejected Cultural Care's conflict preemption arguments in *Capron*. 944 F.3d at 27. Cultural Care contorts the First Circuit's reasoning by arguing that sponsors cannot be state law employers unless the federal regulations explicitly say so. That argument flips the preemption analysis on its head. The question is not whether the federal regulations "convert" sponsors into employers, the question is whether state laws imposing employer obligations on sponsors would conflict with federal regulations.[10]  The answer to that question—in *Capron* and here—is no. *See Capron*, 944 F.3d at 40 ("[A]as we have noted, by terms, the 'Exchange Visitor Program' regulations address only the obligations that sponsors must meet in order to avoid the sanctions that the DOS may impose on them under the regulations. The regulations do not, by terms, purport to define the obligations of the employers themselves that those whom they employ may enforce against them."). Cultural Care attempts to lower the required showing of a conflict—citing *Boyle* for the proposition that "[t]he conflict with federal policy need not be as sharp" where there are significant federal interests. Def. Mem. p. 26 (citing to *Boyle v. United Techs. Corp*, 487 U.S. 500, 507 (1988)). But as the First Circuit recognized, regardless of the applicability of *Boyle*, Cultural Care "still bear[s] the burden of demonstrating that there is a conflict between the state law measures and the Au Pair Program." *Capron*, 944 F.3d at 28.

---

[10] Conflict preemption exists where compliance with both state and federal law is impossible, or where state law is an obstacle to the accomplishment and execution of the purpose and objectives of the federal law. *Oneok, Inc. v. Learjet, Inc*., 575 U.S. 373, 377 (2015).

Cultural Care does not claim that compliance with state and federal law would be impossible. In fact, far from excusing compliance with state law, federal regulations mandate that "[a] sponsor must remain in compliance with all local, state, and federal laws, and professional requirements necessary to carry out the activities for which it is designated . . . ." 22 C.F.R. § 62.9. Sponsor agencies operating programs with an employment component "must have a detailed knowledge of federal, state, and local laws pertaining to employment . . . ." 22 C.F.R. § 62.11. These and other federal regulations suggest that "the Au Pair Program operates parallel to, rather than in place of, state employment laws that concern wages and hours and that protect domestic workers generally . . . . Thus, the text of au pair exchange program regulations themselves does not supply the affirmative evidence that the state measures at issue will frustrate the federal scheme's objectives that the plaintiffs need to identify if they are to meet their burden to show obstacle preemption." *Capron*, 944 F.3d at 30–31.

Cultural Care also fails to explain how protective state wage laws would pose an obstacle to the Au Pair Program's foreign affairs objective. Congress intended the Au Pair Program to "promote international cooperation" and "assist in the development of friendly, sympathetic, and peaceful relations between the United States and the other countries of the world." 22 U.S.C. § 2451. Cultural Care does not explain how paying au pairs the higher state wage would be an obstacle to creating a "'friendly' and 'cooperative' spirit with other nations." *See Capron*, 944 F.3d at 26.

Cultural Care argues, without citation, that the Department of State took "careful efforts to confine sponsors' obligations." Def. Mem. at 27. But as the First Circuit noted in *Capron*, Cultural Care must support this argument with "affirmative evidence that Congress or the DOS had a ceiling-setting—and thus obstacle-preemption-creating—intent." *Capron*, 944 F.3d at 28

(citing *Arizona*, 567 U.S. at 400). Cultural failed to meets burden here, just as it failed in *Capron*; there, as here, "a finding of the requisite ceiling-setting intent would necessarily rest on the kind of unfounded speculation about the federal government's implicit intentions that may not ground a finding of obstacle preemption." *Id.* Cultural Care's own disclosures regarding the applicability of Massachusetts state law (following *Capron*) undermines any argument that the federal regulations cap the stipend at $195.75. (*See* SAC ¶¶ 19-21.) Cultural Care's decision to advise host families regarding Massachusetts state law, but not the laws of other states, evidences both its ability to impose stipends above the $195.75 minimum and its discretion in when it does so.[11]

Cultural Care selectively quotes the First Circuit's recognition that federal regulations "plainly do not" require that au pairs receive the state minimum wage. *See* Def. Mem. p. 27. But Cultural Care ignores the remainder of the First Circuit's analysis:

> the fact that the regulations do not themselves impose on host families an obligation to comply with state wage and hour laws that the DOS may enforce against them does not supply the needed affirmative evidence that the regulations were intended to preempt the enforcement of such a state law obligation against those families.

*Capron*, 944 F.3d at 32. It is a fundamental feature of our federalist system of government that state laws may apply to private actors without federal law expressly saying so. "[T]he mere fact that a state law implicates the interests of persons who are the subject of federal regulation . . . does not alone provide a basis for inferring that the federal regulatory scheme was intended to preempt a field that encompasses such a state law, at least when it concerns a matter of such quintessentially local concern as employment." *Id.* at 24. And again, there is no "precedent that indicates that a federal program that represents an exercise of the federal power to manage foreign relations—even if only through a program to promote international cultural exchange—

---

[11] In *Capron*, the plaintiffs—including Cultural Care, "concede[d] that [the regulations do] not forbid au pair participants from being paid more." *Capron*, 944 F.3d at 29.

must be presumed, for that reason alone, to preempt a state law that merely implicates that power." *Id.* at 25.

*Capron* was neither the first nor the last decision to reject sponsor agencies' preemption arguments. *See*, *e.g.*, *Beltran.*, 2016 WL 695967, *report and recommendation adopted in part, rejected in part* sub nom. *Beltran*, 176 F. Supp. 3d 1066; *Betancourt*, Case No. 2081CV0056; *Kudlacz*, Case No. CGC-20-584567; *Padron*, Case No. CGC-20-587057. For purposes of this case, however, *Capron* is the most important because it is binding on the Court. Cultural Care advances no principled reasons why the preemption arguments that failed in *Capron* should carry the day here. The Court should deny Cultural Care's motion to dismiss.

### D.  Plaintiffs Have Adequately Pled that Cultural Care is their Employer

Cultural Care offers the cursory argument, with minimal support, that Plaintiffs fail to allege employer status. Cultural Care's motion fails to identify the test for employer status under any of the state or federal laws at issue, relying instead on the single argument that "Plaintiffs allege nothing but compliance by Cultural Care with the legal obligations that the Department imposed upon and delegated to Cultural Care in its role as a designated EVP sponsor." Def. Mem. p. 29. As outlined *supra*, the Court must reject this argument because Plaintiffs allege facts exceeding the mere requirements of government regulations. Trials courts have unanimously rejected motions to dismiss based on this same argument. *See Beltran*, 2016 WL 695967 at *22, *report and recommendation adopted in part, rejected in part* sub nom. *Beltran*, 176 F. Supp. 3d 1066 ("The court is not convinced Defendants' statutory obligations should be inherently excluded from consideration of whether they are joint employers . . . [r]egardless however, Plaintiffs have alleged that in addition to their statutory obligations, Defendants set their wages, draft their employment contracts and have the authority to remove the au pairs from

their host families and terminate their employment, even if the host families do not agree to the same") *Betancourt*, Case No. 2081CV0056, Slip. Op. p. 8 ("Plaintiffs' allegations and Cultural Care's contracts describe a relationship that involves more control by Cultural Care over au pairs than is described in the regulations"); *Kudlacz*, Case No. CGC-20-584567, Slip. Op. p. 2 ("Plaintiff sufficiently alleged that Defendant was an employer. Defendant's attempts to disprove those allegations are improper on demurrer); *Padron*, Case No. CGC-20-587057, Slip. Op. p. 3 (finding plaintiffs allegations that sponsor agency Great Au Pair "recruits, supervises, trains, instructs payments, has the right to terminate, handles disputes and grievances, and decides the terms and conditions of employment for au pairs" sufficient to state Great Au Pair was plaintiffs' employer). The Court should do the same here.

### E.  Plaintiffs Have Adequately Pled Their State Deceptive Trade Practices Claims

Cultural Care attempts to dismiss Plaintiffs' deceptive trade practice claim, SAC ¶¶ 181-85, because it is too "vague" and because the alleged deceptive statements are not deceptive. *See* Def. Mem. pp. 29-30. Both arguments fail.

Cultural Care first argues the claim is deficient because it fails to cite specifically to the state statutes which bar deceptive trade practices. *See* Def. Mem. p. 30. However, this entirely misapprehends the Rule 8 pleading standard. Under Rule 8(a), "a complaint need not pin plaintiff's claim for relief to a precise legal theory." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). Rather, the rule only requires "a plausible 'short and plain' statement of the plaintiff's claim**, *not an exposition of his legal argument***." *Id.* (emphasis added); *see also Johnson v. City of Shelby,* 135 S. Ct. 346, 346 (2014).  Put another way, under Rule 8, a plaintiff is only required to plead facts that, if true, would entitle the plaintiff to relief. "Federal pleading rules . . . do not, however, require that a plaintiff enumerate every statute empowering their cause of action." *Saintcome v.*

*Tully*, 296 F. Supp. 3d 377, 382 (D. Mass. 2017) (citing *Johnson*, 135 S. Ct. at 347); *see also*

*Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) ("Notice pleading requires the plaintiff to set

forth in his complaint claims for relief, not causes of action, statutes or legal theories.").

   Culture Care's citation to *Galvin v. U.S. Bank, N.A.*, 852 F.3d 146, 160 (1st Cir. 2017) for

the proposition that the claim, to be successful, would need to cite specifically to each state's

deceptive trade practices statute misconstrues *Galvin*. The cited portion of *Galvin* merely relies on

*Twombly*.[12] And the Supreme Court is clear that *Twombly* requires pleading plausible ***facts,*** not

***legal theories***:

> Our decisions in *Bell Atlantic Corp. v. Twombly* . . . and *Ashcroft v. Iqbal* . . . are
> not in point, for they concern the factual allegations a complaint must contain to
> survive a motion to dismiss. A plaintiff, they instruct, must plead facts sufficient to
> show that her claim has substantive plausibility. Petitioners' complaint was not
> deficient in that regard. ***Petitioners stated simply, concisely, and directly events***
> ***that, they alleged, entitled them to damages from the city. Having informed the***
> ***city of the factual basis for their complaint, they were required to do no more to***
> ***stave off threshold dismissal for want of an adequate statement of their claim.***

*Johnson*, 135 S. Ct. at 347 (emphasis in original).

   Plaintiffs' complaint easily meets this standard. Plaintiffs include detailed allegations

describing how Cultural Care deceives au pairs and host families by claiming it is legal to pay an

au pair $195.75 per week for 45 hours of work in states with state laws that in fact require paying

significantly more. *See* SAC ¶¶ 14-22. Then, though not required, the Au Pairs include a separate

"Deceptive Trade Practice" count which summarizes the alleged deception, *id.* ¶¶ 182-83, and

---

[12] *Galvin* cites and includes a parenthetical quote from *Freeman v. Town of Hudson*, 714 F.3d 29,
35 (1st Cir. 2013) and *Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1, 7 (1st Cir. 2011). Both
*Freeman* and *Ocasio–Hernández* are relying on *Twombly* for the proposition that to survive a
Rule 12(b)(6) motion to dismiss, a complaint must include "give the defendant fair notice of
what the . . . claim is and the grounds upon which it rests . . . ." *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 555, (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

specifically states that the deception violates "the consumer protection laws of the states where they provided au pair services. Specifically, New York, Illinois, New Jersey, Connecticut, and Washington," *id.* ¶ 181. Rule 8 does not require the Au Pairs to then cite the specific statute in each state that bars deceptive trade practices. But they are happy to here. *See* N.Y. Gen. Bus. Law §§ 349(a), 350-a(1) ; 815 Ill. Comp. Stat. Ann. § 505/2; N.J. Stat. Ann. § 56:8-2; Conn. Gen. Stat.§ 42-110b(a); Wash. Rev. Code § 19.86.020.

Cultural Care's only other argument is that the J-1 visa regulations require it to inform au pairs about federal wage requirements and not state wage requirements. Thus, according to Cultural Care, the alleged deceptive trade practice was in fact just compliance with the law. *See* Def. Mem. p. 30. As an initial matter, the premise of this argument is simply untrue. Nothing in the State Department notices cited and provided by Cultural Care require it to notify au pairs of anything, let alone that the federal minimum wages mentioned are the only applicable minimum wages. *See* ECF Nos.. 68-2, 68-3. Cultural Care's decision to emphasize the lower federal minimum on its website while ignoring higher state wage requirements was thus its own to make. It was not dictated by federal law.

Moreover, Cultural Care's argument is belied by its own website which, presumably because of *Capron*, ably describes Massachusetts' state wage and hour laws, but informs au pairs and host families that $195.75 per week is sufficient in all other states. *Compare* SAC ¶ 19 (screen shot of website for Massachusetts wages) *with* SAC ¶ 20 (screenshot of website for wages in all other states). If the J-1 visa regulations are so constraining with respect to accurately describing state wage requirements, why is Cultural Care able to articulate federal *and* state wage requirements for Massachusetts? And while J-1 Visa regulations may not "oblige sponsors . . . to require that au pair participants receive the minimum wage that a state would require that

they be paid," that is not a license to affirmatively deceive au pairs and host families regarding

state wage requirements. *See Capron*, 944 F.3d at 32; Def. Mem. p. 30 (citing and quoting same).

Indeed, those same regulations require sponsors to provide au pairs with:

> ***employment information and terms and conditions of employment*** (including
> employer name and address, position duration, job duties, ***number of work hours,***
> ***wages, other compensation and benefits, deductions from wages,*** including those
> taken for housing and transportation) …

and

> clear information and materials …that will assist exchange visitors to prepare for
> their stay in the United States (e.g., … ***employee rights laws*** …).

22 C.F.R. § 62.10(b) (emphasis added) (outlining J-1 visa sponsors' responsibilities "for the

effective administration of their exchange visitor program(s)").

Finally, Cultural Care implies that it is inappropriate for the named Plaintiffs—who

worked in New York, New Jersey, and Illinois—to represent class members for state law

deceptive trade practices claims in other states, specifically, Connecticut and Washington. *See*

Def. Mem. p. 30 (emphasizing that the claim includes "two states in which Plaintiffs were never

even placed with host families"). However, the First Circuit has already found that named

plaintiffs from one state can have standing to bring class claims for absent class members in

other states under the laws of those other states. *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 51

(1st Cir. 2018) ("Our conclusion is in line with our prior precedent, in which we required only

that a plaintiff make a single purchase in order to satisfy standing for a claim brought under

multiple state laws."). Plaintiffs' deceptive trade practices act claims, as alleged in the Second

Amended Complaint, therefore appropriately include class members in other states asserting

claims under other state laws.

27

## V.    CONCLUSION

For these reasons, the Court should deny Cultural Care's motion in its entirety.


Dated: April 12, 2021

By: s/Matthew C. Helland

DAVID H. SELIGMAN
ALEXANDER N. HOOD
TOWARDS JUSTICE
PO Box 371680
PMB 44465
Denver, Colorado 80237-5680
Ph: (720) 441-2236
David@TowardsJustice.org

PETER RUKIN*
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 290
Oakland, CA 94612

MATTHEW C. HELLAND*
NICHOLS KASTER, LLP
235 Montgomery Street, Suite 810
San Francisco, CA 94104

H. CLARA COLEMAN*
NICHOLS KASTER, PLLP
4700 IDS Center, 80 S. 8th St.
Minneapolis, MN 55402

Attorneys for Plaintiffs
*Admitted pro hac vice

28

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on April 12, 2021, a true and correct copy of the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notice to all attorneys of record.

<u>s/Matthew C. Helland</u>
Matthew C. Helland