UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KAREN MORALES POSADA, | * | |
| AMANDA SARMENTO FERREIRA | * | |
| GUIMARAES, WILLIANA ROCHA, | * | |
| and SARA BARRIENTOS, | * | |
| individually and on behalf of all | * | |
| others similarly situated, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. 1:20-cv-11862-IT |
| | * | |
| CULTURAL CARE, INC., a | * | |
| Massachusetts Corporation, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER

August 13, 2021

TALWANI, D.J.

Plaintiffs Karen Morales Posada, Amanda Sarmento Ferreira Guimaraes, Williana Rocha, and Sara Barrientos are foreign nationals who participated as *au pairs* in the federal *au pair* program (under the J-1 Exchange Visitor Visa Program). Sec. Amend. Compl. ("SAC") ¶¶ 7-10 [#43]. Defendant Cultural Care, Inc. ("Cultural Care") sponsored Plaintiffs, coordinated their immigration process, and placed them with a host family. Id. at ¶¶ 3-4, 31, 50, 60, 71, 84. Plaintiffs allege that Cultural Care, through its failure to adequately pay them and to provide certain disclosures, has violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., and New York, California, New Jersey, and Illinois minimum wage, overtime and wage statement laws. Plaintiffs also allege that Cultural Care has engaged in deceptive trade practices.

Their complaint includes fourteen separate counts. Counts 1-11 allege, as Rule 23 class actions, violations of California, New York, New Jersey, and Illinois minimum wage, overtime,

and wage statement laws. SAC ¶¶ 123-47 (counts 1-4), 84 (class definition counts 1-3), 148-63 (counts 5-7), 91 (class definition counts 5-7), 164-71 (counts 8-9), 98 (class definition counts 8-9), 172-82 (counts 10-11), 105 (class definition counts 10-11). Counts 12-13 allege, as a collective action on behalf of the named plaintiffs and any similarly situated individuals in the three years prior to filing this suit, violations of the FLSA for failure to pay minimum wages and failure to pay overtime. Id. at ¶¶ 183-212 (counts), 120 (collective action class definition). Finally, Count 14 alleges, as a Rule 23 class action on behalf of the named plaintiffs and all individuals who were sponsored by Cultural Care and worked as *au pairs* in the states of New York, Illinois, New Jersey, Connecticut, and Washington during "any portion of the period commencing during the applicable statute of limitations prior to the filing of this action through the entry of final judgment in this action," that Cultural Care engaged in deceptive trade practices in violation of the consumer protection laws of aforementioned states. Id. at ¶¶ 213-17 (count), 112 (class definition).

Pending before the court is Cultural Care's Motion to Dismiss [#66] for lack of subject matter jurisdiction and for failure to state a claim.[1] Cultural Care argues that it is entitled to derivative sovereign immunity (asserted via Rule 12(b)(1) of the Federal Rules of Civil Procedure), that the wage and employment laws allegedly violated are preempted by federal regulations (asserted via Rule 12(b)(6)), and that Plaintiffs failed to allege facts establishing either that Cultural Care "employs" *au pairs* or that Cultural Care engaged in any deceptive practices (both also asserted via Rule 12(b)(6)). Def's Mem. 2-3 [#67].

---

[1] Plaintiffs' Motion to Certify a Collective Action [#98] and Cultural Care's Motion to Strike Pre-Certification Consents [#114] are also pending and will be addressed in a separate order.

For the following reasons, the Motion to Dismiss [#66] DENIED as to Counts 1 through 13 and GRANTED IN PART and DENIED IN PART as to Count 14.

## I.      Background

### A.      *Overview of Federal Statutes and Regulations*

The *au pair* program is a part of the J-1 Exchange Visitor Program through which foreign nationals can come live and study in the United States. 22 C.F.R. § 62 *et seq*. (general program regulations); id. at § 62.31 (*au pair* program specific regulations). To be eligible to receive a J-1 visa, a person must be:

> an alien having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill, or other person of similar description, who is coming temporarily to the United States as a participant in a program . . . for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training . . . .

8 U.S.C. § 1101(a)(15)(J). The *au pair* program is open to foreign nationals between the ages of 18 and 26 and allows such individuals to reside in the United States with an American host family for up to two years, where they provide childcare services and complete coursework at a local college or university. 22 C.F.R. § 62.31(a), (c)(1), (d), (o).

Exchange Visitor Program Sponsors are "legal entit[ies] designated by the Secretary of State to conduct an exchange visitor program." Id. at § 62.2. Organizations must apply to the Department of State (the "State Department") to become sponsors. Id. at § 62.5. If an applicant meets "all the statutory and regulatory requirements," the State Department may grant designation via a letter specifying what activities the applicant may undertake. Id. at § 62.6(a), (c). Designation can last up to two years, id. at § 62.6(b), 62.7(d), and sponsors can apply for redesignation in advance of the expiration. Id. at 62.7. Sponsors are responsible for choosing, in

accordance with the regulatory eligibility rules, who participates in the *au pair* program. Id. at 62.4. Sponsors also have certain financial, insurance, and reporting obligations. Id. at § 62.8-15.

Sponsors designated by the Department of State to conduct an *au pair* exchange program have additional responsibilities, including limiting the *au pair's* initial participation to one year; requiring the *au pair* to register for and attend educational programs; and maintaining a record of monthly (or more frequent) contacts with each *au pair* and host family. 22 C.F.R. § 62.31(c).

The *au pair* specific regulations also require sponsors to provide the *au pair* and the host family documentation about: the *au pair* program rules, a participant's host family and the surrounding community, the participant's educational institution, travel arrangements, and the State Department's "written statement and brochure" about the program. Id. at 62.31(f), (i).[2] Sponsors must also select and screen host families in accordance with State Department criteria. Id. at § 62.31(e), (h). And there are specific *au pair* program monitoring and reporting obligations. Id. at 62.31(c)(5)-(9), (l), (m).

---

[2] Cultural Care asks the court to take judicial notice of what it claims is a copy of the State Department brochure. Courts can take judicial notice of information from an official government website that is "not subject to reasonable dispute." Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (citing Denius v. Dunlap, 330 F.3d 919, 926-27 (7th Cir. 2003)) (taking judicial notice of information on the CDC website). The brochure, filed as an exhibit to Cultural Care's motion, appears on a webpage with a government domain (https://j1.state.gov) and thus seems to be from a government website. Def's Mem. 9 [#67]. The webpage only contains the brochure, so it is not possible to confirm that the brochure is current. Plaintiffs, however, also cite to the brochure in their memorandum opposing the motion to dismiss, Pl.'s Mem. 3 n.1 [#78], so it appears they do not contest the authenticity of the document. It is therefore appropriate for the court to take judicial notice. See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) ("Ordinarily . . . consideration of documents not attached to the complaint . . . is forbidden, unless the proceeding is properly converted into one for summary judgment . . . . However, courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties . . . .") (citation omitted); O'Hara v. Diageo-Guinness, USA, Inc., 306 F. Supp. 3d 441, 457 (D. Mass. 2018), on reconsideration, 370 F. Supp. 3d 204 (D. Mass. 2019).

Of particular relevance here, the regulations address *au pair* wages and hours in a few places. First, *au pair* sponsors are specifically charged with limiting the number of hours per day and per week that the *au pair* participant is obligated to provide child care services. Id. at 62.31(c). The sponsor may not place an *au pair* with a host family unless the family signs a written agreement limiting the obligation to provide child care services for the *au pair* to ten hours per day and forty-five hours per week. Id. at 62.31(e)(5). Sponsors also must require that *au pair* participants "[a]re compensated at a weekly rate based upon forty-five hours of child care services per week and paid in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor." Id. at 62.31(j)(1). The regulations make the aforementioned hourly limitations binding on  sponsors and require that *au pairs* receive at least one and a half days off each week, one full weekend off each month, and two weeks of paid vacation. Id. at § 62.31(j)(2)-(4). In 2009, when the federal minimum wage increased to its current rate, see 29 U.S.C. § 206(a)(1)(C), the State Department issued a notice indicating that in its view a weekly stipend of $195.75 complies with the federal minimum wage rate of $7.25/hour based on crediting room and board as 40% of an *au pair*'s compensation.[3]

---

[3] Cultural Care asks the court to take judicial notice of two documents, Wolkoff Decl. Exs. B, C [#68], that Cultural Care claims are notices issued in 2007 and 2009 by the State Department in which the department calculated the minimum weekly stipend payments owed to *au pair*s under the federal minimum wage. Def's Mem. 12 [#67]. Plaintiffs reference the notices in their memorandum opposing the motion to dismiss and do not contest their authenticity. Pl.'s Mem. 26 [#78]. The court therefore finds it appropriate to take judicial notice of both documents. See Watterson, 987 F.2d at 3.

B.   *Factual Allegations*

As alleged in the Second Amended Complaint [#43] and the incorporated documents, the

facts are as follows.

According to the State Department, each year approximately 3,100 *au pairs* work in

California, 2,500 *au pairs* work in New York, 1,700 *au pairs* work in New Jersey, and 1,100 *au*

*pairs* work in Illinois, and Cultural Care, a sponsor under the federal program, sponsors the visas

for at least 10% of these *au pairs*. Id. at ¶ 13. *Au pairs* sponsored by Cultural Care typically work

at least forty hours per week and fifty weeks per year. Id. at ¶ 14. Cultural Care instructs host

families to pay a weekly stipend of at least $195.75. Id. at ¶¶ 17, 21, 23. Cultural Care advertises

the annual cost to a host family for an *au pair* as $19,553.25, comprised of $9,570 in fees to

Cultural Care and $9,983.25 in payment to *au pairs*. Id. at ¶ 17. Cultural Care has distinct

instructions for Massachusetts host families, who are told the following:

> **Paid weekly to your au pair:**
>
> Au pairs who live with a host family in Massachusetts are entitled to a weekly
> payment directly from their host family, that is at least the greater of either:
>
> - The minimum federal stipend of $195.75[1]
> - The MA minimum wage ($12.75/hour in 2020) times the number of hours the
>   au pair is on duty for the week up to 40. If the au pair works between 41-45
>   hours during a week, you must pay time-and-a-half for the hours worked over
>   the 40 hour limit. You may be able to deduce from the weekly pay to your au
>   pair under the MA minimum wage laws for a meal credit of up to $42 per week
>   and/or a lodging credit of up to $35 per week if you determine all state
>   requirements for these credits are met.

Id. at ¶ 20 (content of footnote omitted in the original). Cultural Care does not have unique

payment instructions for host families in any other state, stating instead that the minimum *au*

*pair* stipend calculation "is based on a weekly stipend of at least $195.75[1] paid to your au pair

for 51 weeks, including 2 weeks of paid vacation." Id. at ¶ 21 (content of footnote omitted in the

original). Cultural Care provides the Massachusetts  instructions because, "[o]n December 2, 2019, the U.S. Court of Appeals for the First Circuit issued its decision that host families must comply with Massachusetts labor laws applicable to domestic workers, including the Massachusetts Domestic Workers' Bill of Rights." Id. at ¶ 19.

Cultural Care communicates with *au pairs* regarding their maximum work hours, the performance of their job duties, and other terms and conditions of their employment. Id. at ¶ 24. It also retains the right to terminate an *au pair*'s assignment to a host family (upon a finding, to be made exclusively by Cultural Care, that an *au pair* has been unable to perform his or her duties for an extended period of time), to reassign an *au pair*, to determine that a host family's home is unsuitable, to terminate a host family's participation in the program, and to mediate disputes between *au pairs* and host families. Id. at ¶ 24.

Cultural Care specifically requires: (1) that if the host family has an infant less than three months old in the home, a parent or other responsible adult shall be present at all times, and a parent or responsible adult shall stay in the home for the first three days of an *au pair*'s assignment; (2) that the *au pair*'s schedule be limited to 45 hours per week, with a maximum of 10 hours per day and no more than 5.5 days per week of work, and failure to comply will result in Cultural Care terminating the host family from the program; (3) that the host family notify Cultural Care immediately if there is a change in the composition of the family and if there are any incidents involving law enforcement; (4) that any adults residing in the host family's home be screened by Cultural Care; (5) that the *au pair* perform only childcare services and light housework relating to childcare services (host families may not ask *au pairs* to do general housekeeping or heavy chores); (6) that the host family provide automobile insurance for *au pairs* who drive; (7) that the *au pair* contact Cultural Care if the family wishes to take the *au pair*

out of the country on vacation; and (8) that the host family notify Cultural Care if the *au pair* needs medical attention. Id. at ¶ 24.

Cultural Care also retains the right to reject any *au pair* application for any reason it deems advisable and to end an *au pair*'s placement if the *au pair* engages in conduct that Cultural Care believes is not in the best interest of the program. Id. at ¶¶ 25-26. Cultural Care does not provide wage statements to *au pairs* with information about pay, deductions, and withholdings. Id. at ¶ 18. Cultural Care also does not retain records of hours worked, breaks taken, or the specific value of room and board provided for Plaintiffs and other *au pairs*. Id. at ¶ 27. Cultural Care does keep records of meetings between *au pairs* and their regional points of contact and documents regarding immigration and visa status. Id. at ¶ 28. Cultural Care requires all *au pairs* it places to attend four days of training prior to their placement. Id. at ¶ 29. The training is uncompensated, and until recently took place in Tarrytown, New York. Id. at ¶¶ 29, 30.

Plaintiff Karen Morales Posada ("Morales Posada") has been an *au pair* since January 2019. Id. at ¶ 7. She worked in New York from January 2019 until December 2019, and since January 7, 2020, she has been working in San Francisco, California. Id. Morales Posada attended three days of training in New York conducted by Cultural Care upon her arrival in the United States. Id. at ¶ 33. For roughly her first six months Morales Posada was paid $200 per week for every week worked and usually worked about 8.5 hours per day, five days a week (42.5 hours per week). Id. at ¶¶ 34-35. In one of those six months she worked two hours on the weekend on top of her usual 42.5 hours during the week. Id. at ¶¶ 35-36. For the second six months Morales Posada was also paid $200 per work week along with $50 for transportation. Id. at ¶ 39. During this period, she usually worked about eleven hours per day on Monday, Wednesday, and Friday

and 8.5 hours a day on Tuesday and Thursday (fifty hours total). Id. at ¶ 40. From January 2020

through the start of the COVID-19 pandemic in March 2020, Morales Posada worked about forty

hours per week. Id. at ¶ 45. From the start of the pandemic through the filing of the complaint,

except for June 2020 when Morales Posada worked fewer hours while her host family's children

attended camp, on "many days she worked 10 hours straight with no breaks." Id. at ¶¶ 45-46. She

did receive "marginally more" payment during this period. Id. at ¶ 45. During this period she

worked roughly forty-nine hours per week. Id. Cultural Care has not maintained any time records

for her work, nor has Cultural Care provided any pay statements. Id. at ¶¶ 48-49.

      Plaintiff Amanda Sarmento Ferreira Guimaraes ("Guimaraes") has been an *au pair* since

September 2018, working in Utah from September 2018 through October 2018, and then in New

York since October 2018. Id. at ¶ 8. Guimaraes attended "three or four" days of training in New

York conducted by Cultural Care. Id. at ¶ 53. She has been paid $200 per week for every week

worked since starting as an *au pair*. Id. at ¶ 54. From about September 2018 to September 2019,

Guimaraes worked about nine hours per day, five days a week (forty-five hours). Id. at ¶ 55.

From about September 2019 to November 2020, she worked about 6.5 hours a day, five days a

week (32.5 hours). Id. at ¶ 56. From about November 2020 through the filing of the complaint

here, she worked about nine hours a day, five days a week (forty-five hours). Id. at ¶ 57. She has

never received any pay statements. Id. at ¶ 59.

      Plaintiff Williana Rocha ("Rocha") has worked as an *au pair* in New Jersey since January

2020. Id. at ¶ 9. Rocha participated in three to four days of training in New York conducted by

Cultural Care. Id. at ¶ 62. She was initially paid $195.75 for every week worked. Id. at ¶ 64.

After about nine months, the weekly amount was rounded to $200 and from January 1, 2020,

through filing the complaint she received $250 per week. Id. at ¶ 64. From January 2020 through

March 2020 (i.e. the onset of the pandemic), she usually worked about seven hours per day, five days a week (thirty-five hours). Id. at ¶ 65. From the start of the pandemic through filing the complaint here she worked 8.5 hours per day, five days a week (forty-two hours). Id. at ¶ 66. Cultural Care has not kept time records regarding Rocha's work, and she has not received any pay statements from Cultural Care. Id. at ¶ 69.

Plaintiff Sara Barrientos ("Barrientos") has been an *au pair* in Illinois since August 2018. Id. at ¶ 10. Barrientos attended a "several day" training conducted in New York by Cultural Care. Id. at ¶ 71. From August 2018 through April 2020, setting aside a two-week period at the beginning of the month, she was paid $200 per week for every week worked. Id. at ¶¶ 72, 74. She usually worked about ten hours per day, five days a week (fifty hours). Id. at ¶ 75. She "occasionally" worked a few hours on the weekend for which she "might" have been paid an extra $10 per hour. Id. at ¶ 77. From April 2020 to through June 2020, she was paid $200 for every week worked and usually worked six hours per day, five days a week (thirty hours). Id. at ¶ 80. Cultural Care has not kept time records regarding Barrientos's work, and she has not received any pay statements from Cultural Care. Id. at ¶¶ 82-83.

Morales Posada, Rocha, Guimaraes and Barrienots had their J-1 visa—which allows each to work as an *au pair*—sponsored by Cultural Care. Id. at ¶¶ 7-10.

## II.      Standard of Review

### A.      *12(b)(1) Standard*

Rule 12(b)(1) is the "proper vehicle for challenging a court's subject-matter jurisdiction . . . ." Valentin v. Hospital Bella Vista, 254 F.3d 358, 362 (1st Cir. 2001). Federal courts are courts of limited jurisdiction, so federal jurisdiction is never presumed. Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998). The party asserting jurisdiction has the burden of

demonstrating the existence of federal jurisdiction. Id. A court should treat all well-pleaded facts as true and provide the plaintiff the benefit of all reasonable inferences. Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009). Dismissal is appropriate only when the facts alleged in the complaint, taken as true, do not support a finding of federal subject matter jurisdiction. Id. A challenge to the court's subject matter jurisdiction must be addressed before addressing the merits of a case. See Acosta-Ramirez v. Banco Popular de P.R., 712 F.3d 14, 18 (1st Cir. 2013) ("Federal courts are obliged to resolve questions pertaining to subject-matter jurisdiction before addressing the merits of a case").

    B.    *12(b)(6) Standard*

    In evaluating a motion to dismiss, this court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Twombly, 550 U.S. at 555 (citations omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). In ruling on a motion to dismiss, "a judge can mull over 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'" Lydon v. Local 103, Int'l Brotherhood of Elec. Workers, 770 F.3d 48, 53 (1st Cir. 2014) (quoting Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008)) (alteration in original).

### III.    Discussion

    A.    *Derivative Sovereign Immunity*

Cultural Care argues, under Rule 12(b)(1), that the court lacks subject matter jurisdiction over all fourteen counts alleged in Plaintiffs' complaint because Cultural Care is entitled to derivative sovereign immunity. Def's Mem. 18-22 [#67]. Yearsley v. W.A. Ross Const. Co., 309 U.S. 18 (1940), is the wellhead for derivative sovereign immunity doctrine. The plaintiff in the case was a landowner whose property had been damaged by flooding that occurred as a result of a private construction contractor's work, and the Court held that the contractor was protected from suit by sovereign immunity because it had been hired by the federal government. Id. at 20-21. Yearsley and its progeny dictate that to receive this kind of protection a private party must be performing exactly as expressly directed by the government. See Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 166-68 (2016); Cunningham v. Gen. Dynamics Info. Tech., Inc., 888 F.3d 640, 646-48 (4th Cir. 2018).

Unlike the parties that successfully invoked derivative sovereign immunity in Yearsley and Cunningham, Cultural Care was not hired by the government to perform certain tasks; it voluntarily decided to apply to be a sponsor organization and operate an *au pair* program, and a condition of doing that was complying with the applicable regulations. Cultural Care is thus more akin to a company operating in a heavily regulated industry, like a bank, than a contractor hired by the government to perform a specific task. Cf. City of Worcester v. HCA Management Co., Inc., 753 F.Supp. 31, 37–38 (D. Mass. 1990) ("The Supreme Court has long held that, pursuant to sovereign immunity, a private company which contracts with the federal government to perform the duties of the government will not be held liable for its actions on behalf of the government." (emphasis added)).

Cultural Care repeatedly emphasizes that it exists only because of, and subject to, the comprehensive commands of the federal government. The regulations, however, make clear that sponsors may be entities that have been operating for some time in other lines of business: there are regulations specifically addressing the financial information required from established entities applying to become sponsors. 22 C.F.R. § 62.5(c)(3)(i). True, the concept of an exchange visitor program "sponsor" is a creation of federal regulations, but this is not uncommon. For example, the concept of an "authorized dispenser" is created by federal regulations governing prescription drug distribution. See 21 C.F.R. § 209.2. And the fact that sponsors must run *au pair* programs in accordance with exhaustive and detailed regulations is much like the situation of a federally chartered bank. See 12 C.F.R. § 5.20. Cultural Care's arguments amount to saying that it operates in a heavily regulated area and therefore should have derivative sovereign immunity, a principle that is far broader than the court can accept. Accordingly, Cultural Care is not entitled to derivative sovereign immunity.[4]

B.    *Preemption*

Cultural Care argues, under Rule 12(b)(6), Plaintiffs' state law class action claims— Counts 1-11 and 14—are preempted by federal law and regulations via field preemption and conflict preemption. Def's Mem. 22-28 [#67]. In an earlier action, Cultural Care asked the court

---

[4] Cultural Care's claim of derivative sovereign immunity as to the FLSA claims fails for the additional reason that the FLSA waives sovereign immunity by permitting suits against public agencies. 29 U.S.C. § 216(b) (applying the FLSA's penalties to provision to any "employer"), § 203(d) (defining "employer" to include public agencies). Cultural Care says that because *au pairs* are not employed by the State Department it cannot be sued under this provision. Def's Reply Mem. 1-2 [#86]. But Cultural Care's argument for derivative sovereign immunity is premised on the idea that it is standing in the shoes of the government by acting as a sponsor organization. Def's Mem. 18. [#67]. It cannot then argue that it is not standing in the shoes of the government where the government has waived sovereign immunity.

to determine that Massachusetts wage and hour laws were preempted and could not be enforced against Cultural Care or its host families. Capron v. Off. of Att'y Gen. of Massachusetts, 944 F.3d 9, 13 (1st Cir. 2019). In that case, Cultural Care did not develop its argument as to sponsors, however, and focused instead on host families. Id. at 20 n.5. The First Circuit held that state wage regulations are not preempted as applied to host families, id. at 43-44, but left open the separate question of whether state wage laws were preempted as applied to sponsor organizations as not properly before it and premature. Id. at 20 n.5. Cultural Care's preemption arguments here now seek to have this question addressed.

### 1. Field Preemption

In cases of field preemption, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." Arizona v. United States, 567 U.S. 387, 399 (2012). "[W]hether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme." Hillsborough Cnty. v. Automated Med. Lab'ys., Inc., 471 U.S. 707, 714 (1985). Even when no conflict exists between state and federal law, "[t]he intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" Arizona, 567 U.S. at 399 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). This is determined by considering the totality of the circumstances. Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc., 507 U.S. 218, 224 (1993). Federal regulations—as opposed to statutes—can have preemptive effect when they are within the

promulgating agency's delegated authority. See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153-54 (1982)

Cultural Care points out that unlike host families, sponsors have extensive reporting, insurance, *au pair* selection, *au pair* monitoring, and host family selection obligations. See 22 C.F.R. § 62.31. But nothing in those regulations suggest an intent to displace state wage and hour laws.

The *au pair* program's circuitous history supports this conclusion. In 1986 the U.S. Information Agency ("USIA") piloted the program under the Fulbright-Hays Act, Pub. L. No. 87-256 § 102, 75 Stat. 527 (1961) (codified at 22 U.S.C. § 2452). Capron, 944 F.3d at 15. The pilot ended after two years due to the USIA's misgivings about the statutory legitimacy of the program, but Congress then passed "special legislation" to authorize the program on a temporary basis. Id. The GAO, at Congress's behest, then issued a report concluding that the program was not authorized by the Fulbright-Hays Act, id. at 15-16, but Congress authorized the program on a temporary basis in targeted legislation that did not provide much elaboration. Cultural Care, Inc. v. Off. of Att'y Gen. of Massachusetts, No. 16-CV-11777-IT, 2017 WL 3272011, at *4 (D. Mass. Aug. 1, 2017). Eventually, in 1997 Congress removed the temporary nature of the authorization, but the Act that did so is cursory and simply removes the time limit on the authorization. Id. at *5 (citing Act of Oct. 1., 1997, Pub. L. No. 105-48, 111 Stat. 1165 (1997)).

This history certainly offers no indication of preemptive intent; it does not suggest anything more than a very limited intent that the program continue to operate. And while regulations can have preemptive effect, the agency must be acting within its statutory authority if promulgating preemptive regulations. See de la Cuesta, 458 U.S. at 154. The court finds nothing

in the extremely limited statutory history here that would give the current administrator of the *au pair* program, the State Department, the authority to preempt state wage regulation.

Even setting that aside, the First Circuit's comprehensive analysis of the specific *au pair* program regulations reveals no intent by the State Department—or its precursor the USIA—to displace state wage regulation in any context, <u>see</u> <u>Capron</u>, 944 F.3d at 29-44, and Cultural Care has introduced no new evidence of agency preemptive intent that the First Circuit did not consider. Although the *au pair* program arguably touches on the peculiarly federal arena of foreign affairs, the First Circuit has observed that ensuring *au pairs* are adequately paid probably does not jeopardize any significant foreign affairs objectives. <u>Id.</u> at 26. Put another way, the federal government has a strong interest in seeing that the *au pair* program is run according to its specifications, but there is nothing to suggest that interest is adverse to requiring sponsors to be jointly liable with host families for ensuring *au pairs* are paid in accordance with state minimum wage laws.

Cultural Care briefly argues that preemption is particularly appropriate where state law is invoked "in an area there has been a history of significant federal presence." Def's Mem. 23 [#67] (quoting <u>United States v. Locke</u>, 529 U.S. 89, 108 (2000)). The *au pair* program has only been authorized on a permanent basis since 1997. <u>See</u> <u>Cultural Care</u>, 2017 WL 3272011, at *5. That is hardly history of a significant presence, and employment is usually regarded a matter of "quintessentially local concern." <u>Capron</u>, 944 F.3d at 24.

   2. Conflict Preemption

Conflict preemption may occur "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" <u>Arizona</u>, 567 U.S. at 399 (quoting <u>Hines v. Davidowitz</u>, 312 U.S. 52, 67 (1941)). In passing on a conflict

preemption claim, the court may not engage in a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," because "such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.'" Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 607 (2011) (quoting Gade v. Nat'l Solid Wastes Mgm't Ass'n, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment). "[A] high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." Id. (quoting Gade, 505 U.S. at 110).

"Conflict preemption is particularly difficult to show when 'the most that can be said about the state law is that the direction in which state law pushes behavior is in general tension with broad or abstract goals that may be attributed to . . . federal laws.'" Fitzgerald v. Harris, 549 F.3d 46, 53 (1st Cir. 2008) (quoting L.H. Tribe American Constitutional Law § 6-26, at 487 (2d ed.1988)). Nevertheless, "[a] direct, facial contradiction between state and federal law is not necessary to catalyze an 'actual[ ]conflict' within the doctrinal parameters of the Supremacy Clause . . . ." KKW Enters., Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp., 184 F.3d 42, 49 (1st Cir. 1999) (quoting Securities Indus. Assoc. v. Connolly, 883 F.2d 1114, 1118 (1st Cir. 1989)).

Cultural Care's conflict preemption argument is premised on there being significant federal interests. Def's Mem. 26-28 [#67]. As noted above, there is no history of a significant federal presence, and the First Circuit has rejected the idea that applying state wage laws to *au pairs* impedes the government's foreign affairs interests. Capron, 944 F.3d at 26. The rest of Cultural Care's argument focuses heavily on the idea that complying with fifty different state wage laws would be expensive and burdensome for sponsors. Def's Mem. 27 [#67]. Complying with state wage laws would no doubt impose new, and perhaps significant, costs on Cultural

Care. "But . . . possible increased costs do not stand as an obstacle sufficient to meet the high threshold required for conflict preemption." Cultural Care, 2017 WL 3272011, at *8. And there is no inconsistency with the federal regulations that require compliance with the FLSA given that the FLSA sets a floor for wages. 29 U.S.C. § 218(a); Capron, 944 F.3d at 34 (noting the "expressly floor-setting" nature of the FLSA).

The only actual conflict Cultural Care identifies is that state employment laws generally prohibit age and national origin discrimination while the *au pair* regulations require selection based on those characteristics. Def's Mem. 28 [#67]. But the First Circuit has already rejected that exact argument, id. at 25 n.9, and there is no reason to believe that the logic does not apply equally in the context of sponsor organizations. Cultural Care's preemption argument, as to both field and conflict preemption, fails.

C.      *Whether Cultural Care "Employs" Au Pairs*

Cultural Care next argues, under Rule 12(b)(6), that Plaintiffs did not adequately allege that Cultural Care "employs" *au pairs* because merely following federal regulations—as Cultural Care argues is the full extent of its role and the full extent of Plaintiffs' allegations—does not make it an employer. Def's Mem. 28-29 [#67]. Though there is some support for the idea that merely following regulations does not make an organization an employer, the principle is not applicable here given the extent of Cultural Care's alleged activities.

A comparison to Cultural Care's two supporting citations bears this out. The more recent case, Ivanov v. Sunset Pools Mgmt. Inc., involved plaintiffs who came to the United States to work as lifeguards and subsequently sued both the lifeguard company they worked for and the recruiting agency they worked with to arrange their immigration paperwork and initial travel arrangements. 567 F. Supp. 2d 189, 190-91 (D.D.C. 2008). The court found the recruiting agency

was not liable as an employer because it was essentially implementing regulations, but the agency exercised much less control than Cultural Care does over the employees. First, the agency exercised no discretion in determining where to place to the plaintiffs; it was the lifeguard company that "interviewed and hired" the plaintiffs. Id. at 196. Cultural Care, in comparison, allegedly retains full discretion of whether to end an *au pair*'s placement, SAC ¶ 24(j), whether to end an *au pair*'s participation in the program entirely, id. at ¶ 26, and whether to permit their participation in the first place. Id. at ¶ 25. And the full discretion Cultural Care allegedly exercises in these areas goes beyond the explicit requirements of the relevant regulations. See 22 C.F.R. § 62.4, 62.10(a). The plaintiffs in Ivanov also paid the recruiting agency, 567 F.Supp.2d at 196, but here Cultural Care allegedly receives payment from the host family in exchange for the placement—and arguably services—of an *au pair*.

The other citation is from California state court and is cited for the proposition that "where the method of performing a task is dictated by . . . regulations imposed by the government, the principal is not exercising the manner and means of control as an employer." Sw. Research Inst. v. Unemployment. Ins. Appeals Bd., 81 Cal. App. 4th 705, 709 (2000). But as noted above Cultural Care does exercise authority beyond those required by federal regulations. In addition to the distinctions noted above, sponsors must ensure that host families are U.S. citizens, are fluent in English, have passed background checks, and have enough financial resources to be hosts. 22 C.F.R. § 62.31(j). But Plaintiffs allege that Cultural Care retains the exclusive right to determine—for reasons not necessarily dictated by these regulatory stipulations—that a host family isn't suitable and to remove the family from the program. SAC ¶ 24(c) [#43]. Sponsors must have local regional counselors that report "unusual or serious situations or incidents involving either the *au pair* or the host family." 22 C.F.R. § 62.31(1)(3).

Yet Cultural Care requires host family to notify Cultural Care if an *au pair* needs medical attention, a category that is not co-extensive with "serious situations or incidents." And finally, Cultural Care retains discretion on what to instruct host families to pay *au pairs*, though it is limited at the lower end by required compliance with the FLSA. 22 C.F.R. § 62.31(j)(1). Cultural Care's policies, as alleged by Plaintiffs, are clearly designed to enforce the government's regulations, but they are also broader than is strictly required by the regulations.

The court's finding is in line with the conclusions of other courts that have examined this issue. A California state court has rejected Cultural Care's challenge to its employer status under California wage law. Kudlacz v. Cultural Care, Inc., Case No. CGC-20-584567, Slip. Op. p. 3. (Cal. Sup. Ct. Sept. 3, 2020) Helland Decl. Ex. 1 at 12-13 [#78-2]. A magistrate judge from the District of Colorado also rejected a challenge to Cultural Care's status as an employer of *au pairs* at the motion to dismiss stage. Beltran v. Interexchange, Inc, No. 14-CV-03074-CMA-KMT, 2016 WL 695967, at *10 (D. Colo. Feb. 22, 2016), report and recommendation adopted in part, rejected in part, 176 F. Supp. 3d 1066 (D. Colo. 2016). And the Beltran court considered Ivanov in detail and arrived at the same answer as this court, emphasizing Cultural Care's ability to end an *au pair*'s assignment and the defendant's lack of ability to fire the plaintiffs in Ivanov. Id. at 9-10. There is no good reason to break from this trend.

D.   *Deceptive Practices Claim*

Cultural Care argues, under Rule 12(b)(6), that Count 14, the deceptive practices claims, should be dismissed because Plaintiffs failed to include the specific consumer protection laws that Cultural Care allegedly violated. Def's Mem. 29-30 [#67]. But it is not necessary to cite the specific provision allegedly violated. Skinner v. Switzer, 562 U.S. 521, 530 (2011); Johnson v. City of Shelby, 135 S. Ct. 346, 346 (2014); Saintcome v. Tully, 296 F. Supp. 3d 377, 382 (D.

Mass. 2017). Cultural Care's citation to the contrary is once again distinguishable, as the plaintiffs in that case, Galvin v. U.S. Bank, N.A., 852 F.3d 146, 160 (1st Cir. 2017), merely claimed a violation of a contractual provision prohibiting violating "applicable law"; this is of course noticeably less specific than the claims asserted here.

Cultural Care also complains that Plaintiffs asserted violations of Washington and Connecticut consumer protection law but none of the named plaintiffs worked in those states. Plaintiffs do not dispute that they did not work in those states, but argue that it is not necessary to have a named plaintiff in each jurisdiction whose laws were allegedly violated, relying on In re Asacol Antitrust Litig., 907 F.3d 42, 49-50 (1st Cir. 2018). Asacol does not establish such a broad principle. The case was an antitrust class action brought under the antitrust laws of twenty-five states and the District of Columbia. Id. at 46. The plaintiffs used state antitrust laws because they were suing a drug manufacturer but had purchased the relevant drug from intermediaries; federal antitrust laws bar such actions, but all twenty-six states had laws allowing such actions. Id. The plaintiffs noted that all "twenty-six jurisdictions . . . generally interpret[ed] state law restraints on anticompetitive activity consistently with federal courts' interpretation of federal antitrust law." Id.

The First Circuit rejected the defendant's Article III standing challenge to the inclusion of unnamed plaintiffs who made purchases outside the states where the named plaintiffs made purchases. Id. at 47-51. This superficially supports Plaintiffs' argument, but the plaintiffs in Asocal argued—and the court agreed—that the state laws were "parallel" to each other. Id. at 49. The court rejected the standing challenge because it was convinced the named plaintiffs would adequately protect the interests of unnamed plaintiffs, and it was convinced because of the parallelism of the state laws. Id. at 49-50. Plaintiffs here made no such allegation of parallelism

in their complaint, nor did they allege that any *au pairs* sponsored by Cultural Care were placed in Connecticut or Washington. Legal theories need not be fully fleshed out in complaints, see Skinner, 562 U.S. at 530, but the allegations here are insufficient to allow the named Plaintiffs to bring the claims on their own behalf under Connecticut or Washington consumer protection law or to establish standing for unnamed plaintiffs from Connecticut and Washington for claims under those state laws.

## IV.    Conclusion

For the forgoing reasons: Cultural Care's Motion to Dismiss [#66] is DENIED as to Counts 1 through 13, GRANTED regarding the Connecticut and Washington elements of Count 14, and DENIED as to the rest of Count 14.

IT IS SO ORDERED.

August 13, 2021                                    /s/ Indira Talwani_____
                                                   United States District Judge