# EXHIBIT E

# Chapter 8.

# LAW of CONTRACTS

**Eugen BUCHER**

## I. General remarks on the Swiss law of obligations

### A. Historical background and influence abroad

The actual text of the Swiss Federal Code of Obligations (CO) relating to contracts and tort was adopted on March 30, 1911, then presented as a supplementary part of the Civil Code (Zivilgesetzbuch, voted December 10, 1907), both entered in force as per January 1, 1912. Its text is to a large extent based on its predecessor, the ancient CO as adopted in 1881 and in force since January 1, 1883 (here "aCO"). This text is worth being mentioned not only because it is in some details preferable to the actual  version but because its creation preceded that of the German Civil Code (Bürgerliches Gesetzbuch, BGB) by almost two decades and necessarily -influenced the latter. The characteristics of the CO recommend it as an example, representing the best of 19th century Civil Law tradition but being less complicated and more straightforward than the German code, which alone by its being focused on the artificial notion of "Rechtsgeschäft" is not easy to be absorbed by lawyers of non-German background. Therefore the influence demonstrated by the CO is remarkable in the Spanish speaking area and in the Far East. Whilst the Japanese Codification of 1898 in most respects follows the German BGB, the influence of the Swiss CO is clearly predominant in the traditional Chinese Code (actually at least in force in Taiwan, Book II), the Code of the Republic of South Korea (Part III) and the Code of Thailand (Book II). In addition it may be mentioned that in 1926 under Kemal Atatürk Turkey adopted the Swiss Civil Code including the CO without major modifications[1].

The contract law of the CO is, as in all areas of the continental Civil Law, based mainly on the tradition of Roman Law. The CO in particular is influenced mostly by the German "doctrine of the Pandects" of the 19th century, therefore the BGB is the next of kin to the Swiss CO. The Romanist basis is still of importance for the handling of the CO not only for full understanding of the intentions of the legislator at the time of its creation, but also as a basis for future modernization and improvement of the CO which in some respect represents Roman Law oversimplified by the 19th century literature: A look into the texts of ancient Rome (the Corpus Iuris of Iustinian) or the Romanist texts of the years 1200 to 1800 can provide considerable inspiration for the solutions to come.

---

[1]   See in this context E.Bucher, The position of the Civil Law of Turkey in Western Civilisation, in <www.eugenbucher.ch> no. 72, or in "Annales de la Faculté de Droit d'Istanbul", XXXII/49 (2000), p.7-23.

**Nr. 62**              Swiss Law — Law of Contracts          { 103—123 }

### B. Evolutions to be expected in the future

Whilst in Germany a reform of the BGB is under discussion since 1980, the Swiss legislator considers a reform of the law of tort (see the following ch.9) but is not inclined to touch the text of the contract-related dispositions, which are in most respects still perfectly satisfactory but nevertheless would in some aspects deserve an updating. The following aspects should be kept in mind:

-   Consumer's protection is a subject as it is popular and promoted by EU-legislation, requested by the Federal Constitution (Art. 97) but neglected or systematically avoided by the legislator. First a step allowing judicial control of General Conditions (*Allgemeine Geschäftsbedingungen*) is needed. Based on the experiences made abroad the undersigned is inclined to prefer a general clause allowing judges in unacceptable cases to disregard the pre-made text of the parties' agreement to a detailed codification, the precision of which would exist more in appearance than in fact.

-   In a broader context also the abolition of the rule *periculum est emptoris* (the risk passes from the seller to the buyer with the conclusion of the contract, not with the transfer of the sold object; Art. 185/I CO) may be considered as being part of consumers' protection (see below fn.40 and 41 and the relating text). Said rule exists not in its presentation but in the practical effect in the majority of the legal systems influenced by the French Civil Code, and the lawyers accustomed to it like the resulting legal complications. In all other systems (and in all of the German speaking areas) this rule was never adopted, and in Switzerland the view of it being outdated prevails more and more.

### C. Basic elements of contracts

The law of contract is to a large extent the same worldwide. Certainly the rules governing contracts in the English-speaking countries differ considerably from those of the Civil Law countries. Amongst the latter, when there are divergences, they are often more in appearance or theory than in the practical effects of the solutions. The similarities between Swiss and German contract law are extensive (below II). Both German and Swiss legislation have their roots in the Roman Law tradition of the 19th Century; in addition, both are influenced by the French Civil Code ("Code Napoléon" of 1804), the Swiss Code showing this influence more clearly.

The notion of contract in Switzerland is a broad concept embracing situations perhaps elsewhere not considered contracts. Not only is donation not a unilateral declaration of the donor but a bilateral act (contract) between the donor and the donee (Art. 239 CO); the assignment of choices in action presupposes an agreement between the assignor and the assignee (Art. 164), the transfer of movable property requires the mutual intention of the parties to transfer property (and, in addition, the physical transfer of the goods, Art. 714 CC) and the remission of a debt the consent of the debtor (Art. 115). These acts, transferring or annulling a right under the categories of Swiss    (or   German)   law,   are   qualified   a   special   kind   of   contract

*(Verfügungsgeschäft/acte de disposition;* as far as real property is concerned: *dinglicher Vertrag/contract réel;* see also E below).

The possibility of private individuals to cause legal effects to others ("autonomy of the parties") *(Privatautonomie/autonomie privée)* is restricted to contracts in the sense of bilateral acts; unilateral acts have legal consequences only insofar as a specific legal basis to that effect exists. Examples of unilateral acts are wills ruling the succession of the testator (Art. 467 CC) or termination of a contract by giving notice (but only as far as the law or contractual provisions provide a legal basis). There is nothing like the assumption of obligations by unilateral declaration of the obligated party (though the law relating to negotiable instruments provides examples of obligations created by unilateral acts).

### D. Principle of freedom of contract

Swiss law upholds to the maximum the principle of freedom of contract as developed in the seventeenth and eighteenth centuries. The main aspects are:

1. Freedom to conclude or not to conclude a contract and freedom of choice of the partner.

There is no obligation to enter a contract unless a special legal provision prescribes the formation of a contract (as may be the case for public transportation and other public services or in the context of antitrust law).

2. Freedom to establish the content of the contractual provisions.

Either party may at free discretion establish the conditions of the contract. This refers not only to the possibility of the parties determining their mutual obligations but also to the consequences of non-performance (*e.g.* conditions and effects of breach, etc.). Furthermore, the freedom as granted under Swiss law means that some types of contracts, perhaps excluded or restricted in other systems, are admissible even without explicit legal basis. For example:

- the agreement terminating a previously concluded contract or altering the terms thereof (Art. 115);
- the contract creating an obligation for one or both of the parties to conclude a contract in the future *(Vorvertrag/précontrat, promesse de contracter*; Art.22);
- the contract for the benefit of a third party (Art.112);
- the contract substituting a party to a contract by another party (below X D).

3. Freedom to depart from the types of contract as presented in the special part of the Code of Obligations (below XIV A).

### E. Contracts as basis for obligations: No Translative Effect

Contracts create legal obligations and claims of the parties but do not by themselves actuate the transfer of rights, if such a transfer is the object of the obligation (this is true in other systems where contracts for the transfer of goods bear the fulfillment, *i.e.*

the transfer of property, in the act of their conclusion; see e.g. the French Civil Code[2]). In Switzerland (as under German law) the contract of sale does not transfer property (as an "agreement to sell" does not) but obliges the seller to effect this transfer at a later stage by another act involving the same parties (which may again be qualified as a contract; see above I C). The same is true for contracts such as one obliging the creation of a pledge.

## II. System of the legislation; comparison with foreign law

**Contract law as described here is contained in the CO[3], Arts.1-529.[4] These provisions are divided into two parts: General Part (Arts.1-183) and Special types of contracts (Arts.184-551). The division into general and special contract rules reflects the different historical background of the two sets of legal rules:**

- the general rules regulating formation and termination of contract, avoidance of contract, sanctions in the case of non-performance and transfer of contractual rights (see below III-VII, X) are based on the legal theory of the seventeenth and eighteenth centuries and the philosophy of the Enlightenment;
- the special rules (referring to the contract of sale, donation, etc. (see XIV below) follow the Roman law tradition and deal with problems specific to the legal relationship under particular circumstances. In addition, the dependence on Roman Law is shown in Restitution (Arts. 62-67), extralegal quasi-contractual obligations and Compensation (see VIII, IX, XI).

   The historical basis of Swiss contract law is identical with that of the German Civil Code (Bürgerliches Gesetzbuch of 1896-1900)[5]. The Swiss Code of Obligations dates back to 1883; a reform of the Code at the time of the enactment of the Civil Code in 1911 introduced changes of minor importance, many of them inspired by the German Code. According to the identity of the background of German and Swiss legislation and given the fact that the original Code of Obligations influenced the German Code and subsequently the latter the Swiss Code in its actual form, contract

---

[2]     The model of the French Civil Code of 1804 may be compared with the effect of a sale transferring title; see CC Art. 711, 938, 1138 and 1583. The main reason for the adoption of this system is to provide a modern vest to the old Roman rule *periculum est emptoris* (the risk is with the buyer, who must pay the price even if the object of the contract perishes before its delivery); see E.Bucher in Zeitschr.für Europ.Privatrecht (ZEuP) 1998 p. 615-669. This concept was adopted by the majority of codifications influenced by the French CC, i.e. those of Romanic languages.

[3]     An trilingual version (English, Spanish and French) of the Text of the CO was published by Georg Wettstein, Zürich 1928 (Art.1-551) and 1939 (Art.552-1182).

[4]     No consideration can be given to contract law as contained in special legislation (such as insurance contracts). For partnerships see Chapter 10, I, D.

[5]     An English version of the BGB was published by Ian S. Forrerster/Simon L. Goren/Hans-Michael Ilgen, Amsterdam/Oxford 1975. Previous versions by Chung Hui Wang (1907) or the Philadelphia Law Ass./ Walter Loewy.

law in Switzerland and in Germany is to a large extent congruent, if not in its presentation, at least in its practical solutions. The German Code differs from the Swiss Code of Obligations in terms of system and abstraction. For example, it begins with a General Part giving rules not referring to "contracts in general" but to an abstract notion of legal act *(Rechtsgeschäft /acte juridique).* The Swiss approach is more practical and vivid in its presentation and certainly easier to understand for a lawyer of the English-speaking world than the text of the German Code.

The relative congruency of Swiss and German contract law means practically that a substantial part of German legal literature as well as court decisions are helpful to the understanding of Swiss law, and this to a much larger extent than in any other branch of Swiss law.

### III. Formation of contracts in general

#### A. *Survey of the positive prerequisites of validity*

The elements necessary for the formation of a contract are to a large extent identical with those familiar in the Common Law system; however, certain elements of the Common Law contracts do not exist in Switzerland (letter C).

The main requirement of valid contractual relationship is the consent of the parties, their *consensus ad idem*. The problem of formation of consensus is seen on the Continent in the same way as in the Common Law countries, under the principle of "offer and acceptance" (below IV).

In order to distinguish from non-binding rules of conduct such as gentlemen's agreements, agreements forming a binding contract require that the parties express - even tacitly - the intention to bind themselves.

Other elements may be mentioned such as the requirement of the capacity of the persons concluding the contract (as a general rule all persons of the age of 18 years or more; CC Art.14) and the fact that a contract only exists as from the moment parties have not only agreed on the terms of their contract but mutually expressed the intention to enter into it and to be contractually bound.

#### B. *Form-requirements*

As a general rule, the formation of a contract does not presuppose formalities of any kind. With a few specific exceptions, contracts may be concluded orally or even without any verbal expression of assent, for instance, by actions implying *viz.* showing the intention to enter into a contract (Art. 1).

This is not only true on the basis of substantive law but also in procedure. Contrary to the tradition of the Statute of Frauds and to the system of the French Civil Code (see Arts. 1341 *et seq.*) every contract, regardless of the amount involved, may be proved in court by all means receivable in evidence, especially by witnesses. Cantonal

legislation, generally competent to regulate procedure before cantonal courts, is not allowed to require written evidence for the proof of contracts (see Art.10 Swiss CC).

The main exceptions to this rule of absence of formal requirements are:

- an assignment requires a written document, signed by the assignor and delivered to the assignee (Art. 165 I). This refers to assignment as the act transferring the right *(Verfügungsgeschäft;* see above I E and below III B); the contract creating an obligation to assign/transfer is not subject to said form-requirements;

- the contract for the sale of land, contracts to transfer interest in land, and preliminary contracts for the sale of land require a notarial deed (Art. 216);

- an executory contract of donation (or promise of donation) requires a written contract signed by the donor (Arts. 243 I and 13);

- the contract of suretyship (guarantee) is submitted to an elaborate system of formal requirements (CO Arts. 493-494);

- If a formal requirement as established by legislation has not been realized, the contract, at the level of substantive law, is void (*i.e.* evidence of the oral conclusion of the contract by the party entering obligation could not validate it; see Art.11 II). However in the context of sale of land this rule in its effect is partly excluded: according to court practice a sale contract not indicating the price really paid by the purchaser and mentioning a fictitious figure instead is void, but if executed (price paid, transfer of property entered in the register) either party is 'estopped' by the rule of CC Art.2 ("misuse of a right") to claim restitution.

### C. No Requirement of Consideration

The doctrine of consideration of the Common Law countries (as well as the concept of 'cause' of French law) are not familiar to Swiss contract law. This has the following practical consequences:

- a party may informally enter a purely unilateral contractual obligation. He or she may, without consideration, validly remit debts, extent the time limit for performance or agree to any change of contractual conditions favoring the other party exclusively;

- the absence of consideration does not constitute a ground for special formal requirements corresponding to those existing for deeds;

- unilateral contractual obligations are binding even in the absence of an explicit agreement with respect to the ground of the assumption of said obligation, *i.e.* letting unanswered the question whether the contractual obligation (to pay) is entered into for consideration (the possibility – somewhat controversial – of an 'abstract' obligation, *i.e.* one not being explicitly related to the commercial basis of the transaction; someone may be obliged to a contractual payment only because he expressed the intention to enter an obligation to pay, Art.17);

- offers to enter a contract may be binding (below IV).

On the other hand, some legal consequences which are often attached to the concept of consideration are realized with similar effect but under different presentation:

- The rule of 'privity of contract' ("consideration must move from the promisee") is unquestioned; a party foreign to a contract may not be obliged by it. As a difference, less important as to the practical outcome, but influencing the historical evolution, may be mentioned the development of the possibility of the assignment (below VIII) and third party beneficiary contracts which in Swiss law were never impeded by the 'privity argument' as in the Common Law countries;
- Legality of contract ("consideration must be legal") is an obvious requirement which is under Swiss (and German) law not understood as a positive, but as a negative condition (below D 2).

## D. Negative elements making a contract void

### 1. Impossibility

Impossibility under Article 20 CO follows the old rule of *impossibilium nulla obligatio*, stating that a contract is void which subsequently appears to be impossible at all times to be executed and was so at the time of the conclusion of the contract.[6] A party entering into an agreement knowing that its performance will not be possible may be liable under the rule *culpa in contrahendo* (below IX D).

### 2. Illegality

Illegality is another ground for nullity of a contract under Art. 20; the same rule applies to contracts with immoral content (against *boni mores).* Cases of application of said rules are comparatively rare (contracts for the sale of illegal drugs or of obscene publications; contracts implying an element of bribery).

In modern practice there is growing a importance of contracts disapproved of by law under the aspect that the binding effect is too burdensome for one of the parties involved. Examples are excessive contractual prohibition of competition, agreements in restraint of trade[7] or the contractual exclusion to dissolve a partnership by giving notice.[8] Traditionally in the above situations such contracts were null; more recently, however, a voidability concept, allowing the party excessively bound to seek relief by way of exception, is gaining ground. The problem is rather one of application of Article 27 of the Civil Code on the protection of the personality (Ch. 4) than of Article 20 CO.

## IV.   Formation of contract (consensus; offer and acceptance)

The constituent element of a contract is the consent of the parties to it. Their agreement may be extensive, including details of the duties of the contracting parties or

---

[6] For the consequences of subsequent impossibility, *i.e.* impossibility occurring after the conclusion of the contract, see below VI D.

[7] In the context of a contract of employment the special provisions of Art. 340 are applicable.

[8] BGE 106 II 230.

**Nr. 62**              Swiss Law — Law of Contracts          { 103—123 }

consequences of hypothetical situations, or it may be limited, *i.e.* covering only the most basic points and leaving open all secondary questions. Validity of the contract is reached by a consensus covering a minimum only. This minimum is define by the doctrine of the special types of contract (see below XIV).

Beside the rule that contracts are created by mutual assent of the parties the formula exists as a worldwide commonplace that contracts are formed by an offer and its acceptance. Although obviously correct in a restricted meaning, it becomes nonsense if read as: the coming into existence of a valid contract requires a (valid) offer and its (valid) acceptance. If the consent of the parties at a given moment is unquestioned, the validity of a contract as a consequence of the impossibility to recognize or evidence the exchange of offer and/or acceptance can never be doubted. Both with respect to the transactions of minimal importance as e.g. such concluded at newsstands and to voluminous contracts being the result of lengthy negotiations in multimillion dollar deals, the formula of formation by offer and acceptance is meaningless. Both conceptions only applies (and are indispensable) exclusively in the situation where partners enter into a contract by subsequent declarations (mostly agreements between absent).

An offer is deemed to be a declaration of the intention to be bound under a contract with the content as specified, under condition of acceptance by the addressee. It has to include all the necessary elements of the intended contract, so that the addressee of the offer may only say 'yes' or 'agreed'.

Contrary to the Anglo-American system and in accordance with the other Civil Law countries, under Swiss law an offer, though oral, may be binding. The intention of being bound by the offer – contrary to the French tradition and others – is presumed. If the offeror does not express his intention to reserve his right to revoke the offer (Art. 7 I), it cannot be withdrawn. Nevertheless, some circumstances may show that a party does not intend to be bound. The sending out of price-lists, for example, is deemed to be not an offer but an invitation to make one (Art.7 III).

The duration of the binding effect may be fixed by the offeror at his free discretion. If no time limit has been fixed, an offer is open for a reasonable period of time, allowing the transmission of the acceptance under normal circumstances after a short time of reflection. An offer made *viva voce* to a present partner or by phone has no binding effect if the offeror does not expressly declare his or her intention to be bound for a certain period.

The acceptance must be entirely consistent with the offer; a modification of conditions of the original offer is not an acceptance but is deemed to constitute a counter-offer.

Under certain circumstances explicit acceptance is not required; in such cases the addressee of the offer is bound to the contract (Art.6) if he does not expressly reject the offer. This applies to contracts which are exclusively beneficial to like donations to the donee or assignments to the assignee. Existing commercial relationship between the parties may also create a presumption of acceptance therefore requiring an explicit rejection if the party receiving the offer is not prepared to accept it.

Under the provisions of Arts. 8 and 9 an offer to the public in general is possible (*Preisausschreiben und Auslobung/promesse publique – Public promise/Reward*).

The obligation of the offering person is not created by an explicit acceptance of the other party but by the performance required by the promise declared to the persons possibly interested.

## V. Conclusion of contracts by representatives

The rules governing the conclusion of a contract by other than the parties to it, but by an intermediary acting for one of them (agency, representation) follow one of two concepts, the first being predominant in non-commercial circumstances (below A, the other ruling in commerce (below B) and being valid for legal entities as corporations and for partnerships (dealt with below chapter 10). The two models have different sources and background: Whilst the non-commercial representation was developed by the doctrine as taught at the Universities, the other model is a creation (previous to the other) by the circles of commerce.

### A.  Non-commercial representation  (CO Art. 32-40)

Swiss civil law fully admits the possibility of concluding contracts by an agent. Notwithstanding a Roman Law tradition reluctant to admit representation, under the influence of ideas of the Enlightenment the scholars increasingly admitted this institution, and all modern codifications accept it. A contract concluded  by a person in the name of another is valid, if the latter has authorized the acting person to do so. A subsequent ratification of the conclusion of the contract equals a preliminary authorization.

In order to contrast it with the other model it must be emphasized that an only apparent and not real authorization is of no effect. The contract is not valid even if the other party had reasons to believe that the acting third person was duly authorized. In noncommercial transactions an 'agency by appearance' can only be admitted under special circumstances, i.e. if the represented person himself has created said appearance or tolerated others creating it.

In the absence of a preliminary authorization or subsequent ratification the contract is void and the person wrongly alleging to be authorized is liable in damages to the other contracting party (Art. 39). The amount of damages is generally restricted to the "negative interest", i.e. the amount of useless costs caused by negotiating and entering the void contract, but not comprising "positive interest", i.e. missed profits to be expected from the non existing contract. A claim in the amount of "positive interest" may exceptionally be granted in case of fault of the non-authorized representative.

The power of representation given to the agent may be revoked at any moment, and an obligation not to retract authorization would not be valid (Art. 34, 34 II). The same applies in principle in the commercial context. But third parties not duly informed of the revocation are, as long as in good faith, not concerned by the revocation.

### B.  Commercial representation (OR 458-465, and special provisions)

The model of representation in commerce has its origin in the late middle-ages in northern Italy, where the institution of *procura* was created: the *alter ego* of the principal in another town being authorized to conclude all contracts entering into the range of businesses of the principal. This historical background shows clearly the justification of the representing effect. It is not (as in the voluntaristic model above see A above) the intention of the principal to conclude a contract of a given nature, but his being prepared to be bound by the contracts of whatever content concluded by his *procurator*.

The traditional model of Procura (*fondé de procuration / agent with power of procuration*) is laid down in Art. 458-461. The range of allowed representation is defined by the legal text and is not open to modifications. All contracts entering in that area are valid whilst the approval by the principal of the content of the contracts as concluded is immaterial. The only restrictions allowed are the prerequisite of the consent of one or even more other persons (i.e. their concurring signature) and a geographical limitation to local branches of the business (Art. 460).

As a general rule the Procura is established by inscription in the register of commerce. But contrary to the non-commercial rules (above lit. A) a Procura may come into existence not only without inscription in the register, but also without an explicit expression by the principal to confer such power, based on the sole fact that the principal admits the coming into existence of the appearance to authorize the person acting as an agent and to have the intention to institute him as a *'fondé de pouvoir'*.

As in the non-commercial context the power of representation given to the agent may be revoked at any moment. If the power of procuration has been entered into the register, its cancellation must equally be entered. Was no inscription performed, it nevertheless is possible to enter the cancellation of the power in order to inform all persons having knowledge of the procuration (Art. 461).

For a power of representation on a more modest level and a restriction to only limited sectors of the business the rules for "other commercial powers" of Art 462 and 463 apply. Entering into the commercial register of this form or representation is not foreseen.

Similar rules as established for the *procurator* apply to the power to represent a partnership (Art. 563), corporations and other legal entities (see with respect to the Company limited by shares Art. 718 lit.a, for the Co-operative society Art. 899).

## VI. Interpretation; vitiating elements in the consensus

### A. Interpretation in general

The interpretation of the declaration of a party follows the 'principle of confidence' *(Vertrauensprinzip/principe de la confiance),* that is, the declaration is neither understood in the sense of what the declaring party may have had in mind nor in

accordance with the literal meaning of the wording, but in the meaning the addressee could in good faith attribute to it. This is in some way an 'objective' approach to the problem. On the other hand, the addressee is deemed to be obliged to give all possible attention to the 'subjective element', *i.e.* to consider all aspects allowing the understanding of the declared intent. Under these two aspects interpretation is less strict than under the English and American tradition, i.e. focused on the "objective" meaning of the existing texts.

## B. 'Dissensus' distinguished from 'error'

In case of divergence of the real intention of one party from the understanding of its declaration by the other, two situations must be distinguished. 'Dissensus' is the absence of contractual consent with the consequence that no contract at all came into existence even if the parties believed to have concluded it. Dissensus exists when two parties agree to the same term but understand it in a different way so that both interpretations are equally admissible in the particular circumstances. For example, where a Canadian and a U.S. citizen conclude a bargain based on a dollar price there is dissensus (no contract), if in the particular situation each party is equally entitled to understand 'dollar' as his own national currency. If one understanding prevails, the contract exists but the other party may claim relieve resulting from "error" (see C above).

In case of *dissensus* the contract is non-existing, i.e. void *ab initio*.

## C. Error (Mistake; Arts. 23-27)

'Error' *(Irrtum/erreur)* describes the situation where a party is held, based on the 'principle of confidence', to the apparent meaning of a declaration even if another meaning was intended. For instance, said Canadian, who understood the agreed price to be in Canadian dollars, is not entitled to his interpretation if under the given circumstances an objective interpretation indicates that U.S. dollars were intended. Consequence of error is the voidability of the contract, *i.e.* the party succumbing to it has the possibility to bring the contract to an end by making a private declaration to that effect to the other party within one year from the date of discovery of the error (Art.31).

In its original meaning error was restricted to the situation of the diverging intention of a party from their declaration. It had to refer to one of the three aspects mentioned in Art.24. par. 1-3 (the traditional *error in negotio*, *error in persona* and *error in quantitate / qualitate*, which survive also in the French CC, Art. 1109-1110 as well as in the German BGB § 119). Contrary to said tradition the voidability of a contract based on error has in the Swiss Code a broader application. It introduces the principle of 'error as to the basis of the contract' (*Grundlagenirrtum/erreur sur la base nécessaire du contract),* under which a contract is voidable if a party concluding the contract relies upon elements which later prove to be non-existent (Art. 24 No. 4). In Switzerland as elsewhere, the motives of the parties concluding a contract are generally

irrelevant. But under actual Swiss Law[9] they start being relevant if the motives under consideration have such weight, that they become a precondition of the conclusion of the contract for one party: The other party, knowing that the contract would not be concluded with said precondition missing, cannot conclude the contract without the preparedness to accept the existence of said element as an implied condition of the contract. This is at least true if under general aspects the element under consideration is generally qualified as relevant and decisive, and therefore the non-acceptance of the thereto related precondition of the contract is not compatible with good faith. This concept of 'error as to the basis' actually has more importance than Art. 24 Nos. 1-3 setting out the traditional topics of error[10]. The "error as to the basis" argument covers also parts of the 'frustration-cases' of the Common Law (see G above).

The party terminating a contract on the legal ground of *error* is liable for damages if their erroneous understanding was due to their own negligence in examining and  understanding the given situation; the compensation has to cover the 'negative interest' (*negatives Interesse / intérêt négatif*); see VII D below), i.e. to put the other party economically in the situation they would be not having concluded the subsequently annulled contract. In exceptional cases the damages may comprise further elements ('positive interest', *lucrum cessans*; Art.26).

### D. Fraud, Duress (Arts. 28-31)

Whilst the contractual defects of *error* as explained above are the result of the given circumstances and not intentionally caused by the parties, *fraud* and *duress* are the result of machinations of one of them. *Fraud* consists in causing a mistake by intentionally misinforming the partner with respect to essential elements of the contract (Art.28), *duress* means constraining a person to conclude a contract, be it by coercion, threats or by physical force (Arts.29 and 30). Under such circumstances the affected party may terminate the contract by private declaration to the opposed partner. Such declaration must be given in a one year's term upon the recognition of the mistake *viz.* the termination of the coercive situation. The aggrieved party may also choose to maintain the contract by ratification, in that event still preserving claims for damages (Art.31).

---

[9]    "Grundlagenirrtum" was introduced into the text in the reform of 1911 (Art. 24 par. 4) on the basis of doctrine and some precedents. The German BGB still does not know this type of error.

[10]    BGE 113 II 27 states that the precondition of "Grundlagenirrtum" is a misconception which is, known or unknown to the parties, under 'objective criteria' a precondition of the contract (with reference to BGE 109 II 324). Further examples of jurisprudence: BGE 55 II 184; 79 II 161; 97 II 45; 98 II 18/87 II 137 (sale of land for construction; construction not possible for legal or other reasons related to the land); 52 II 153/82 II 424; 114 II 131 (sale of an antique carpet not being antique, of a van Gogh painting not being painted by this artist, and of a Picasso drawing not drawn by him). Also negative precedents exist not allowing avoidance: BGE 95 II 409 (sale of land for construction with impossibility to construct; under the given circumstances the buyer was not allowed to take the possibility to construct for granted); 53 II 127; 41 II 575.

**Nr. 62**            Swiss Law — Law of Contracts         { 103—123 }

### E. Protection of consumers

Articles 6a and 40a to f CO, enacted in 1991 allow a consumer to terminate a contract concluded under unusual conditions such as at the consumer's home or at the occasion of an advertising ride, etc. Repudiation can be made by written declaration within a week after the conclusion of the contract.

Special legislation in favor of consumers as existing in the European Union and elsewhere does not yet exist, nor is given legislation authorizing the courts to control General Conditions introduced to mass-market contracts.

### F. Subsequent impossibility of performance

In cases where performance is possible at the time of the conclusion of contract but subsequently becomes impossible without fault on either side, the obligation to perform is extinguished[11]. The performance promised in exchange does not become due or must, if executed, be restituted. If the impossibility is not due to 'circumstances for which the debtor is not responsible' (Art. 119 I), *i.e.* if the debtor is not in the position to prove 'that there is no fault on his part' (Art. 97 I), he is liable under the general rule of liability for non-performance.

### G. Frustration

The concept of frustration is not known on the Continent. Arising in England in the late l9th century it seems not completely clear and coherent to Civil lawyers. 'Frustration' covers 'impossibility' of the Swiss and German tradition (see F above), but is a larger concept, comprising in addition the relief from contractual obligations under the doctrine of 'error as to the basis of the contract' (see C above). The so-called 'Coronation cases' (renting of a room with a view of the coronation procession of King Edward VII, which did not take place on the date originally scheduled) are in English doctrine generally understood to come under the frustration rule[12], but would, under Swiss law, be qualified as problems of 'error' (though probably with a result similar to that in the English Coronation decisions).

## VII. Breach of contract

### A. specific performance

Unlike the Common Law tradition Swiss law as a general rule that enables the creditor to claim specific performance of the contract. Said principle has some limited relevance in contracts for the transfer of property and contracts preventing a party from doing something (*e.g.* competing in a specified field). However, specific performance

---

[11]      Same rule in England since *Taylor* v.*Caldwell* (1863).
[12]      *Krell v. Henry*, [1903] 2 K.B.740.

is not available in contracts positively obliging a party to do something such as to render a service or the like.

The Roman law was intended to convert an obligation to do or to deliver something into damages when not carried out, a solution which is to some extent still preserved in the French Civil Code[13]. The Swiss Code of 1881 followed the French example, exchanging specific performance of obligations to do (or refrain from doing) something; but the Reform of 1911 abolished it and introduced, under the influence of German law (and to the regret of this writer), said possibility of specific performance. This rule is applicable even to the non-execution of pre-contracts (*i.e.* contracts obliging to conclude a specified contract in the future; see above I B 2). The prevailing view accepts an action based on the pre-contract for the conclusion of the main contract. The latter is deemed to be concluded at the moment of a court decision to that effect.


*B. Damages as general remedy for breach*

The general rule is that a party to a contract not performing it correctly must pay damages compensating the failure of performance or its imperfections.

The quantum of damages equals the difference between the actual financial situation of the aggrieved party and the hypothetical situation in which he or she would have been in case of a proper performance. This so-called 'positive interest' comprises also *lucrum cessans,* that is, the profits lost as a consequence of the incorrectness of performance (see also D below). The burden of proof of the amount of the damages lies with the injured party.

The liability of the parties to a contract is in the diction of the Code a liability under the condition of fault of the party not performing correctly (Art. 97 CO). This principle is complemented and qualified by a presumption of fault: the burden of proof is on the non-performing party causing damage who may show that their non-performance, or delayed or defective performance, was caused by elements independent of their responsibility. In effect, exoneration as a consequence of evidence for absence of fault of the non-performing debtor is rare. Therefore in the practical effect the liability under Swiss (and German) law is not far away from the strict liability of legal systems allowing the excuse of *'force majeure.'*


*C. Consequences of delay (Arts. 102-106 CO)*

"Delay" in performance is understood in a technical meaning, *i.e.* as default *(Verzug /demeure),* presupposing a delay either under the precise stipulation of a

---

[13]    French CC Art. 1142 CC: "Toute obligation de faire ou de ne pas faire se résout en dommages et intérêts, en cas d'inexécution de la part du débiteur". This rule applies as far as personal obligations are concerned but not to obligations to transfer a thing or property: property is transferred by contract of sale (see I E above), and therefore the claim of the purchaser for the delivery of the object sold is an action of the owner *in rem.*

certain date of performance in the contract or a subsequent notice by a creditor demanding performance (Art. 102 CO).

These requirements of default are the basis of damages for delay in performance described under par. B. In addition, default has the consequence of transferring the risk to the belated party (*periculum in mora*). Once in default, he is liable for further damages even if the subsequent delay or impossibility of performance is not caused by his fault. If the default concerns a payment of money the debtor has to pay interest on arrears to the amount of 5% per annum if there is not a higher interest rate stipulated in the contract. In commercial transactions bank rates may be applied if they are higher (Art. 104 CO).

The above consequences of default are independent of a fault of the non-performing party; only the consequences of damages presuppose fault. It may be noted that the contrary is true under the German Civil Code, where not only damages are the consequence of fault, but the notion of default (*Verzug*) itself depends on fault. Interest on arrears is due under Swiss law without respect to fault. The general rule of damages as exposed under par. B applies if the creditor not receiving payment in due course has suffered injury in excess of the legal or contractual rate. He may recover the amount of his loss if the debtor is not in the position to exonerate.


*D. Discharge by breach (Arts. 107-109 CO)*

Upon the failure of a party to perform, the other party may be released from the contractual obligations and has a claim for damages. This solution, in the practical outcome, is granted by Swiss law, but it must be noted that the 'discharge by breach' does not operate automatically as it may do in the Common Law area and that full damages are not granted under all circumstances. Discharge from the contract as a consequence of non-performance is subject to the following two requirements:

The party not receiving performance in due course (1) generally has to grant a grace-period, *i.e.* an additional time limit for execution and (2) must upon failure of performance during the grace-period express the intention not to accept the delayed performance (renunciation, or rescission of the contract).

These two prerequisites (traditional under Swiss law, followed by the German BGB § 326 and to some extent actually adopted by the United Nations Convention on Contracts for the International Sales of Goods (1980) (CISG) (see Arts. 47, 49 I b) are governed by the following rules:

(1) The additional period conceded by the creditor may be short but must be long enough that a party who has already made appropriate preparations for his performance may have an additional chance to perform. The creditor is only exempted from allowing an extension of time for execution if one of the three situations indicated by Art. 108 CO is fulfilled[14]:

(a) the attitude of the obligor has shown that conceding an additional time is useless (*e.g.* the obligor has made no preparations and additional time would not allow

---

[14] See also Art. 190 CO making the idea of Art. 108 CO applicable to all sales between professional dealers.

**Nr. 62**          Swiss Law — Law of Contracts          { 103—123 }

performance, or the obligor has expressed his intention not to perform, he has repudiated the contract, etc.);

(b) the performance, as a consequence of the delay, has become useless to the obligee;

(c) the contract is unambiguously stating that performance has to be effected on or before a certain time and shall subsequently be excluded.

(2) The expiration of the period of time as described under no.1, including the situation that no additional time must be conceded, does not automatically operate as a discharge of duties. Discharge depends on a renunciation by the obligee. Upon expiration of the time limit the obligee may still insist on contractual performance; if he prefers the exclusion of the belated performance he has to give notice of his decision to rescind immediately. The obligee may declare renunciation at the moment of fixing a time limit (see A) but is (contrary to the German Civil Code § 326) not obliged to do so. He may make his declaration upon expiration of the time conceded (but then must act without delay; Art 107 II CO).

Renunciation may be expressed in two ways, with different consequences as to the amount of damages:

The traditional concept of the effect of renunciation is that of subsequent dissolution of the contract, i.e. rescission in the technical sense (*Rücktritt/se départir du contrat*, i.e. 'withdrawal from the contract'). This possibility (originally inspired by the *condition résolutoire* of the French Civil Code), puts an end to the execution of the contract, both parties becoming free. The party who failed to perform must pay damages, but only on the basis of 'negative interest' *(negatives Interesse/intérêt négatif).* The obligee must be put in the situation he would be in, had he never entered the contract. This quantum is generally smaller than that of 'positive interest', which is based on the aim to grant to the obligee the hypothetical benefits of correct performance of the contract. If the obligee wishes to reserve his right to 'positive interest' (including *lucrum cessans, i.e.* indemnification for lost profits, which only in exceptional cases is comprised by 'negative interest', see B above ), he has to choose another way and insist on the validity of the contract while renouncing to the performance of the obligation as stipulated in the contract. Thus, the right to and the duty of contractual performance is transformed into contractual damages, replacing the original contractual duties. Both parties are held to perform the contract, but the party not having performed his or her part must pay damages in place of the performance originally due. The system of twofold possibility for renunciation of the obligee is more complicated than necessary and may be explained only by the historical evolution of legislation in the context of 'discharge by breach'. In practice, there is a clear tendency to grant full compensation (*positives Interesse*) irrespective the obligee's declarations.

A distinction must be drawn between 'main duties' and 'ancillary duties' of the party performing incorrectly. Discharge by breach as shown above operates only if a 'main duty' is not correctly performed (*e.g.* in the case the object sold is not delivered) but not if the performance of 'ancillary duties' fails (the object sold is not properly packed, user's instructions due under the contract are not given, etc.).

**Nr. 62**          Swiss Law — Law of Contracts          { 103—123 }

## VIII.  Restitution (CO Art. 62-67)

### A.  General remarks

The Swiss Code follows, as all other codifications of the continental legal tradition do, the example of Roman Law by introducing its institution of *condictio*. In its historical origin and until modern times *condictio* does  not represent a clear and well defined concept, but comprises a series of types of different character, mostly covered by the general notion of obligations of quasi-contractual origin (which is shown in the French Civil Code, Arts.1371-1381). A tendency to a more systematic approach of the phenomenon goes back to the antiquity and may be seen in the Corpus Iuris (533-535) of Justinian (emperor 527-565).

The core of *condictio* is to grant the restitution of assets which have been transferred from one person to another, because the justification of said transfer did  - contrary to the understanding of the parties at the time of the transfer-  not exist or disappeared after the event.

The term defining the situation in modern Codifications is "unjustifiable enrichment" of the obligor of condiction (*enrichissement illégitime/ungerechtfertigte Bereicherung*; see the heading before CO Art. 62-67). The basis of the claim for restitution is the fact that no cause exists for the transfer of title of a thing from the obligee to the obligor or of money paid to the latter.

Three groups of cases allowing restitution may be distinguished under the aspect of the reason of the transfer of value which must be reversed:

- the reason may be an act of the obligee who transferred title or made payment erroneously assuming the existence of a good cause (restitution of a benefit granted by act of the claimant; "Leistungskondiktion"; see B below)

- the transfer may be caused by an unjustified act of the obligor of the restitution (restitution of things acquired by unjustified acting of the obligor; "Eingriffskondiktion", see C below);

- the transfer may be caused by chance, i.e. without interference of one of the parties ("Zufallskondiktion", see D below)

### B.  Restitution of a benefit granted by the party claiming restitution

This type of restitution is by far the most common and important of all. It comprises the *condictio indebiti* of the Roman Law[15], which became under some authors of the enlightenment and especially in the French Civil Code (as well as in the innumerable Codifications following it) the restitution pure and simple, in general (the concept of *répétition de l'indu*, see CC Art-. 1376-1381) and which may explain the core of the situation justifying the claim for restitution. The party granting a payment of money or transfer of title of an object does so under the belief that he has an

---

[15]     See Digests 12, 6 and Codex 4,5, both *de condictione indebiti*

obligation to do so (because he is under a contractual duty, he has a duty as the heir of a deceased person etc.) while, as he learns only later, this duty does not exist, may the contract be void or avoided *ex post* , the performance previously granted by another person, the deceased not having been obliged etc. In case of a contract being void or becoming subsequently avoided both partners to it may be at the same time entitled to restitution of what they granted under the non-existing contract.

The condition of the existence of a claim of restitution is not only the absence of a legal duty to the granting of the object to restitute, but equally the error of the claiming party at the time of the performance as to the legal duty to grant said performance, the burden of proof for both elements (absence of a duty and the erroneous belief in the existence of it) is with the person claiming restitution.

The concept of *condictio indebiti* or *répétition de l'indu* can be generalized in the sense that the error of the party giving performance does create a claim for restitution. The error must relate to the reason for giving the performance, i.e. to an element being the precondition of granting the transfer of value, but it must not necessarily refer to the existence of a legal duty to provide performance. Certainly, the error may refer to a legal aspect. The debtor of a claim assigned by the creditor to a third person paying erroneously to the original obligee and thus must not pay a second time to the latter has a claim for restitution against the payee to whom he was not a debtor. But the misconception may refer to the erroneous assumption to receive any value in exchange. Even the assumption of the coming into existence of a marriage could justify the claim for restitution of a gift if the marriage does not happen[16].

The transfer of value (payment of money to a bank-account etc.) with the intention to grant a benefit to a third person does exclude the claim for restitution even if a valid contract of donation between the person transferring and the person receiving the value did not come into existence[17].

The requirement to provide evidence of an error at the time of the performance is vital under general aspects of law: Without it every person receiving a payment or receiving a thing would  incur the risk of a claim for restitution, could she or he not be in the position to provide evidence for the existence of a thereto related duty of the other party.

## C.  Restitution of unjustly appropriated value

In this context are considered cases of appropriation of value caused without legal justification. For example, if a person has sold foreign property in good faith, he

---

[16]     BGE 82 II 433.

[17]  The Federal Tribunal in a series of decisions misinterpreted the legal situation in the context of donations: BGE 105 (1979) II 105; 69 (1943) II 309; 52 (1926) II 369 take the position, that the nullity of a donation for formal reasons is a ground for a claim of restitution not withstanding the fact that in said cases the intention of the donor to grant a benefit was in no way doubtful: The absence of a formally valid contract of donation does in no way constitute an error requested for claim for restitution; the absence of the preconditions of restitution constitute good title to keep what was received even without valid donation. See also E.Bucher, in ZSR 1983 II p. 330, 332.

is not liable in tort but has to restitute the proceeds under the rules of *condictio*. The same may apply in case of infringement of foreign patent rights etc.

### D.  Restitution of value transferred by chance

The transfer asking for restitution may be the consequence of acts of third parties or happen by chance: cash is erroneously mixed with the money of another person and becomes by that his or her property. Value is appropriated by insane persons not liable in tort, or cattle is grazing on foreign pasture.

## IX.  Extra-contractual and quasi-contractual obligations

### A.  General Remarks

The (prevalent German) Romanist doctrine of the 19th century had its merits, but transmitted the legal tradition in many respects in an oversimplified presentation. The codifications of the continental legal tradition qualify the obligations according to their sources. Following the concepts of the 19th century the position of the Codes is the dualism of obligations resulting either from a contract or from a tort. The CO (in this respect identical with the German BGB) adopts the distinction of *contractus*  and *delicta* (Art. 1-40; Art. 41-61 CO), adding only *restitution* as a further possible cause (Art. 62-67 CO) and, by doing so, excluding all further types of obligations.

The more complex way of looking at the possible grounds of obligations of the jurists from the antique Rome up to those of the 18th century who knew intermediate figures (*obligations quasi ex contractu* and *quasi ex delicto* or also such as *obligations ex variarum causarum figuris*) were regrettably not considered by the codifications[18]. In the intention to overcome the oversimplified system of the codes the doctrine, followed by court-practice, developed other types of obligation-creating situations, so in Switzerland and to some extent in Germany, Austria and other countries. As these concepts have under practical aspects considerable impact and deserve to be outlined in their basic elements:

- *faktische Vertragsverhältnisse* (obligations resulting from facts of the obligor; see B below),

- *Vertrauenshaftung* (*responsabilité fondée sur la confiance*; obligation from inspired confidence; see C below),

- *culpa in contrahendo* (in short *c.i.c.*; fault in concluding a contract; see D below).

---

[18]     Nevertheless we mention that two institutions of modern codifications (restitution, CO Art. 62-67; above VIII,  and *negotiorum gestio*, CO Art. 419-424; below XIV F) follow the Roman Law Tradition in which they were qualified as *obligationes quasi ex contractu* (obligations resulting from quasi-contractual relations).

**Nr. 62**                    Swiss Law — Law of Contracts          { 103—123 }

Each of the three concepts covers a group of cases which cannot remain without adequate remedies. The group of *obligations quasi ex contractu* or *ex variarum causarum figures*, well established in the texts of the Corpus Iuris as well as by the literature up to the 19th century covered these cases which actual doctrine tries to re-invent and to handle under new headings[19].

Said labels are of recent invention, but the principles represented by them have been realized in court practice long before. That does not make the theories under consideration superfluous. They are helpful as means of communication, i.e. to recall them to the legal community, to create a focus of closer consideration in doctrine  and to establish a generalized view of the existing law[20]. Switzerland in comparison with other countries is ahead in recognizing the said concepts. Change and progress is easier to achieve in small areas[21].


*B.  Obligations resulting from facts of the debtor*

As has been shown the concept is very old. The actually used label "faktische Vertragsverhältnisse" was created by G. Haupt in1941[22].

An illustrative case mentioned in literature goes back to the year 1930. A private pilot is landing (without any prior contact) on an airfield and refuses to pay the usual fee. The airman must pay notwithstanding that no prior contract was concluded nor could the landing be qualified as *delictum* (tort). In this context were mostly considered cases of taking profit of a generally offered facility (public transportation, the procurement of water, electricity, gas etc.), but the principle may possibly apply to important issues of commerce[23].

The concept was always controversial and is actually out of fashion in Germany, but nevertheless applies without referring to the term[24]. Eventually it is not possible to renounce to said rule without instituting an area of lawlessness. The rule applies only in cases where a party takes profit goods which are offered under contract, and it cannot remain without sanctions the appropriation of a benefit for which correct people grant the contractual counter value.

---

[19]    In this context is fundamental CARLO AUGUSTO CANNATA, Das faktische Vertragsverhältnis oder die ewige Wiederkunft des Gleichen, in: Studia et Documenta Historiae et Iuris, Rom Pontificia Universitas Lateranensis, LIII – 1987, 297 ff. See also EUGEN BUCHER, Rechtsüberlieferung und heutiges Recht, in ZEuP Zeitschr.für Europäisches Privatrecht, Bd. 2000 S. 394-543, p. 465 s (<www.eugenbucher.ch> no. 75).

[20]    One should bear in mind the key distinction between the legal rule as applied in practice and the recourse to the related technical short term thereto (faktische Vertragsverhältnisse, Vertrauenshaftung, c.i.c.). In Switzerland the application of the three formulas was subsequent to the application of the legal rule labeled by them.

[21]    In Germany only the use of the formula *culpa in contrahendo* is well established and broadly used, whilst all three principles are used in practice, often without reference to generalizing principles, but many of them allocated to c.i.c. notwithstanding they fit better in one of the two others:  Actually reluctance to explicitly accept the formula "faktische Vertragsverhältnisse" prevails. Cases best considered as "Vertrauenshaftung" are preferably qualified under the heading of "culpa in contrahendo".

[22]    G.HAUPT, Ueber faktische Vertragsverhältnisse, Leipzig 1991 (or Festschrift für Siber, Bd. II, Leipzig 1943).  BUCHER CO § 16; ZEuP (Fn.19) 1996 S. 715-722 (<www.eugenbucher.ch> no. 65).

[23]    See BUCHER in ZEuP (Fn.19).

[24]    See PETER LAMBRECHT, Die Lehre vom faktischen Vertragsverhältnis, Tübingen 1994.

**Nr. 62**          Swiss Law — Law of Contracts          { 103—123 }

In Switzerland an early case of 1937 (BGE 63 II 369) applied the rule (without referring to the then still unknown term of faktische Vertragsverhältnisse) by obliging an overstaying tenant to pay the contractual rent even the contract is terminated. In BGE 110 (1984) II 249. The purchaser of a car annulling the contract on grounds of absence of formal requirements must pay a quasi-contractual compensation for the period he used the car. This *landmark case* is generally followed and of considerable practical importance in the context of purchase by installments or hire-purchase-contracts (often somehow misleadingly called "Leasing-Verträge") which might be found void or voidable if they are not in conformity with the form-requirements of CO Arts. 226a-228.

*C.  Obligations resulting from acts of the debtor: Vertrauenshaftung; responsabilité fondée sur la confiance[25]( obligations bared on trust)*

The term "Vertrauenshaftung" received general attention in 1971 as a consequence of the publication of Canaris 26. However, it still misses general acceptance in Germany today. It was the 1st Zivilabteilung of the Swiss Bundesgericht which in the so called "Swissair-Case" (BGE 120 [1994] III p.331) had to deal with a classical example for the application of the principle of "Vertrauenshaftung":  The then national airline of Switzerland had allowed or at least tolerated that a depending company establishing luxury tourist-sites used logos of Swissair and made reference to the reputation of this firm as a means of promotion. In the subsequent insolvency Swissair was held liable to the investing shareholders, because under the given circumstances the latter where allowed to believe that the mother-company would grant save investment policy as well as the solvency of the daughter-company.

Since 1994 the 1st Zivilkammer had the opportunity in a series of cases to refer to the Vertrauenshaftung. In BGE 121 (1995) III p.350 they granted damages for useless expenditures to a sportsman, the defendant being a sports club competent to select the athletes representing Switzerland in an international competition which had promised to delegate him but failed to do so. Similar considerations where applied in a case of banking law (responsibility of the bank in the context of mistakes in the transfer of money; BGE 121 [1995] p. 310). In other cases the principle under consideration may provide arguments for adequate limitation of responsibility. With reference to the liability of a member of a law firm (constituted as a "partnership firm", Kollektivgesellschaft, under CO Art. 552-593) it was held that a lawyer, although as a general rule engaging the liability of all member of the firm by his professional activity shall not do so in cases where his incorrect declarations were, to the knowledge of the client, purely personal and had no relation to the firm and his partners (BGE 124 [1998] III p.364). See also BGE 124 III p. 297 following the same approach. The importance of this newly discovered principle is clearly demonstrated by the multiplicity of comparable cases in a short period of time.

---

[25]          BUCHER in *recht* 2001 p. 65-81 (<www.eugenbucher.ch>, no. 76).

**Nr. 62**          Swiss Law — Law of Contracts          { 103—123 }

The range of possible application of "Vertrauenshaftung" is considerable. It covers e.g. the case of misleading testimonial for employees. In BGE 101 (1975) p. 69ss. an employer was held liable for part of the damages caused to the new employer, because he had delivered to a bookkeeper dismissed for fraud an excellent testimonial attesting trustworthiness (the legal basis was in the then viewed *tort liability* which in fact is hardly compatible with the traditional understanding of that cause of obligations under CO Art. 41ss.). Even more important is the rule to handle *letters of intent*, *memoranda of understanding, gentlemen's agreements* as well as declarations providing more or less explicit guaranty of an enterprise for another legal entity (often called "Patronatserklärungen" etc.). These cases have in common that they are neither considered in legislation nor even accessible to general rules. The content and the consequences are purely depending on the intention of the parties to these agreements *viz*. the understanding in good faith of the addressee of unilateral declarations. Essential is the interpretation of the relevant texts and the given circumstances which must be examined under the aspect of the created appearances and the therefrom resulting justified expectations.

A series of claims by the courts granted either on tort liability or on the c.i.c.-argument are more correctly qualified as resulting from the trust created by the obligor. BGE 101 II 69ss.held liable a patron for losses incurred by a subsequent employer who relied on the certificate issued by the former attesting perfect trustworthiness, notwithstanding that the person was dismissed on the grounds of embezzlement. The same view of creation of confidence may be applied in dealing with *letters of intent* or *memoranda of understanding* (likewise "Patronatserklärungen" etc.) which play a considerable role in modern business.

### D.  Obligations resulting from "culpa in contrahendo"[26]

### 1.    Origin and explicit legal provisions

The concept of *culpa in contrahendo* (hereinafter *"c.i.c."*) was created by Rudolf v. Jhering[27]. This expression suggests that a party is liable to a contractual negotiations if by his *culpa* (fault, wrong) no valid contract comes into existence. The main example is voidable contract for mistake. The erring party should, in case of negligence, grant compensation to the other party for his losses resulting from the reliance on a valid contract. The concept was not new[28] but found much attention, arising controversies but finding finally widespread acceptance in Germany as in other countries even outside the German speaking area. The Swiss Code of Obligations of 1881/83 was the first codification realizing some of Jhering's concepts and including them to the actual Code:

---

[26]    BUCHER CO § 17
[27]    JHERING, C.i.c. oder Schadenersatz bei nichtigen oder nicht zur Perfection gelangten Verträgen, in Jhering's Jahrbuch 4 (1861) p.1-112.
[28]    POTHIER in his Traité des obligations (1761-67) N.19 refers to the problem, the Allgemeine Preussische Landrecht (1794) I 5 §§ 284s. establishes such rules.

**Nr. 62**          Swiss Law — Law of Contracts          { 103—123 }

- CO Art.26 establishes the liability of the party avoiding a contract for his mistake resulting from negligence;

- CO Art. 31 III establishes liability of the party having reached the contract by fraud or duress (be the contract avoided of ratified);

-  CO Art. 39 creates the liability of a representative concluding a contract without authority, and Art. 36 II the liability of a partner revoking a given authority without taking back the proxy subsequently misused[29].

In these cases the lawyer will refer to the legal provisions and not to the formula of c.i.c. which caused the coming into existence of the former.

The Swiss code fails to order the liability of the party concluding a contract knowing the impossibility of performance, in which case reference to the c.i.c.-principle is still indicated (both the German BGB, § 307, and the Italian CC Art. 1338 provide an explicit rule) [30].

2.    Extended application

The c.i.c.-concept had an impact on subsequent legislation but did not show its main importance in the field of the examples promoted by Jhering, but served as a nucleus for further development of the doctrine which did not hesitate to attach new (and justified) ideas to the term of c.i.c. German courts were first reluctant, but eventually adopted the theory in 1911 in the subsequently most influential "Linoleumteppich-Decision"[31]. It is obvious, that even this leading case departs from the original idea: The damage was not caused to the prospective buyer by a defective contract but only at the occasion of negotiations in view of a possible conclusion of a contract.

A series of Swiss court decisions (e.g. BGE 90 II 453, BGE 92 II 334 E.4 and BGE 105 II 77) grant compensation for the fact that contracts were concluded with a certain content and not with another, a result hardly compatible with the c.i.c.-concept. On the other hand, well established and justified is the rule, that negotiating contracts without intention to conclude such contract may cause a liability for losses (useless travel costs, missed other opportunities to contract) of the partner to the negotiations (e.g. BGE 77 II 137; 80 II 37s.). Equally, preliminary agreements to conclude a contract with form-requirements (i.e. the sale of immovables, requiring a notarial instrument; Art. 216; below XIV B 1) may cause, if not executed, a liability (e.g. BGE 39 II 227; 41 II 101 E.2; 49 II 67 E.4; 51 II 54ss.). Partly, The aforementioned decisions are partly not based on the c.i.c. argument but on tort (CO Arts. 41ss.).

---

[29]    To illustrate the influence of the ideas of Jhering may be mentioned in addition the German BGB, § 122 (equivalent to CO Art.26) and § 179 (corresponding to CO Art. 31/III but adding a claim for performance).

[30]    Besides the provisions of the Swiss CO may be mentioned in addition the German BGB, § 122 (equivalent to CO Art.26) and § 179 (corresponding to CO Art. 31/III but adding a claim for performance). The Italian CC, Art. 1338 establishes the interesting rule inspired by c.i.c. (but not mentioned by Jhering), that a party to a contract is liable for damages if he fails to inform his partner of the contract being not valid for grounds unknown to the latter.

[31]    Entscheidungen des Reichsgerichts in Zivilsachen RGZ 38 p. 239ff. A client interested to buy a linoleum in a shop was injured by a roll of such carpets falling by negligence of an employee. The shop owner was held liable for damages.

X. Assignment and other Transfers

## X.    Assignment and other transfers

### A. Preliminary remarks

As a general rule the effects of a contract under Swiss law are less strictly limited to its parties than in Anglo-American law. Third party beneficiary contracts and assignment of contractual rights are allowed almost without restrictions, and contractual rights and obligations are more widely transferred to the heirs of the deceased contracting party. This difference may be explained by different historical evolution. The Common Law system is determined by the idea of contract as a legal relationship binding on the parties only. Contrary to this approach, continental legal thinking has, for centuries, in some way been dominated by the concept of the rights or claims of the persons involved (*subjektives Recht / droit subjectif*). This concept does not oppose to solutions involving a transfer of a legal position to another person or to make a third party the beneficiary of a contract. The clear distinction between benefits conferred by contract upon a third party and liabilities imposed by it upon third parties (excluded under all systems) allows without restriction the admission of the former.

### B. Assignment of choses in action ( Arts. 164-175)

1. Object of assignment

Claims of whatever nature and origin may be transferred to a third party by assignment. In case of assignment of contractual rights, not the position as a party to the contract is transferred, but only the specific claim emerging from it. The seller may transfer by assignment his claim for the price to his banker, but he cannot transfer to him the position as seller and party to the contract. The buyer, though obliged to pay the banker, has rights from the sale (warranty, etc.) against the seller exclusively.

Legal provisions excluding assignment of specific claims exist but are not numerous (CO Arts. 529 I, 325 II, 306 II, 292, 262/3, etc.). Furthermore the assignment of future claims of salary is not possible (CO Art. 325 II, in force since July 1, 1991). However, the transfer of contractual rights by assignment may be excluded by a clause in the contract with the debtor excluding assignment (CO Art. 164 I). The effect of such a clause is not a duty of the obligee not to assign but the incapacity to do so. An assignment would be ineffective even with respect to *bona fide* assignees.

2. Contract to assign and assignment

The stipulation of an obligation to assign a chose in action and the assessment of the conditions of assignment, such as a consideration possibly provided by the assignee, may be effected by a normal (*i.e.* informal) contract (Art. 165 II). The assignment itself, i.e. the act actually transferring the claim from the assignor to the assignee,

requires a document in writing, which represents a contractual consensus of the parties (assignor and assignee) but must only be signed by the assignor (Art. 165 I).

### 3. The position of the debtor

In the transaction transferring the claim against him the debtor (*debitor cessus*) does in no way participate. His consent to the transfer is not required. Neither is there a validity requirement to inform the debtor of the assignment. This solution is opposed to that of the Common Law tradition and of the French Civil Code (CC Art.1690).

A fundamental task of the law governing assignment is to protect the position of the debtor. *First*, the debtor must be protected against the risk of being obliged to perform twice because the first performance was not made to the real creditor. Therefore, the debtor not being informed of the assignment may now as before make payment with liberating effect to 'his' creditor (*i.e.* the assignor), notwithstanding the effects of the assignment *inter partes*. In fact, assignments not disclosed to the debtor are common and they prevail in assignments securing bank-credits: The prerogative rights of the assignee/banker to the claim assigned to him are independent from notification of the assignment to the *debitor cessus*.

If the debtor has been informed of the assignment by the assignor or the assignee, it prevents him from paying the assignor ('his' creditor). If he should do so he would incur the risk of being obliged to make a second payment to the 'real' creditor, *i.e.* the assignee (CO Art. 167). Besides this effect, the notice (given by the assignor or the assignee) as such does not constitute an obligation to give performance to the assignee as long as the latter does not provide evidence of the assignment. In case of uncertainty as to the person of the 'real' creditor, the debtor may be discharged by depositing the amount of his debt with the court (CO Art. 168). On the other hand, if the debtor is informed of the assignment by the assignor and former creditor, he may free himself by payment to the assignee as indicated by the creditor even if, for one reason or another, the assignment should be not valid. The notice of assignment given by the creditor must, in case of a non-existing assignment, be interpreted as an order to pay to a third party which, for obvious reasons, is a sufficient basis for the discharging effect of a payment made to that third party.

*Secondly*, the debtor must be protected against an alteration in the substance of his debt by effect of the assignment. Therefore, the debtor has all means of defense and exceptions against the assignee he had against the assignor (CO Art. 169 I), such as in the case of assignment of a claim of the seller, the defense that the delivered goods were defective. Compensation (set-off) of a claim of the debtor against the assignor with the claim assigned is permitted after assignment if the debt of the original creditor (assignor) becomes due not later than the claim transferred by assignment (Art. 169 II). In addition, the debtor may use all means of defense allowed against the person of the assignee; if *e.g.* the debtor has a claim against the assignee he may use it for compensation against the assignee.

## C. Assumption of obligations (CO Art. 175-183)

Articles 175-183 of the CO, introduced in the law reform of 1911, contain provisions with various aspects. The most important may be summarized as follows:

1. Art. 175 declares the (obvious) admissibility of a contract of the debtor of an obligation with a third party, the latter assuming the obligation to discharge the debtor, either by an arrangement with the creditor or by fulfillment of the existing obligation. Such a contract does not amount to an assumption of obligation. The assuming third party is obliged against his partner (the debtor) but not against the creditor. An agreement under CO Art. 175 is an "obligation to discharge from an existing obligation". It does not change the situation of the creditor, who now as before has a claim against the his debtor and therefore must not give his consent to said agreement.

2. The CO does not mention the obviously equally existing possibility, that a third party, in the intention of granting a kind of surety, agrees with the creditor to equally be liable for an existing obligation (an agreement possible without the consent of the debtor). Said mechanism of "accession to an existing debt" has some attraction as it is not submitted to the strict preconditions of the suretyship under CO Arts. 492-512. An agreement of the intervening third party with the debtor is equally possible and without the consent of the creditor, who receives a direct claim against the third party if this event corresponds the intention of the latter in the sense of CO Art. 112 CO.

3. A transfer of the obligation (debt) from the actual debtor to another person discharging the former is possible but obviously presupposes the consent of the creditor. According to CO Art. 176 this consent may be given by ratification of the contract concluded between the debtor and the third party (see par. 1 above) by the creditor. The transfer may also be effected by a contract of the creditor with the third party assuming the obligation of the debtor. In both cases the new debtor may "raise such defenses arising out of the obligation as were open to the original debtor" (CO Art. 179 I).

4. In case that the assumption of the debt should, for whatever reason, be void, the original obligation (i.e. the obligation of the former debtor) "revives with all accessory rights" (COArt. 180). The rules of CO Arts. 179 and 180 intend to clarify that by the act of assuming an obligation neither the nature nor the content of the latter is altered in any respect.

## D. Transfer of business-enterprises with assets and liabilities (CO Art. 181 - 183)

In a very summary regulation Articles 181/182 refer to the problem of transferring a business-enterprise (not constituting a separate legal entity which as such could be transferred) with all assets and liabilities. This transfer (*i.e.* the contract of the parties) must be followed by publication in official journals; its effect is an immediate liability of the party taking over the business, with a cumulative liability of the former debtor for a period of two years after publication. Under the same conditions a merger (amalgamation, *Vereinigung von Geschäften/fusion*) of two business enterprises and the connected assets and liabilities is possible (CO Art. 182); in such cases however,

each party is, with respect to the liabilities of the other, considered to be the person taking over the business in the sense of CO Article 181. The same scheme is also applied to the transfer of assets and liabilities of a non-merchant.

### E. Transfer of the position as a party to a contract to a third party

By assignment of claims (CO Arts. 164-174) and assumption of obligations (CO Arts. 175-180) not the position as a party to the contract is transferred to a third party, but only claims or obligations resulting from said contract[32]. On the other hand, if the intention is to transfer the position of a party to a contract to a third party, that is, the quality as a seller, a buyer, a contractor, etc., this transfer can only be operated by an agreement including all of the three parties (*i.e.* the two parties to the original contract and the third party assuming the position of the outgoing party). This type of contract is not mentioned in the Code of Obligations, but there is no doubt as to the admissibility of such a transfer (see I B above).

## XI. Set-off or compensation (Verrechnung/compensation; CO Arts. 120-126)

If debts of identical objects (practically debts in money) are mutually owed, each of the debtors may be discharged from his obligation by way of compensation (set-off). This discharge does not, as under the French Civil Code and all codifications following its example, operate automatically but requires a declaration of the party refusing payment on grounds of setting off his counterclaim[33].

Discharge by set-off is only possible if mutuality of claim and counterclaim exists (*i.e.* if debtor and creditor on both sides are identical). The object of the mutual debts must not be identical in quantity (CO Art. 120). The set-off operates up to the amount of equality in claims and leaves unaffected the remaining part of the higher claim and debt. On the other hand, the prerequisite of identity of the object of the mutual claims seems to exclude set-off in case of debts in money of different national currency, or debt in money on one side and debt in securities, negotiable instruments etc., on the other. But there is a tendency in the literature to admit set-off in such situations, especially in cases of the possibility to execute the claim of the compensating party being doubtful .

The extinction of the two claims and corresponding debts are connected and interdependent. This extinction becomes effective only upon a declaration to that end by one or the other party (CO Art. 120 I; more explicit BGB § 388). This solution is opposed to that of the French CC[34], most countries preferring a system of the extinction

---

[32]   It is doubtful to what extent the same  is true for transfers of business as regulated in Arts. 181-183 CO (above D).

[33]   The same mechanism as in the Swiss CO is realized in the German BGB (§ 388), the BGB of Japan (Art. 505), China/Taiwan (CC Art. 335), Thailand (CC sec. 342), Portugal (CC Art. 847 f.).

[34]   French CC Art. 1290: "La compensation s'opère de plein droit par la seule force de la loi, même à l'insu des débiteurs …"

by compensation being realized *ipso iure* (by rule of law), i.e. automatically at the moment of the coming into existence of the debtor's counterclaim.

The practical importance of the possibility of set-off is most evident in the case of bankruptcy of one party. Set-off under these circumstances is possible even if the debt of the bankrupt is not yet due; special provisions of the Code of Executions and Bankruptcy prevent fraudulent practices, such as assignments by third parties of claims against the bankrupt to his or her debtors.

The mechanism of the set-off can easily be misused, and there must be restrictions to this possibility. The French CC and all codifications following it allow this mechanism for undisputed claims exclusively[35], a precondition considerably restricting the range of possible applications. Said restriction is missing in the Codifications following the system of "compensation by objection" and requiring, as the Swiss Code, a declaration of the party striving for compensation. Art. 125 of  the CO does not adequately define the cases which dare not be open for setting off. Compensation should be excluded during court-proceedings if the defendant wants do compensate by a claim which falls neither in the jurisdiction of the court of the main-claim nor can it be ascertained easily and without delaying excessively the decision on the main-claim[36].

## XII.  Negotiorum gestio (*Geschäftsführung/gestion d'affaires*) CO Art. 419-424

This particular type of legal relationship called negotiorum gestio ("acting without authority") is based on the Roman Law-tradition and was adopted in one way or an other by all codifications, but is unknown to the Laws of the English speaking area. It covers primarily the situation that one person is acting in favor and in the interest of another who is for the time being not in the position to do so. Contrary to the rule "volunteers have no right" in the continental tradition the relationship between the person acting (the *gestor*, acting person, *Geschäftsführer/gérant"*) and the person in who's favor the activity is deployed (*dominus* [*negotii*], *Geschäftsherr/maître*) is submitted to legal rules which are as far as possible following those of mandate:  The person acting has to do so according the presumed intention of the *dominus* and to favor and protect his interests (CO Art. 419). All activities being possibly the object of mandate may be covered by the rules of *negotiorum gestio*.

Does the *dominus* subsequently ratify the intervention of the acting person, the rules of mandate (CO Art. 394-418) apply altogether (CO Art. 424), therefore restricting the application of CO Art. 419-424 to the event of dissent of the persons involved.

---

[35]     French CC Art. 1291 par.1: "La compensation n'a lieu qu'entre deux dettes [...] qui sont également liquides et exigibles".

[36]     The adequate rule, which should prevail in Switzerland as it does mostly abroad has its origin in the Codex of Justinian (532) 4, 31, 14, l: *Ita tamen compensationes obici iubemus, si causa ex qua compensatur liquida sit et non multis ambagibus innodata, sed possit iudici facilem exitum sui praestare* (we order compensations exclusively if the ground of the compensation is indisputable and does not involve in much uncertainty but allows to the judge an easy decision).

The acting person is responsible for *omnis culpa* (i.e. liable for all *negligence*). This strict liability is alleviated in cases where the intervention was meant to provide protection from imminent danger (i.e. to the *dominus* or his property), but the agent's responsibility is extended to a liability for damages resulting without any fault if the intervention was against the obvious intention of the *dominus* (CO Art. 420). Should the acting person be under age his responsibility is limited to the amount of an eventual profit resulting from the intervention (CO Art. 421).

 The *dominus* must reimburse to the acting person all expenses incurred by the latter. In addition also compensation for losses eventually incurred by accident. Contractual rules apply, if the acting person employs personnel for which he is liable under Art. 101 CO. The claim for compensation includes the salaries of employees, but does not comprise any fee or salary of the acting person himself. As under *mandate* the claims for reimbursements are dependent from the (meaningful) activity only.

The *practical importance* of the *negotiorum gestio* is considerable. The set of rules provides the legal bases for compensation of the persons and institutions intervening and helping in cases of natural disasters as earthquakes and inundation, searching for missing persons in case of avalanches or other circumstances etc. The costs caused by searching for missing persons in avalanches etc. may be considerable and include damages incurred accidentally by the helping persons and the salaries of the persons employed by the persons or institutions organizing help in the catastrophe. The argument of *negotiorum gestio* may even help if a person is accepting personal damage in order to save others (a driver driving against a tree in order to avoid hurting a child who escapes into the street; decision of the German Bundesgerichtshof; BGHZ 38 p. 274 cons.2).

In addition to these traditional scenarios the application may be widened to quasi-contractual relations. In a situation comparable to the facts of the well-known decision *Sumpter v. Hedges*[37] the party not delivering the construction due under the contract may, contrary to said English precedent, claim compensation for the value of the work done, if the termination of the project is realized making use of the elements performed by the contractor. The argument to grant (reduced) compensation does apply by analogy the rules of *negotiorum gestio*[38].

*Specific problems* :
- *payments made to the account of another person* generally do not qualify as *gestio*. If the person making the payment was in error with respect to the purpose of the

---

[37]      *Sumpter v. Hedges*, Court of Appeal, 1 Q.B. 673: under a lump sum contract for the construction of a work no claim for compensation is given if in case of the abandonment of the work only half done. This rule is still good law in the UK.

[38]      Had the parties no contract, the termination of the project by the party who ordered the work making use of the work-elements granted by the contractor would amount to a ratification of the intervention and constitute "appropriation of the benefits resulting from the other parties acts", which creates a duty to indemnify the contractor "to the extent of the benefits received" (Art. 423); the contractor therefore claims for the value of his work (i.e. the reduction of the costs for the ordering party). This is the legal situation in case of absence of a contract between the parties, and the reasoning goes that the existence of a contract cannot do harm to the contractor, who necessarily has the same claims under the contract he had in absence of a contract under the rules of *negotiorum gestio*.

**Nr. 62**          Swiss Law — Law of Contracts          { 103—123 }

payment (he believed erroneously to be obliged to such payment) he may claim the paid sum under the rules of restitution (see VIII above) but has no title under the rules of negotiorum gestio for disbursements against or the third person in who's name payment was made. Exceptions must be admitted to this rule, especially if the payment was meant to execute a third party's duty following directly from legislation or being in public interest; the CO does not include a provision to that end (but the German CC does; see §§ 679 and 683); it may be assumed that Swiss courts would equally apply the said rule). Nevertheless it is advisable that persons intending to settle the bills of third parties ask for the assignment of the claim they intend to satisfy (i.e. not to perform the respective obligation, but to buy it from the creditor).

- the institution of *negotiorum gestio* is limited to *factual activity* of the *gestor* but does not cover legally relevant declarations. It is not possible without thereto related authorization to accept an offer in the name of the offeree nor is it possible to act in favor of any creditor in order to avoid limitation of his claim. As *gestio* is related to *mandate* it is important to state that it does not provide any authority to act in the name of the *dominus*, because the French Civil Code makes authority to a constituent an element of mandate (see Art. 1984 ff. CC).

## XIII. Limitations of actions (Verjährung/prescription; Arts. 127-142)

Actions of claims are limited in time with the exception of claims secured by pawn or real estate mortgage and a few others[39]. The periods of limitation under Swiss law seem short if compared with those of the other Civil Law countries.

The general time limit for claims not otherwise qualified is ten years (CO Art. 127). A limit of five years applies to claims resulting from rent or hire or from other periodical payments, as to claims for food, board, lodging and similar, for professional services such as legal consulting and for work done by mechanics, etc. (CO Art. 128). A term of limitation of one year is applicable to claims for damages in tort and claims resulting from unjust enrichment (CO Arts. 60, 67). The time-limit of one year is more and more questioned. Claims resulting from tort under the rules of special codes have a longer limit (e.g. two years under the rules for road accidents), and further extension is under consideration. But especially unsatisfactory is the rule of CO Art. 67 (unknown in the aCO) which establishes a one year-limit for claims for restitution of value and which in most cases was transferred under a presumed contract.

The period commences at the time the obligation becomes due (CO Art. 130). The one-year term regarding tort and enrichment claims starts only when the claim and the person of the debtor is known to the creditor (but an 'absolute' limitation becomes effective ten years after the event causing damage or enrichment, regardless of the knowledge of the creditor; see CO Arts. 60 and 67). Under special circumstances the period does not start or is suspended (CO Art. 134), especially regarding claims

---

[39]   Claims of creditors resulting from losses in bankruptcy proceedings against the debtor are submitted to a time limit of 20 years (and of 1 year as far as directed against the heirs of the debtor); Art. 149 a of the Schuldbetreibungs- und Konkursgesetz of 1996.

**Nr. 62**          Swiss Law — Law of Contracts          { 103—123 }

between members of the same family, claims of employees against their employers and actions which cannot be brought before a Swiss court (*e.g.* because the debtor has no legal residence in Switzerland).

The term of limitation is interrupted and a new period commences when the creditor brings an action before a court or arbitral tribunal or when making an application in bankruptcy proceedings. The same effect results from an acknowledgement of the debt by the debtor. By special provision, other acts of the debtor have the effect of interruption, all of them implying an acknowledgement of the debt, such as payment of interest, installments or furnishing a pledge or guarantee (CO Art. 135).


## XIV. Special types of contracts

### A. General remarks

Swiss law divides the 'Law of Obligations' into a 'general' and a 'special' part. The, general part covers (among other subjects, such as the law of torts and claims arising from unjust enrichment; CO Art. 41 *et seq.* and Art. 62 *et seq.*) the general rules of contract law as exposed above under pars. III-VII; while the special part is mainly reserved for the particulars of special types of contracts, *i.e.* the following: sale and barter (CO Arts. 184-238); gifts (CO 239-252); letting and hire, lease (CO 253-304); loans (CO 305-318); contract of employment (CO 319-362); contracts of manufacture (CO 363-379); publishing contracts (CO 380-393); the agency contracts, such as ordinary agency (CO 394-406), letters and orders of credit (CO 407-411) and brokerage contracts (CO 412-418); conducting business on behalf of a third party without request (CO 419-424); commission (425-439); contracts for transportation (CO 440-457); procuration and other commercial powers of representation (CO 458-465); order to pay to third party (CO 466-471); contracts of deposit (CO 472-491); contracts of suretyship (guarantee) (CO 492-512); gambling contracts (CO 513-515); annuity agreements and contracts for lifelong support (CO 516-529) and simple partnerships (CO 530-551).

The lawyer from an English-speaking country may be startled by the fact that this long list of specific types is set out and covered with detailed rules by legislation. In the Common Law areas, the problems related to such contracts are to a great extent solved by recourse to general principles of the law of contracts while under Civil Law many aspects of the law of contract are related to the traditions of the specific types of contract. Their catalogue reflects the Roman Law tradition with its *contractus*, whereby only contracts corresponding to a type in the series of the system were valid in every respect. Thus, the actual contract law of Switzerland is characterized by a double influence:

*First*, the general rules of contract of any type (described above under pars. III-VII) are determined by the legal ideas of the seventeenth and eighteenth centuries of the Enlightenment with its concept of freedom of contract and the *pacta sunt servanda* rule (all contracts, regardless of their content and of the possibility of their attribution to one of the pre-formed types are equally binding).

*Secondly*, it is influenced by the Roman Law tradition with its list of types of contracts and the specific rules governing each type; however, not adopting the Roman rule that agreements are only binding if qualified as a contract, *i.e.* being in conformity with one of the available types (see I D above ).

This combination of two principles has many advantages, and indeed the rules as presented in the context of special types of contracts and developed for specific practical problems in a legal tradition of innumerable centuries are of great help and provide adequate practical solutions not deducible from general principles of contract. On the other hand, it may be added that the combination of the two systems of different historical origin presents an intrinsic contradiction with which jurisprudence and legal literature did not yet fully cope with. Regarding contracts which combine elements of different types, regularly the question is put the way as to whether such a contract is to be qualified as of type A or type B. In resolving the above problem it would be more appropriate to adopt an approach which admits the possibility of an intermediate solution, *i.e.* a contract which is at the same time partly governed by the provisions of contract type A and partly by those of contract type B. Such a concept is the only way to realize the principle of freedom of contract, which means, *inter alia*, that parties are free to depart from the types of contracts offered by the Code.

In the following, only a few remarks with respect to a selected number of types of contracts can be made.

*B. Sale (CO Arts. 184-236)*

l.   The content of the contract and passing of title

The contract for the sale of any goods creates the obligation of the seller to deliver it and of the purchaser to pay the price agreed, but does not transfer the ownership to the purchaser, a situation corresponding to the *Agreements to Sell* of the English speaking area[40]. The ownership regarding movable goods passes at the moment of their physical transfer (under condition the parties intend the simultaneous transfer of dominium), in case of a sale of land by inscription in the register. Nevertheless, when an individualized object is sold, the risk of loss passes at the moment of the conclusion of the contract, *i.e.* the buyer must pay the price even if the goods perish or deteriorate before delivery (CO Art. 185). This solution does not reflect adherence to the old Roman principle of *periculum emptoris* (the risk is with the buyer) but was, in the preparation of the Code of Obligations, meant as a step in the direction of the French law which transfers ownership (and, in consequence, the risk) at the moment of the conclusion of the contract[41].

---

[40]   The opposite solution, i.e. the passing of the title at the moment of the agreement of the parties as in the Sale (or agreement of sale) is established in the French CC (Arts. 711. 938. 1138, 1583) and in many codifications following its example.

[41]   The French system is mainly inspired by the intention to maintain the Roman *periculum emptoris*-rule but present it in a more modern form and avoid the deviation from the rule *casus sentit dominus* (the risk of a thing is with its owner). See E.Bucher, Die Eigentums-Translativwirkung von Schuldverträgen: Das

**Nr. 62**         Swiss Law — Law of Contracts         { 103—123 }

The contract for the of movable goods do not require any specific formalities, i.e. may be agreed orally or even without explicit declaration. Special provisions have been introduced in order to prevent misuse in sales payable by installment and in similar transactions (CO Arts. 226-228). - Contracts for the sale of land must be effected by *deed*, i.e. a notarial instrument (CO Art. 216) to be established at the place of the real estate.

Switzerland has adopted the UN convention for the International Sale of Goods of 1980 (CISG, par.4 below).

2.    Warranty for defective goods

Under practical aspects the most important provisions of a sale contract refer to the warranty for defects of the delivered goods (CO Art. 197). The general rules of non-performance (as exposed, VII above) apply exclusively in case the goods sold are not delivered in due course. Once delivered, possible defects of the goods are not considered to be a form of non-performance of contractual obligations, but a situation for which the Code is granting specific remedies. This deviating from the general rule is the consequence of the fact, that the contract of sale in its traditional understanding relates to unique objects which as a general rule cannot be influenced with respect to their qualities (a concept which may be called "technological fatalism"): if the seller has no control over the quality of the sold item, he cannot have a thereto related obligation (*impossibilium nulla obligatio*; no obligation as to impossible things). This is the view of the Roman lawyer. In compensation the buyer has choice between the claim to a reduction of the price (*actio quanti minoris*, Minderung/action en réduction du prix) and the request to rescission of the whole transaction (*actio redhibitoria, Wandelung/action rédhibitoire*)[42], the latter being possibly combined with a claim for damages (CO Art. 205 I). If the defects are of minor importance, the judge may against the buyer's decision grant only reduction of the price (CO Art. 205 II), a rule which is peculiar to the Swiss code and not existing elsewhere (but in the practical outcome a possible consequence in contracts ruled by the CISG[43]).

The claims of the buyer presuppose that he has upon reception of the goods immediately inspected them and that he has given notice of the defects to the seller (CO Art. 201). If the defects are not perceptible in a normal inspection he may give notice when they have subsequently become apparent. Defects which do not appear within the period of one year from the delivery give no cause of action against the seller if he has not stipulated a contractual warranty of a longer period (CO Art. 201 I).

If the sale is for the delivery of fungible goods the buyer may, instead of rescission or reduction of price, claim the delivery of goods in conformity with the contract (CO

---

"Woher" und "Wohin" dieses Modells des Code Civil; in  ZEuP (Zeitschrift f.Europ.Privatrecht), 1998, S. 615-669.

[42]    This scheme of the sanctions available in cases of the sale of defective goods is common to all codifications of the continental legal tradition and goes back to the remedies offered by the *aediles* who were directing the police of the *forum* (market); the *sale* being legally organised mainly with respect to the practice of the marketplace.

[43]    CISG Art. 49 (1,lit.a) allows the buyer to avoid the contract in case of fundamental breach (Art.25) only, excluding thereby to rescind the sale on the ground of minor defects.

Art. 206). If the fungible goods differ substantially from the contract in the sense that they must be regarded as a thing incompatible with the contract (*aliud*, another thing), the delivery is considered as nonperformance (breach) in the sense of par. VII above.

3.    Warranty for defective title

   As the seller has no direct responsibility for the quality of the sold item, his obligation does equally not include the obligation to transfer the title; the seller must grant that the buyer enjoys peaceful and undisturbed possession of the purchased good, his responsibility not being engaged by the sole defects of title but becoming effective only in case of eviction, i.e. the threat that the buyer has to surrender it. This realistic and clear position follows the Roman tradition which is prevalent in most codification, the important exception being the German BGB which has created a system of guarantee of title[44].

4.    The Vienna Convention on international sale

   Switzerland adopted the UN Convention on Contracts for the International Sale of Goods of April 11, 1980 (CISG) as per March 1, 1991. It is expected that this codification will in the future influence the understanding of the Sale of Goods contracts in general insofar as its specific concepts deviate from the tradition of this contract in the codifications of the continental tradition. Civil law is deeply rooted in the Roman tradition which is focused on the sale of individualized items, thereby neglecting the sale of goods of a given genus (mass-products from agricultural or industrial origin). The former type of contract still exists and finds perfect regulation in the Roman concept of sale and the thereon based codifications. In modern times such contracts are comparatively few in number; far more important is the type of contract which in the English tradition is called, very much to the point, "sale by description" (i.e. the sale of all mass products of agriculture and industry, crude, coal etc.). The actual Swiss jurisprudence is characterized by the attempt to find solutions to meet today's needs based on a codification elementary aspects not the actually most practical

*C. Letting and hiring (rent) (CO Arts. 253-274g)*

The general rules governing the contract of rent (*Miete/bail*) apply both to the rent of movables and immovables. The actual law is characterized by the reform of 1989, in effect since July 1, 1990, which extended largely the protection of housing tenants. Rules allowing control of rentals are established (CO Arts. 269-270e) and the possibility of the owner to terminate the rent are restricted. The renewed text also comprises some rules on how to proceed in disputes developing from rent (CO Arts. 274-274g).

---

[44]    BGB §§ 433 I, 434, 439 and 440 II. The legal situation is somehow ambivalent and does not exclude the result that the buyer of a stolen object can refuse payment even in the absence of any risk of eviction. For more detail see E. Bucher, Rechtsgewährleistung in BGB und OR, Festgabe für Karl H. Neumayer, Basel 1997 p. 171-193 or "recht" 1996 p. 178-188.

**Nr. 62**            Swiss Law — Law of Contracts          { 103—123 }

### D. Contract of manufacture (Werkvertrag/contrat d'entreprise) (CO Arts. 363-379)

This type of contract, which follows the Roman law tradition of *locatio conductio operis* has no precise equivalent in the Anglo-American law. Its main characteristics are the obligation of the contractor (*enterpreneur*) to produce a certain effect or result and his strict bearing of risks. If he is not in the position to produce the result as promised, he has no claim for the price, even if the failure is not caused by his fault. The 'result' to be produced by the contractor may vary widely. The construction of a building or other work may be the kind of result mainly contemplated by the CO, but – according to the Swiss Federal Tribunal – even the showing of a film or the staging of a spectacle may be considered to form the object of this type of contract.[45]

### E. Agency (mandate) and similar types of contracts (CO Art. 394)

Agency, which is also known as mandate (*Auftrag/mandat*) is the type of contract of the CO influenced by the Roman law tradition more than any other. The main feature of the contract is the rule of loyalty and faithfulness between the parties (see the Latin origin: *mandatum* from *manum dare*, give the hand, *sc.* in order to affirm the mutual intention of good faith). The main duty of the agent is to safeguard the interests of the principal. He has to follow the instructions of the principal but remains responsible for the effects of his own acts. He is obliged to oppose if the principal is giving inadequate instructions. Often the agent is the person with more knowledge or skills than the principal who therefore merely indicated the desired aim, while it is the agent's duty to determine the appropriate means to reach it.

The agent should transfer to the principal the result of his activity (the *actio mandati directa* of Roman law), whereas the principal owes compensation for disbursements, etc. (the *actio mandati contraria*). In the Roman law tradition, still maintained by the German Civil Code, mandate is necessarily gratuitous. Swiss law, however, abandoned this principle, thus safeguarding the practical importance of the mandate in a modern world. In Switzerland, mandate is therefore the traditional type of contract governing the activities of lawyers, doctors, etc. but applies in addition to all contracts obliging to whatever activity in favor and interest of the partner.

A basic rule of the Roman mandate, preserved in Switzerland as well as in Germany (BGB § 671 I), France (Fr. CC Art. 2003) and most places of the Civil Law area, is the principle of revocability, *i.e.* the power of either party to terminate the contract at any time (CO Art. 404 I). This principle is even maintained when an immediate termination of the mandate causes damage to the other party; but in that event compensation is still due by the terminating partner (CO Art. 404 II).

---

[45] See e.g. BGE 109 II 38, 80 II 34, 70 II 218.