# EXHIBIT 1

1 | DANIEL J. BERGESON, SBN 105439
dbergeson@be-law.com
2 | CAROLINE McINTYRE, SBN 159005
cmcintyre@be-law.com
3 | BERGESON, LLP
111 N. Market Street, Suite 600
4 | San Jose, California 95113
Telephone: (408) 291-6200
5 | Facsimile:  (408) 297-6000

6 | Attorneys for Specially Appearing Defendant
INTERNATIONAL CARE LIMITED

7

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **COUNTY OF SAN FRANCISCO**

10

11 | KATARZYNA KUDLACZ, individually and
on behalf of all others similarly situated,

12 |
                                            Plaintiffs,

13 |               v.

14 | CULTURAL CARE, INC., a Massachusetts
Corporation; INTERNATIONAL CARE
15 | LIMITED, a Swiss Corporation; EF
EDUCATION FIRST, INC., a Massachusetts
16 | Corporation; and DOES 1 through 25,
inclusive,
17 |
                                            Defendants.
18

19

20

21

22

23

24

25

26

27

28

Case No. CGC-20-584567

**DECLARATION OF DAVID
WIDERBERG IN SUPPORT OF
SPECIALLY APPEARING DEFENDANT
INTERNATIONAL CARE LIMITED'S
MOTION TO QUASH SERVICE OF
SUMMONS FOR LACK OF
PERSONAL JURISDICTION**

Judge:     Hon. Ethan P. Schulman
Dept.:     302
Date:      October 29, 2020
Time:      9:30 a.m.

Complaint Filed:  May 27, 2020
Trial Date:  None set

DEC. OF DAVID WIDERBERG ISO SPECIALLY APPEARING DEFENDANT INTERNATIONAL CARE
LIMITED'S MTN TO QUASH SERVICE OF SUMMONS FOR LACK OF PERSONAL JURISDICTION
Case No. CGC-20-584567

I, David Widerberg, declare as follows:

1. I am Manager for International Care Limited ("ICL") in the above-captioned action (the "Action"). As Manager for ICL, I am familiar with, among other things, ICL's corporate structure, operations, contracts, contacts with, and services provided to, its international au pairs including Plaintiff, and ICL's relationship with Cultural Care, Inc. ("Cultural Care"). I submit this declaration in support of ICL's Motion to Quash Service of Summons for Lack of Personal Jurisdiction. I have personal knowledge of the facts set forth herein and, if called to do so, could and would testify competently thereto.

2. ICL does not submit to this Court's jurisdiction and provides this declaration as a special appearance for the sole purpose of challenging this Court's jurisdiction over ICL.

**No General or Specific Jurisdiction**

3. ICL is incorporated, and has had its principal place of business, in Zurich, Switzerland since January 2019. At the time Plaintiff joined the au pair program, ICL was incorporated, and had its principal place of business in Lucerne, Switzerland.

4. ICL is not, and has never been, registered to do business in California. ICL does not have offices or employees in any state in the United States.

5. ICL has never had a registered agent in California.

6. ICL has never paid taxes in California.

7. ICL has never had any officers, employees, offices, operations, bank accounts, property or other assets in California.

8. ICL does not solicit or conduct, and has never solicited or conducted, any business in California.

9. ICL has not submitted itself to jurisdiction in any United States forum.

**ICL's Contracts and Contacts with Plaintiff**

10. ICL did not enter into any contract with Plaintiff Katarzyna Kudlacz ("Plaintiff") or any *au pair* in California.

11. Plaintiff contracted with ICL while in her home country of Poland.

12. ICL's contracts with all of its international au pairs including Plaintiff contain

2

exclusive forum selection clauses mandating that all disputes be arbitrated in Switzerland with Swiss law governing the proceedings:

> This Agreement . . . *shall be governed by the laws of Switzerland.*  In the event of any claim, dispute, or proceeding arising out of the relationship of me and CC [defined in the contract as ICL], or any claim which in contract, tort, or otherwise at law or in equity arises between the parties, whether or not related to this Agreement, the parties submit and consent to the *exclusive jurisdiction and venue of the arbitrational tribunals of Switzerland.*  (Emphasis added).

Attached hereto as Exhibit 1 is a true and correct copy of ICL's contract with Plaintiff.

13.     Au pairs who contracted with ICL, including Plaintiff, signed contracts containing this exclusive forum selection and mandatory arbitration provision.

14.     ICL's au pair agreements describe the U.S. Department of State regulations that apply to au pairs while participating in the program, the nature of the relationship between the au pairs and their host families, and other terms and conditions of the program.

15.     ICL's sole contacts with the United States regarding the operation of the au pair program are its contractual relationships with Cultural Care, a Massachusetts corporation with its principal place of business in Massachusetts, memorialized in a Service Agreement.  Pursuant to this Services Agreement, ICL provides a variety of services to Cultural Care, including the identification, screening, selection, and preparation of prospective au pairs.  Services Agreement, § 3b-c.  ICL also provides a number of services to the prospective au pairs, including assistance in the preparation of required documents (*e.g.,* health forms, insurance certificates, participant and parental releases, etc.); training and preparation of the au pairs in their home country; informing the au pair of visa requirements; and provision of certain emergency or translation services during the program year.  *Id.*, § 3f, h, i, k, m.  ICL also provides international and domestic air travel for the au pair, along with securing health and accident insurance.  *Id.*, §l.  Attached hereto as Exhibit 2 is a true and correct copy of ICL's Services Agreement with Cultural Care.

16.     Cultural Care's roles and responsibilities under the Services Agreement include the selection, screening, and supervision of the host families, and training and supervision of the au pairs as required by the U.S. Department of State regulations once in the United States.  Services Agreement, § 4a-f.  Cultural Care is responsible for the au pairs' ground travel arrangements in the

3

1    United States.  *Id.,* §4.g.

2         17.     In addition to the Services Agreement, ICL and Cultural Care entered into an Air

3    Travel Services Agreement dated December 31, 2004, but last amended on October 1, 2011.

4    Under this Air Travel Services Agreement, ICL is responsible for providing airline transportation

5    to the au pair participants.   ICL's responsibilities include negotiating contracted fares with airlines

6    and providing ticketing services to Cultural Care.  Air Travel Services Agreement, § 1.  Attached

7    hereto as Exhibit 3 is a true and correct copy of the Air Travel Services Agreement.

8         18.     ICL contracts directly with au pairs in their home country regarding the services

9    ICL provides them.  ICL does not contract with American host families.

10        19.     The services ICL provides au pairs are all generally completed before the au pairs

11   depart their home country for the United States.  Once an au pair is in the United States, ICL has

12   no contact with the au pair unless there is a need for emergency translation services or other

13   contact with the au pair's home country.

14        20.     ICL is not responsible for making any payment to the au pairs, is not responsible

15   for ensuring that the au pairs receive any such payments from their host families, and has no

16   responsibility to supervise the au pairs when they are in the United States.

17        21.     ICL arranged for Plaintiff's flight from her home country of Poland to New York,

18   where the Plaintiff attended training programs operated by Cultural Care before joining her first

19   host family in Connecticut.  ICL's only other contact with Plaintiff was to secure air transportation

20   from her placement in Connecticut to her first of three California host families.

21        22.     After Plaintiff joined her first host family in California, ICL did not have any

22   additional contact with her.

23   **ICL's Relationship with Cultural Care**

24        23.     ICL is an international affiliate of Cultural Care.

25        24.     Cultural Care and ICL are legally distinct entities with different officers and

26

27

28

DEC. OF DAVID WIDERBERG ISO SPECIALLY APPEARING DEFENDANT INTERNATIONAL CARE
LIMITED'S MTN TO QUASH SERVICE OF SUMMONS FOR LACK OF PERSONAL JURISDICTION
Case No. CGC-20-584567

1   directors.

2       25.    Cultural Care and ICL maintain separate corporate books and records and their

3   funds are separately maintained.

4       26.    ICL is not and has never held itself out as liable for Cultural Care's debts.

5       27.    Throughout ICL's existence, corporate formalities were faithfully followed by:

6   appointing officers and directors, holding regular board of director meetings, keeping minutes

7   from those meetings and maintaining corporate records.

8   **Burden on ICL if Forced to Litigate in California**

9       28.    If ICL, a Swiss company with no presence in California, is forced to appear in a

10  forum thousands of miles away from its headquarters in Switzerland, it would impose "serious

11  burdens" on ICL.  In that regard, ICL would first need to litigate whether Plaintiffs' claims are

12  subject to the mandatory arbitration provision and Swiss governing law provision in her contract

13  with ICL.  If they could proceed in this Court under California law, Plaintiff's claims would likely

14  result in expensive and burdensome discovery of witnesses and documents.  To effectively defend

15  itself, ICL would have to disrupt its business and direct significant resources and employee

16  attention to California.  ICL's witnesses would have to travel thousands of miles to be subjected to

17  foreign legal proceedings in California.

18      I declare under penalty of perjury under the laws of the State of California that the

19  foregoing is true and correct.

20      Executed on this 6th day of October, 2020, at Zurich, Switzerland.

22                                          David Widerberg

28                                      5

# EXHIBIT 1

**To**
**Declaration of David**
**Widerberg in Support of**
**Specially Appearing Defendant**
**International Care Limited's**
**Motion to Quash Service of**
**Summons for Lack of**
**Personal Jurisdiction**


**Cultural Care Au Pair**

Au Pair reference number
POL10609804

# Agreement

*Cultural Care (registered business name of International Care, Ltd.), with registration number CH-1003.023.491-6, having its registered address at Haldenstrasse 4, 6006 Lucerne, Switzerland, together with its successors and assignees ("CC"), and the undersigned au pair,*

KUDŁACZ KATARZYNA

(Please print full au pair name)

*with date of birth:* 01/07/1990 *(Hereafter refered to as "I", "me" or "my"), for good and valuable consideration, understand and agree to the following terms and conditions (the "Agreement") relating to the au pair's participation in Cultural Care Au Pair au pair program (the "Program").*

1. In addition to the terms of this Agreement, I agree to abide by additional reasonable terms and conditions stipulated by CC during the Program, including the Extension program. If there is any confusion between this Agreement and the terms of any other contracts, agreements, or materials of any kind, the terms of this Agreement shall prevail.

2. I acknowledge that any materials I submit to Cultural Care will be used to make a suitable host family match for me and therefore agree that any submitted materials may be disclosed to prospective host families during the selection process, including my submitted medical forms.

3. I agree to comply with the Program regulations issued by the United States Department of State (22 CFR Part 62) ("Regulations"). I acknowledge receipt of a copy of the Regulations as they apply to me. I also understand that I must comply with CC's rules as outlined in this Agreement, the Au Pair Handbooks and other materials that CC has supplied to me. This includes staying within the legal number of working hours per day and week without exception. This also includes participation in all child safety and child development training and orientation sessions sponsored by CC. I will inform my Local Childcare Coordinator or CC if I encounter anything that does not comply with the Program regulations as outlined by the U.S. Department of State Regulations.

4. I agree to perform the child care responsibilities as outlined by CC and my host family to the best of my ability. I understand that providing childcare is my primary obligation in this Program and that any personal plans or activities will take secondary priority to caring for my host children. Should I be found to act in a way that puts my host children at risk or is inappropriate in any way, I understand that I will be removed from the Program immediately. I understand that my host family may ask me to respect a curfew and/or assign other reasonable restrictions designed to protect the safety and well-being of my host children. I agree to abide by such reasonable restrictions. I also understand that I may not post photos or personal information about my host family, host children, or host home on any web site, blog or the like without the express written consent of my host parents.

5. During my participation in the Program I will abide by all local, state and federal laws and other regulations. I understand that breaking these laws (such as shoplifting, driving under the influence of alcohol, drinking alcohol under the age of 21, possession, or use of illegal substances, etc.) shall be grounds for my immediate dismissal from the program and my return flight will be forfeited.

6. I understand that I may not use the family's automobile(s) for any reason without express permission from the host family and that any agreement to use the host family's automobile is strictly between the host family and me. I will not use the automobile unless the host family has obtained all of the mandatory automobile insurance coverage required under the laws of the state where the host family resides. I understand that if I have a car accident while using the car for personal use not related to my child care duties that I will be required to pay a deductible up to $500 US.

7. I agree to pay any personal expenses I incur while participating in the Program, including but not limited to, health expenses not covered by insurance, phone bills and/or car damages. CC is not responsible for any financial disputes I have with my host family such as outstanding money for educational component, weekly stipend, etc. I understand that I must settle all disputes directly with my host family prior to my departure from their home.

8. I understand that my Local Childcare Coordinator and the Cultural Care staff in the U.S. are my primary contacts during the Program, and are responsible for ensuring a positive and successful program year for me and my host family. I will notify the staff of CC in the U.S. in case of disagreement, misunderstanding or serious problems including but not limited to my health, safety, welfare, adjustment to my host family, school, culture or language, or misunderstandings or problems with my host family. I acknowledge that CC is solely responsible for choosing appropriate host families for me and I will not make attempts to obtain placements on my own after my arrival in the U.S. In situations where I am having problems with my host family, I agree to consult with and meet with my Local Childcare Coordinator and to follow CC's mediation guidelines as outlined in the Au Pair Handbook. I understand that it is CC's policy to try to resolve issues in the existing placement if possible before considering a new placement.

9. If CC determines that my placement within the host family will not continue, CC shall determine whether or not to pursue a new host family match for me. I understand that CC may not pursue a new host family for me due to safety concerns, a lack of positive recommendations or for other reasons relating to my suitability on the Program. I acknowledge that CC has sole discretion to pursue a new placement or not. Should CC decide to pursue a new placement, I understand that CC will use reasonable efforts to find another host family for me. During such time, I shall continue to live with my current host family who, in its discretion, may request me to provide, or not to provide, any childcare services and I shall remain reachable by phone/email with CC at all times. If I do not perform childcare duties during the transition period (even if I am staying with a host family) I understand that I will not receive the weekly stipend. CC will make every effort to match me with appropriate host families. Should I reject these host families for reasons of geographical region, car/computer use or other non-essential reasons I understand that CC may opt to discontinue a search for replacement. I understand that CC cannot guarantee a new family placement for me within the two-week transition period and inability to be replaced will result in my early return to my home country. Notwith-standing the above, I further understand that the first month of any placement is a period of adjustment and therefore CC will not process any non-emergency transitions during this period.

10. I understand that CC has the exclusive right to determine my suitability for acceptance and for my continued participation in the Program. I understand that if CC determines that my emotional or physical state does not make me suitable for providing quality childcare, I will be removed from the Program. I also

Au Pair's signature for this page: *Kudłacz Katarzyna*

Date: 13/02/2017

Version SY16

understand that should I marry or become pregnant while on the Program I will also be removed from the Program. If my performance as an au pair and/ or participation in the program is deemed unsatisfactory by CC for whatever reason, CC will reassess my suitability for future placement. I understand that I may be terminated from the Program if I do not successfully complete the Program requirements and uphold Program expectations for reasons including, but not limited to, the following: leaving the host family without prior consent from CC; engaging in behavior that CC deems inappropriate during the Program duration, performance reasons including but not limited to breaking host family rules, neglectful or inappropriate behavior towards the children, etc.; non-participation in training, not fulfilling educational credit, non-attendance at monthly meetings, or if I in any way violate this Agreement. I further understand that should it be discovered that I have falsified or withheld critical information from my application materials including, but not limited to, health conditions, criminal history, educational documentation, childcare experience, etc. I may be terminated from the Program. Should I be terminated from the Program because of my actions including, but not limited to, those outlined above, I forfeit my return to my home country and must pay for this flight on my own.

11. I understand that the Program is designated as a full year program with the possibility to extend for a further six (6), nine (9) or twelve (12) months. I confirm receiving information about the optional Extended Insurance coverage, including a copy of the general conditions booklet. If I extend after my first program year, I will be contacted regarding the activation of Extended Insurance coverage for my extension term under a new policy. Should I voluntarily decide to return home before the regular end date of my program (including extension period) I understand that my flight will not be paid for by CC. The exception to this will be in cases of my own extreme illness or the extreme illness or a death in my immediate family. Should I terminate or be terminated from the Program for any reason as outlined in this agreement, such termination will result in the following:

a) I will forfeit the return ticket and I will be required to make my own arrangements to return to my home country at my own expense; and b) My CC insurance coverage will no longer be valid and no part of it refunded other than the additional month optional insurance; and c) My status will be reported to U.S. Immigration and my participation in the au pair program will be canceled. d) CC will not provide me with housing in the USA.

12. CC will arrange my flights from and to my home country, from a CC approved gateway. I am responsible for my own transportation and the cost involved to the specified departure gateway in my home country. My departure date to the US (Group Arrival Date), will be determined by my availability and my host family's request. Should I cancel either of the included flights once the ticket has been issued, I understand that I will then be held responsible for any penalties and costs relating to this cancellation. CC will determine my return date based on the end date of my program and my host family gateway will be my return gateway. Special requests may be considered, however additional fees may apply and these costs will be my responsibility. I agree to provide proof of medical insurance coverage, either purchased as additional month optional insurance through CC or as a comparable policy from a third party, in order for CC to book my return flight for a date later than the completion of my Program. I understand that CC cannot book my return flight for a date later than thirty (30) days after completion of my Program. I understand that CC will not arrange for my return flight in case that I do not successfully complete the Program (including completion of required educational component). In this case I shall be responsible for my own flight home.

13. This agreement is made between me and CC. In regards to confidentiality, CC agrees not to divulge medical or confidential information (with the excep-tion of my submitted medical forms, and any accompanying documents) about me or my Program experience to any third party except in case of medical emergency, or in the event I am incapacitated for any reason. As a person of the age of majority I understand that this also includes my parents or family members as well as any partner or friends. Any disputes will be settled between me and CC or any legal entity bound to represent us and no other third party.

14. I agree to irrevocably, unconditionally, and fully remise, release and forever discharge CC and its affiliates; and said persons' respective officers, directors, suc-cessors, assigns, attorneys, insurance companies, agents, employees and affiliates, or others to the extent acting or purporting to act on the afore mentioned persons' behalf (all of said persons hereinafter, in the aggregate, being referred to as "Released Parties"), from any and all claims or causes of action which I have or may hereafter have, which arise out of illness, injury, damage or loss of any other kind to me or my property resulting from or during participation in the Program. This includes, without limitation, my performance of services for and involvement with the host family, regardless of how such illness, injury, damage or loss may arise. I further agree to indemnify and hold harmless the Released Parties from and against any losses, claims, damages or liabilities related to or arising out of my participation in the Program, including (without limitation) any illness, injury or damage to me, that my host family causes, that any third party causes, that I cause or to which I contribute, and any illness, injury or damage to my host family which I cause or to which I contribute.

15. This Agreement shall take effect as a sealed instrument under and shall be governed by the laws of Switzerland. In the event of any claim, dispute, or proceeding arising out of the relationship of me and CC, or any claim which in contract, tort, or otherwise at law or in equity arises between the parties, whether or not related to this Agreement, the parties submit and consent to the exclusive jurisdiction and venue of the arbitrational tribunals of Switzerland.

16. My signature on this agreement indicates acceptance of this Agreement and is legally binding. No alterations to the terms of this agreement will be valid unless approved in writing by CC. If any provision of this agreement shall be deemed unenforceable, such paragraph shall be omitted and the remainder of the agreement shall be valid and enforceable to the fullest extent allowed by law.

_Kudłacz Katarzyna_ (signature)
Au pair signature

_13/02/2017_
Date

KUDŁACZ   KATARZYNA
Au pair name printed

*If au pair will not be of the legal age of majority in his/her home country at the time of anticipated departure to the USA, please include below signature of parent or legal guardian.*

KUDŁACZ KATARZYNA
Legal guardian signature

Date

Legal guardian name printed

# EXHIBIT 2

## To
## Declaration of David Widerberg in Support of Specially Appearing Defendant International Care Limited's Motion to Quash Service of Summons for Lack of Personal Jurisdiction

## Agreement

This Agreement is made and entered into in Lucerne, on the date hereinafter set forth, by and between Cultural Care Inc., duly organized and existing under the laws of the Commonwealth of Massachusetts, (hereinafter referred to as "Inc") and International Care. Ltd. (hereinafter referred to as "ICL") Duly organized under the laws of Switzerland.

Whereas:

A.      It is the mission and purpose of Inc to operate exchange visitor programs (hereinafter "Programs") which are designed to afford exchange visitors (hereinafter "Participants") cultural and educational opportunities outside their native countries.

B.      Inc identifies and recruits American families willing to host an au pair and thereby increase the appreciation of international culture among American families and at the same time enhance the knowledge of the Participant and increase the Participant's awareness and appreciation of American culture and the English language through active participation in family and community life.

C.      Inc has received official recognition as a Designated Exchange Visitor Program Sponsor from the United States Department of State ("U.S.D.S.") and its Exchange Visitor Program designated number is P-4-10181

D.      Inc wishes to devote itself exclusively to its chartered purposes. It therefore desires to deliver its exchange program services to ICL, as ICL is an organization which is experienced in organizing and promoting cultural and educational programs abroad and which has vast international experience and is familiar with the legal regulations governing such programs.

E.      ICL has a thorough global knowledge in national policies, rules and regulations governing international cultural and educational exchange programs and has experience marketing and developing such programs.

F.      The purposes of ICL include the promotion of educational and cultural exchange programs such as Au Pair to clients throughout the world.

G.      ICL has the global presence with offices, staff and contracted agents and the unique capacity to supply Inc with significant number of qualified participants who are adequately screened and prepared. ICL also has long term relationships with schools and other organizations through which to contact potential participants worldwide.

H.      ICL has the global scale, organization, systems and skills to coordinate the





logistics, insurance and supply of qualified participants from around the world according to the demand of Inc.

I.      ICL has developed an internet based information system allowing for accurate management of applications and Participants. This is highly useful in facilitating selections and matching between applicants and host families.

J.      ICL owns the rights to the name Cultural Care and is willing to license the use of this name to Inc

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below and for other good and valid consideration, the sufficiency of which is hereby recognized, the parties hereto agree as follows:

## 1. General Statement.

Inc operates an au pair program whereby eighteen (18) to twenty-six (26) year old Participants from countries outside of North America stay with host families in the United States, learn about American culture, provide a cross culture exchange and improve English language skills, while assisting the host families with child care to promote the general interests of educational and cultural exchange. The principal purpose of the Program is that of an educational and cultural exchange. The program is operated in accordance with the rules and regulations promulgated by the US Department of State (the "Regulations").

Inc shall deliver all services required to be performed by the designated entity under the Regulations and ICL shall recruit participants and provide the other services needed for organizing the program as set forth in this Agreement.

Inc specifically seeks partnership with an Organization which has the international capacity and experience to organize and promote recruitment of qualified participants worldwide and to supply Inc with a sufficient number of applicants with a wished for diversity to facilitate and accommodate Inc's needs from time to time.

ICL operates a global organization outside the United States with the unique capacity to find, recruit and prepare international individuals who are qualified and suitable to become participants in the program. ICL has the know-how and capacity to manage an international organization, and be able to respond to fluctuations in demand or supply and to monitor various national policies regulating exchange programs. ICL also has the reputation and developed brand recognition needed to accommodate the volume demands as well as future increase in demand from Inc.

Inc and ICL hereby contracts with each other to promote the Program outside of North America and to accommodate the placements of Participants in host families in the United States and, in connection therewith, to cooperate as set forth below to provide the services as may be necessary



or advisable to operate the said Program, with the terms and conditions set forth in this Agreement.

## 2. Term.

### 2.1. Initial term.

The obligations of the parties hereunder shall commence on October 1, 2010 and shall continue through September 30, 2011 unless sooner terminated as herein provided.

### 2.2. Extension.

This agreement shall be automatically extended for additional one year periods should either of the parties fail to give notice of termination at least 3 months prior to the expiration of this agreement, provided that each of the parties is in compliance with its obligations hereunder.

## 3. Duties of ICL

- a,  Organization and Promotion. ICL will promote the Cultural Care name and program worldwide.
- b,  Recruitment and preparation of participants. ICL will identify, recruit and prepare prospective Participants to the Program directly or through its agents in countries designated by the U.S.D.S. (each respectively a "country of origin").
- c,  Selection of Participants, ICL will be responsible for the selection and screening of Participants, and will present the agreed number of Participants to Inc.
- d,  Qualifications. Qualification requirements of the Participant are thoroughly described in the Regulations. Applicants will be screened by ICL for demonstrated maturity, good character, sufficient skills in English and ability to derive maximum benefit from the Program experience and shall meet other such requirements and procedures which are required under the Regulations, adopted or modified from time to time by the U.S.D.S. and as the parties deem appropriate in connection with the Program.
- f,  Screening. In screening applicants, ICL shall perform a personal interview, a careful evaluation of the application information, school reports, references, and medical forms concerning physical and mental health. ICL shall also conclude a background investigation that includes verification of school, three non-family related personal and employment references, a personality profile and criminal record check or its recognized equivalent.
- f,  Preparation of application. ICL will ensure all applications have required documents in a format as from time to time required by Regulations and Inc. such as health forms, insurance certificates, participant and parental releases and all other documents deemed necessary or advisable. ICL will verify all documents and supply to Inc. a complete application package.
- g,  Promotional materials. Depending upon the number of participants Inc and ICL agree to accommodate, ICL will develop promotional activities, material and plans. Inc will supply ICL with Program information deemed necessary in

promoting the Program. ICL translates promotional materials to all relevant markets, ensuring compliance with all requirements in the Regulations. All promotional material shall name Inc as the sponsor of the Program in the United States. Annually ICL will provide Inc with a complete set of all promotional materials, brochures or pamphlets distributed to either Participants or host families for further deliverance to U.S.D.S. according to the Regulations. All promotional and orientation materials developed hereunder shall remain the property of ICL. The rights of ICL regarding the assignment of promotional materials contained in this 3. shall survive the termination of this Agreement.

h,    Preparation of participants. ICL will arrange for training and education of the participants in the home country of the Participant. Prior to the start of the Program, ICL will arrange pre-departure orientation meetings to familiarize the Participant with orientation materials to acquaint the Participant with the host country, its people, and its family and cultural life.

i,    Visa. ICL shall inform each Participant that he or she is responsible for arranging and obtaining all necessary visas and other immigration requirements for his or her travel to and from the host country sufficiently in advance of his or her departure. ICL shall do its best in actively supporting the Participant in the application process.

j,    Notification of Qualification. As each applicant is deemed qualified, ICL shall notify such applicant and provide Inc with the name and address and all application documents of the applicant.

k,    Liaison. ICL shall serve as a liaison between Inc., the Participant and the Participants home country family through the duration of the program. ICL shall be prepared to arrange for emergency contacts, translation services and other services needed to fulfill the Program's intention of a successful cultural exchange experience.

l.,   Travel. ICL is responsible for providing international and domestic air travel.

m,    Insurance. ICL will secure participant health and accident insurance meeting the requirements of U.S.D.S.

## 4. Duties of Inc.

a,    Selection, Screening and supervision of host families. Inc arranges for the selection, screening and supervision of host families. Inc ensures that the host families are fully aware of their responsibilities and obligations set forth in the Regulations, as such Regulations may be modified and amended from time to time.

b,    Compliance. Inc has the procedures and systems in place to secure compliance with the Regulations. Inc also provides such other services as may be required to assist in the orderly administration of the program and the needs and welfare of the Participants during their stay in the United States.

c,    Visa. Inc is responsible for the proper handling and registration of all applicants in order to obtain necessary documents for J-visa application.

d,    Final selection of Participant. Inc is responsible for the presentation of the applicant to the selecting host family and has the right to reject any potential

Participant for any reason it deems advisable.

e,   Training. Inc provides health and safety training and childcare and development education to the participants, consistent with the Regulations, and provides some general orientation about the way of life and culture in the United States.

f,   Supervision. Inc provides continuing supervision in the US of the Program by means of meetings with the participant and the host family and/or monthly telephone progress reports. Inc provides counseling support to the participant on an ongoing basis. In addition, workshops are scheduled on a regular basis to address cross-cultural issues.

g,   Travel. Inc shall be responsible for the Participant's ground travel arrangements in the United States.

## 5. Matching applications.

The matching of an applicant with the appropriate host family is a key element for a successful program year. ICL and Inc. shall work together to meet the demands and expectations of both parties. The final matching is decided between the au pair and the host family by mutual consent.

## 6. Program Rules.

Inc has together with ICL established such program rules as it deems in the best interest of the Program and the Participants. If, at any time, a Participant violates such program rules or engages in any conduct which Inc, after thorough review, believes is not in the best interest of its Program, the Participant will be required to return to his or her home country at his or her own expense.

## 7. U.S. Department of State.

Inc and ICL acknowledge and affirm that Inc's Program is subject to the Regulations for au pair programs now in existence, as such Regulations may be amended or modified in the future, and that this Agreement and the obligations of the parties hereunder shall be subject to, and interpreted in accordance with such guidelines and any relevant regulations related thereto. Inc will provide all selected host families and Participants with copies of the U.S.D.S.-promulgated Exchange Visitor Program Regulations. In addition, Inc shall file with the U.S.D.S. such annual reports and other information as required under the Regulations.

## 8. Extensions of Program

Since February 2004 U.S.D.S allows Participants a one term extension of their stay in the US for a period up to 12 months after their initial year. It is in both parties interest to promote extensions to both Host Families and to the participants and it is therefore agreed that all obligations under this agreement shall continue under such extension.

## 9. Projected Number of Participants.

a,   Inc and ICL shall each year in August agree on a budgeted number of participants

Page 5



for the following year. This amount will be partly based on the number of visas Inc expects to have for the upcoming year. Inc shall then use its best efforts to inform ICL regularly of the estimated number of Participants Inc anticipates that it will be possible to accommodate for the succeeding month, based upon the number of host family applications received without this being deemed to be a guarantee that a certain number of Participants will be accepted.

b, ICL shall use its best efforts to promote the Program to the extent necessary to provide Inc with a pool of applicants from which Inc can select approximately the number of Participants submitted to Inc pursuant to subsection 9.a, The parties anticipate that the number of applicants will be significantly higher than the estimated number of Participants to be accepted. ICL or its agents shall use its best efforts to provide Inc on a regular basis with a list of potential Participants from each country of origin.

## 10. Intangible Property

ICL is the sole and exclusive owner without any legal or territorial limitations of intangible property as defined below. The Intangible property means: the trade mark and trade name Cultural Care, registered domain names, the know how, agent lists, country information, data manuals, standards, specifications, screening and selection materials, recruitment leader lists, design, contracts and all other related information to the promotional activities of the Cultural Care name.

ICL has developed an Internet based system for tracking and facilitating the matching process between prospective Participants and Host Families. ICL is the sole and exclusive owner of this system.

## 11. Use of Intangible Property and Trade Marks

a, ICL grants Inc the non-exclusive rights to use the intangible property in the US for purposes of operating the designated program. Inc's right to use the intangible property expires automatically when this agreement terminates or expires.

b, ICL develops and produces instructions and manuals for usage of the Intangibles and the trademark and any material produced directly by Inc needs to conform with these instructions. http://www.culturalcare.ch/media/4502980/styleguide.pdf

c, Upon termination or cancellation of this Agreement, each party shall take all actions necessary to transfer and assign to the nominee any right, title or interest in or to any of the trademarks which ICL and/or Inc may have acquired in any manner under this Agreement, and each Party shall cease to use any trademark or copyright material of the other party.

## 12. Emergency.

In the event of war, natural catastrophe, illness, death, or other unforeseen emergency, both parties shall cooperate in fulfilling such responsibilities to Participants and their families as the parties deems it to be necessary and/or advisable. ICL shall arrange with Participant and his or her family a means of emergency communication in the Participant's native language

## 13. Program Fees and Payments.

### 13.1 ICL Compensation.

As a result of the services described in this agreement, INC shall provide ICL with arm's length compensation as specified in Exhibit A. All compensation paid under this agreement shall be transferred to the bank account indicated by ICL within 30 days of receipt of written compensation request. Above compensation should be decided for one year at a time and should be subject to negotiations during the month of September each year. Modifications must be mutually agreed to by the parties in writing to be effective.

### 13.2. Fees and other services.

Each party shall be entitled to retain fees and offer supplemental products to the participant such as visa services, pre-language training, and other travel related services and special travel arrangements. ICL shall offer these services prior to the Participant's departure and Inc has the right to offer this kind of services during the stay in the United States.

### 13.3. Royalties and Compensation for use of Intangible Property.

All compensation referable to the use of trademarks and other intangible property owned by other party is subject to separate agreement.

## 14. Indemnity.

ICL shall defend and indemnify Inc and its employees, its agents, and its representatives and hold it and them harmless from and against any and all costs, expenses, and damages of any kind suffered or incurred by any reason of any suit, claim or demand arising out of or attributed, directly or indirectly, to the acts or omissions of ICL or its employees or agents in connection with the Program. Inc shall defend and indemnify ICL and its employees and agents and hold it harmless from and against any and all costs, expenses and damages arising out of or attributed, directly or indirectly, to the acts or omissions of Inc or its employees or its agents in connection with the Program, provided however, that any indemnification provided by Inc is made in accordance with the rules and regulations governing Inc.

## 15. Relationship to the Parties.

Nothing contained in this Agreement shall be construed to constitute ICL or Inc as a partner or agent of the other. Either party has no right or authority to incur, assume or create, in writing or otherwise, any warranty, liability, or other obligation of any kind, express or implied, in the name of or on behalf of the other party, it being intended by both ICL and Inc that each shall





remain an independent contractor responsible for its own actions. Inc shall not be liable or responsible for any cost or expenses of ICL, its agents, volunteers, or employees.

## 16. Notices.

Any notice required permitted to be given hereunder shall be in writing and may be given by facsimile, international courier service, personal delivery or by certified mail, and if given personally or by mail, shall be deemed sufficiently given, if addressed to the respective party at the address below, as the case may be:

President
Cultural Care, Inc.
One Education Street
Cambridge, MA 02141
U.S.A.

President
International Care, Ltd.
Haldenstrasse 4
6006 Lucerne
Switzerland

Either party may by notice in writing to the other party specify a different address for notification purposes.

## 17. Termination of Agreement.

### 17.1. Breach.

Either party may terminate this Agreement immediately upon written notice to the other party if that party fails to cure any material breach of its obligations hereunder within thirty (30) days of the delivery of written notice of such breach. If the Agreement is terminated under this provision, all amounts outstanding shall be due and payable within thirty (30) days of termination.

### 17.2. Insolvency.

This Agreement shall be terminated by written notice upon either party's cessation of business, election to dissolve, dissolution, insolvency, or the commencement of a proceeding by or against such party for the appointment of a receiver for any substantial part of its property under any bankruptcy law or similar law.

### 17.3. Operation of Law.

Either party may terminate this Agreement in the event that a law, decree, or regulation is enacted or adopted by any governmental authority which would impair or restrict in any manner

Page 8



whatsoever the right of Inc to terminate or elect not to renew this Agreement; provided, however, that such termination shall not take effect until the day prior to the effective date of the aforementioned law, decree, or regulation.

## 17.4. Compliance with Governmental Regulations.

In the event any legislation, rule, judgment or order is enacted, adopted or issued which frustrates Inc's purposes in entering into this Agreement or its ability to perform, Inc has the right, in its sole discretion, notwithstanding any other provisions of this Agreement, immediately to terminate this Agreement or to cease performing or unilaterally to modify that portion of the Agreement which has been so affected upon notice to the other parties.

## 17.5. Obligations on Termination.

Upon the termination or cancellation of this Agreement, ICL shall return to Inc any supporting documents made available to them by Inc, and any monies held for the benefit of Inc, and shall further comply with their obligations under section 13.

## 17.6. Confidentiality of Information and Materials.

Both parties shall hold in strict confidence and shall not disclose to others or use, either before or after termination or expiration to this Agreement, any technical or business information, Participant records, informational materials, computer programs and databases, processes, trade secret or their confidential matter relating to the Program, except to the extent disclosure is necessary to perform under this Agreement.

The Parties shall, upon request (and upon termination or expiration of this Agreement without request), return any and all handbooks, manuals, notes, records, computer programs, and databases, documents, and materials received from or owned by other party.

## 18. Miscellaneous.

### 18.1. Force Majeure.

If the performance of any obligation under this Agreement by either party is prevented, restricted, or interfered with by reason of war, revolution, civil commotion, acts of public enemies, blockade, embargo, strikes, any law, order, proclamation, regulation, ordinance, demand, or requirement having legal effect of any government or any judicial authority or representative of any such government, or any other act whatsoever, which is beyond the reasonable control of the party affected, then the party so affected shall, upon giving prior written notice to the other party, be excused from such performance to the extent of such prevention, restriction, or interference, provided that the party so affected shall use reasonable commercial efforts to avoid or remove such causes of nonperformance, and shall continue performance hereunder with reasonable dispatch whenever such causes are removed.

### 18.2. Authentic Text.

The authentic text of this Agreement shall be the text in the English language first executed by the parties.

## 18.3. Assignment and Delegation.

This Agreement shall be binding upon and inure to the benefit of and enforceable by the successors and assigns of both parties.

## 18.4. Binding Effect.

Subject to any provisions hereof restricting assignment, this Agreement shall bind the parties, their personal representative, successors, and assigns.

## 18.5. Applicable Law.

This contract shall be governed by the substantive laws of Switzerland. Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration in accordance with Swiss law. The place of arbitration shall be in Lucerne and shall be conducted in English. The arbitration tribunal shall be composed of a single arbitrator unless the parties agree otherwise in writing.

## 18.6. Partial Illegality.

If any provision of this Agreement of the application thereof to any party or circumstances shall be declared void, illegal or unenforceable, the remainder of this Agreement shall be valid and enforceable to the extent permitted by applicable law. In such event, the parties shall use their best efforts to replace the invalid and unenforceable provision that, to the extent permitted by the applicable law, achieves the purposes intended under the invalid or unenforceable provision. Any deviation by any party from the terms and provisions of this Agreement in order to comply with applicable laws, rules or regulations shall not be considered a breach of this Agreement.

## 18.7. Waiver of Compliance.

Any failure by either party hereto to enforce at any time any term or condition under this Agreement shall not be considered a waiver of that party's right thereafter to enforce each and every term and condition of this Agreement.

## 18.8. Counterparts.

This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

## 18.9. Amendments.

This Agreement and any Schedule hereto may be amended by written agreement of the parties.

In witness whereof, the parties hereto have caused this Agreement to by duly executed by their duly authorized representatives.

**Cultural Care, Inc.**

By: _____

_____ **OCT 1 2010**
Date

**International Care, Ltd.**

By: _____
    RADACLU A-IBOKETU

_____ **OCT 1 2010**
Date



## Exhibit A – Arm's Length Compensation Determination

The arm's length compensation from INC to ICL for services provided in this contract has been determined as below for the year:

A. A fixed amount of ███████ per completed application ('ACC')

B. A fixed amount of ███████ per selected Participant in the program ('OTP')

C. A fixed amount of ███████ per participant enrolled in an extension for 12 months beyond the standard Program 12 months ('12EXT')

D. A fixed amount of ███████ per participant enrolled in an extension for 9 months beyond the standard Program 12 months ('9EXT')

E. A fixed amount of ███████ per participant enrolled in an extension for 6 months beyond the standard Program 12 months ('6EXT')

The compensation shall be subject to review in September each year, meeting the Arm's Length Standard between the parties.

**Cultural Care, Inc.**

By: _____        Date: __OCT 1 2010__

**International Care, Ltd.**

By: _____        Date: __OCT 1 2010__
    RADAELLI ALBERTO

Page 12



**CULTURAL CARE AU PAIR**

Cultural Care, Inc.                                                                                     September 10, 2019
One Education Street
Cambridge, MA 02141
U.S.A.

International Care, Ltd.
Haldenstrasse 4
6006 Lucerne
Switzerland

International Care Ltd is entitled to arm's length compensation for services described in the Agreement between Cultural Care, Inc. and International Care Ltd. originally dated October 1 2010.

Pursuant to section 2 of the Agreement, this letter confirms the decision made by the parties to continue the Agreement. The updated Exhibit A with the agreed compensation, effective October 1 2018 is enclosed to this letter. All other terms in the agreement remain unchanged.

INTERNATIONAL CARE LTD                                               CULTURAL CARE, INC.

Alberto Radaelli                                                                    Jens Appelkvist

Enclosure: Updated Exhibit A (effective October 1 2018)

**Exhibit A – Arms' Length Compensation Determination**

Effective October 1 2018

The arm's length compensation from INC to ICL for services provided in this contract has been determined as below for the year:

A.  A fixed amount of USD ▮▮ per completed application ('ACC')

B.  A fixed amount of USD ▮▮ per selected participant in the program ('OTP')

C.  A fixed amount of USD ▮▮ per participant enrolled in an extension for 12 months beyond the standard Program 12 months ('12EXT')

D.  A fixed amount of USD ▮▮ per participant enrolled in an extension for 9 months beyond the standard Program 12 months ('9EXT')

E.  A fixed amount of USD ▮▮ per participant enrolled in an extension for 6 months beyond the standard Program 12 months ('6EXT')

The compensation shall be subject to review in September each year, meeting the Arm's Length Standard between the parties.

# EXHIBIT 3

**To
Declaration of David
Widerberg in Support of
Specially Appearing Defendant
International Care Limited's
Motion to Quash Service of
Summons for Lack of
Personal Jurisdiction**

## AIR TRAVEL SERVICES AGREEMENT

AGREEMENT, entered into as of this 31st day of December 2004 by and between **Cultural Care Ltd.,** with its principal offices at Haldenstrasse 4, 6006 Lucerne, Switzerland ("CC") and **Cultural Care Inc.,** with its principal offices at One Education Street, Cambridge 02141, U.S.A. ("Inc").

WHEREAS, CC by itself or through its affiliates provides airline transportation to the Participants of the Exchange Visitor program operated by CC and Inc.; and

WHEREAS, Inc has received official recognition as a Designated Exchange Visitor Program Sponsor from the United States Department of State and desires to use the airline contracts and ticketing services of CC;

NOW THEREFORE, for good and valuable consideration, the parties agree as follows:

1. Duties of CC:  CC shall negotiate contracted fares with airlines and provide ticketing services to Inc including, but not limited to:  space allocation, inventory management and booking and processing airline tickets.  CC shall also manage and maintain any necessary technical platform to provide the services herein.

2. Term:  This term of this Agreement shall commence on December 31, 2004 and shall continue thereafter unless either party terminates with sixty days (60) written notice to the other party.

3. Compensation: Inc shall reimburse CC the net airfare incurred including Airline surcharges and taxes. Further Inc shall pay CC a two tier fixed service charge fee per issued passenger ticket.

    - Net Remit < ▉▉ – Service Charge ▉▉
    - Net Remit > ▉▉ – Service Charge ▉▉

4. Relationship of Parties.  CC and Inc are operating as independent entities. This Agreement is for the purposes expressly set forth herein and does not constitute a partnership, agency or joint venture, and nothing herein contained is intended to constitute, nor shall it be construed to constitute or create a partnership, agency or joint venture relationship between the parties.  Neither party hereto shall have any power or authority to (a) act in the name or on behalf of the other party hereto or (b) incur or accept any liability or obligation binding upon the other party without the express prior written consent of the party to be bound.  The employees of each party hereto shall remain the employees solely of such party, subject to the sole and exclusive direction and control of such party.

5. Indemnification:  Each party (as such, the "indemnifying party") hereby covenants to defend, indemnify and hold harmless the other party (as such, the "indemnified party") against all losses, liabilities, costs and expenses, including, without

limitation, related legal fees and disbursements, incurred by the indemnified party, if and to the extent such loss, liability, cost or expense results from the negligence or misconduct of the indemnifying party, its employees, agents, officers, directors or any other person acting on its behalf.

6. Notices.  Any notices hereunder shall be in writing sent by certified mail, return receipt requested, or by reliable overnight courier to the parties hereto at the addresses stated above, or to such other addresses as the parties may furnish to each other in writing.

7. Governing Law.  This contract shall be governed by the substantive laws of Switzerland. Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration in accordance with Swiss law. The place of arbitration shall be in Lucerne and shall be conducted in English. The arbitration tribunal shall be composed of a single arbitrator unless the parties agree otherwise in writing.

8. Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of and enforceable by the successors and assigns of both parties.

9. Entire Agreement.  This Agreement contains all of the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or written, regarding the subject matter of this Agreement shall be deemed to exist.  This Agreement may not be amended or modified except in writing signed by Ltd and Inc.

IN WITNESS WHEREOF, the parties have set their hand and seal on the date first above written.

Cultural Care Ltd.

By: _____

Name: J. APPELKVIST

Title: President

Cultural Care Inc.

By: _____

Name: GORAN F RANNEFORS

Title: PRESIDENT

## Amendment

This is an amendment to the Air Travel Services Agreement made between Cultural Care Inc. (former EF Au Pair Inc.), Cambridge, Massachusetts, ("Au Pair") and International Care Ltd. (former Cultural Care Ltd.), Lucerne, Switzerland ("ICL") and entered into on December 31, 2004 ("Main Agreement").

Whereas:

In light of resent changes to the business climate relating to air line operations and net air fairs the parties have decided to re-negotiate and amend the Air Travel Services Agreement with the following changes to paragraph 3;

3. Compensation: Au Pair shall reimburse ICL the net airfare incurred including Airline surcharges and taxes. Further Au Pair shall pay ICL a two tier fixed service charge fee per issued passenger ticket with ▇ markup..

   - Net Remit < ▇ – Service Charge ▇
   - Net Remit > ▇ – Service Charge ▇

All other obligations of the parties remain unchanged from the Main Agreement.

October 1, 2012

Cultural Care Inc.

Jens Appelkvist

International Care Ltd.

Alberto Radaelli

Charlotta Bjornsson