UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KAREN MORALES POSADA, AMANDA | * | |
| SARMENTO FERREIRA GUIMARAES, | * | |
| WILLIANA ROCHA, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 1:20-cv-11862-IT |
| | * | |
| CULTURAL CARE, INC., | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

February 28, 2024

TALWANI, D.J.

Plaintiffs Karen Morales Posada, Amanda Sarmento Ferreira Guimaraes, Williana Rocha, and Sara Barrientos assert against Cultural Care, Inc. ("Cultural Care Inc."), an au pair agency: claims on their own behalf and on behalf of similarly situated au pairs who have opted in to this litigation for violations of the federal Fair Labor Standards Act; and claims on their own behalf and on behalf of putative classes and subclasses for violations of various state laws. Cultural Care Inc. has now moved to compel the named Plaintiffs and all opt-in Plaintiffs to arbitration and for other or alternative relief, based on two agreements. Motion to Compel Arbitration [Doc. No. 309].

For the reasons set forth herein, to the extent arbitration is sought based on a 2023 agreement between individual au pairs and Cultural Care Inc., the motion is DENIED without prejudice where Cultural Care Inc. has not identified any named or opt-in Plaintiffs who signed the 2023 agreement. To the extent arbitration is sought based on a contract signed by the Plaintiffs and another party, International Care, Ltd., the motion is DENIED where Cultural Care

Inc. has waived any right to enforce that arbitration provision, and in any event may not enforce it either as a third-party beneficiary or under the doctrine of equitable estoppel.

## I.      Background

### A.   *The Original and Amended Complaints and the First Motion to Dismiss*

On October 15, 2020, Karen Morales Posada filed the original <u>Complaint</u> [Doc. No. 1] in this action. On December 24, 2020, Cultural Care Inc. filed its first <u>Motion to Dismiss</u> [Doc. No. 11]. Shortly thereafter, on January 14, 2021, Morales Posada, joined by Amanda Sarmento Ferreira Guimaraes and Williana Rocha, filed an <u>Amended Complaint</u> [Doc. No. 23], and the court denied the first <u>Motion to Dismiss</u> as moot [Doc. No. 25].

### B.   *Temporary Stay of Discovery and the Commencement of Opt-In Filings*

The parties subsequently filed a join motion seeking, <u>inter alia</u>, a deadline for Plaintiffs to file a second amended complaint and a temporary stay of discovery, Joint Motion [Doc. No. 29], which the court allowed, Elec. Order [Doc. No. 30]. Beginning February 3, 2021, Plaintiffs began filing opt-in Plaintiffs' <u>Notices of Consent to Sue</u>. <u>See</u>, <u>e.g.</u>, Notices of Consent to Sue [Doc. Nos. 32-42].

### C.   *The Second Amended Complaint*

On February 19, 2021, Morales Posada, Ferreira Guimaraes, Rocha, and Sara Barrientos filed the operative <u>Second Amended Complaint</u> [Doc. No. 43] alleging that Cultural Care Inc. is a U.S.-based au pair agency that sponsors foreign citizens' entry to this country, thereby allowing them to acquire the J-1 visas they need in order to work as au pairs in the United States. <u>Id.</u> ¶ 13. Plaintiffs alleged that they are citizens of other countries who provided in-home childcare services in the United States as au pairs employed by Cultural Care Inc. <u>Id.</u> ¶¶ 31-83. They alleged further that once they and other au pairs entered the United States, Cultural Care

Inc. controlled their placements with host families, the communications with host families

regarding au pairs' compensation, id. ¶¶ 16-23, and communications with the au pairs regarding

their maximum work hours and job duties, among other things, id. ¶¶ 24-26.

Plaintiffs brought claims under California, New York, New Jersey, Illinois, and

Washington's wage and hour, unfair business practices and/or deceptive trade practices laws, and

under the federal Fair Labor Standards Act ("FLSA"). They sought to recover unpaid wages

(including minimum wages and overtime wages), liquidated damages, statutory penalties, and

attorneys' fees and costs on behalf of themselves and other au pairs employed by Cultural Care

Inc. Id. ¶ 4, Prayer for Relief.

D.  *Cultural Care Inc.'s Second Motion to Dismiss*

Cultural Care Inc. filed a second Motion to Dismiss [Doc. No. 66] on March 22, 2021.

Cultural Care Inc. argued that it was entitled to derivative sovereign immunity (asserted via

Federal Rule of Civil Procedure 12(b)(1)) as to all claims. It argued further that the wage and

employment laws allegedly violated are preempted by federal regulations (asserted via Rule

12(b)(6)), and that Plaintiffs failed to allege facts establishing either that Cultural Care Inc.

"employs" au pairs or that Cultural Care Inc. engaged in any deceptive practices (both also

asserted via Rule 12(b)(6)). Def's Mem. 2-3 [Doc. No. 67]. Plaintiffs opposed the motion. Pls.

Opp. to MTD [Doc. No. 78].

E.  *Motion for and Opposition to Conditional Class Certification*

While the motion to dismiss was pending, Plaintiffs filed a Motion to Conditionally

Certify the Class [Doc. No. 98]. Cultural Care Inc. filed an Opposition [Doc. No. 112] on June 9,

2021. Cultural Care Inc. disputed the factual basis for Plaintiffs' claims, including whether

Cultural Care Inc. maintains a policy of failing to pay overtime or failing to properly instruct

host families on stipend amounts. Memorandum 9-14 [Doc. No. 112]. Cultural Care Inc. also objected to Plaintiffs' proposed notice to class and argued that if notice was given, it should be amended to say that individuals who opt-in "may be required to submit documents and testify under oath at a deposition, hearing, or trial, which will take place in Boston, Massachusetts." Id. at 18-19.

F.  *Motion to Strike Pre-Certification Consents to Sue*

Also on June 9, 2021, Cultural Care Inc. filed a Motion to Strike the Pre-Certification Consents to Sue [Doc. No. 114], based in part on Plaintiffs' purported failure to inform potential opt-in class members of their need to "produce documents, testify at a deposition, and even travel to the United States for testimony at trial" during the litigation. Memorandum 8 [Doc. No. 115]. Plaintiffs opposed that motion. Pl.'s Oppo. to Motion to Strike [Doc. No. 122].

G.  *The Court's Order on the Second Motion to Dismiss, Cultural Care Inc.'s Notice of Appeal, and the Stay of Proceedings*

On August 13, 2021, the court granted Cultural Care Inc.'s Motion to Dismiss as to part of Count 14, dismissing Plaintiffs' claim that Cultural Care Inc. had violated Washington and Connecticut consumer protection laws. Mem. 21-22 [Doc. No. 137]. The court otherwise denied the motion, allowing Plaintiffs to proceed on Counts 1 through 13 and the remainder of Count 14.

Cultural Care Inc. sought an interlocutory appeal of the court's Order "and each and every part thereof." Notice of Appeal [Doc. No. 142]. Cultural Care Inc. also sought a stay in this court. Motion to Stay [Doc. No. 156]. Plaintiffs stipulated to the stay after the First Circuit denied their request for summary disposition and set merits briefing, and Cultural Care Inc. agreed to toll the FLSA statute of limitations for putative collective action class members until the First Circuit resolved Defendant's appeal, Stipulation [Doc. No. 161], and the court entered

the requested stay, Order Granting Joint Motion for Entry of Stay and Tolling of FLSA Statute of Limitations [Doc. No. 162].

H.  *Proceedings at the First Circuit*

At the First Circuit, Cultural Care Inc. argued that the district court had jurisdiction over Plaintiffs' FLSA claims under 28 U.S.C. § 1331 and over Plaintiffs' state law claims under 28 U.S.C. § 1367(c); that the First Circuit had jurisdiction to review the denial of Cultural Care Inc.'s motion to dismiss state law claims based on derivative sovereign immunity under the collateral order doctrine; and that the First Circuit had pendent appellate jurisdiction to review the denial of the motion to dismiss state law claims based on preemption and to dismiss the FLSA claims for failure to state a claim. Br. for Appellant, No. 1:20-cv-11862-IT, 2022 WL 159237, at *3-4 (1st Cir. Jan. 10, 2022).

On April 26, 2023, the First Circuit issued an opinion affirming the court's denial of Cultural Care Inc.'s <u>Yearsley</u> claim of derivative sovereign immunity. <u>Posada v. Cultural Care, Inc.</u>, 66 F.4th 348 (1st Cir. 2023). The Court noted that Cultural Care Inc. also "challenge[d] the order's rejection of the portions of the motion to dismiss that were based on grounds independent of the claim of immunity," <u>id.</u> at 350, but declined to assert pendent appellate jurisdiction and dismissed those portions of the appeal for lack of appellate jurisdiction, <u>id.</u> at 350, 364.

I.  *The Lifting of the Stay, the Court's Orders on Pending Motions, and Cultural Care Inc.'s Answer*

On June 9, 2023, the First Circuit issued its mandate returning the case to this court, thereby ending the agreed-upon tolling of the FLSA statute of limitations. Mandate [Doc. No. 260]; Order Granting Joint Motion for Entry of Stay and Tolling of FLSA Statute of Limitations [Doc. No. 162]. On June 20, 2023, this court lifted the stay, <u>Elec. Order</u> [Doc. No. 262] and issued its <u>Memorandum and Order</u> [Doc. No. 263] denying Cultural Care Inc.'s <u>Motion to Strike</u>

Pre-Certification Consents and granting Plaintiffs' Motion to Certify a Collective Action and Issue Notice to the Proposed Collective. The court agreed in part with Cultural Care Inc.'s notice to opt-ins, requiring Plaintiffs to amend the proposed notice to state that "[i]ndividuals who consent to join this action may be required to submit documents and testify under oath at a deposition, hearing, or trial" and to make clear that Cultural Care Inc. disputed Plaintiffs' claims. Id. at 22.

On July 7, 2023, Cultural Care Inc. filed its Answer [Doc. No. 274] to Plaintiffs' Second Amended Complaint [Doc. No. 43]. Cultural Care Inc. asserted as one of forty-one Affirmative Defenses that Plaintiffs' "claims and purported class action are barred by their arbitration agreements[.]" Answer 32 [Doc. No. 274].

J. *Motion to Compel Arbitration*

On August 18, 2023, Cultural Care Inc. filed the pending Motion to Compel Arbitration [Doc. No. 309]. Cultural Care Inc. seeks to compel arbitration based on two contracts, as discussed further below.

The parties stipulated to limited discovery regarding the motion to compel arbitration, and the court so ordered. Joint Stipulation and Order [Doc. No. 325].

Following limited discovery, Plaintiffs have opposed the motion on numerous grounds. Pl.'s Oppo. [Doc. No. 368]. They also report that, as of that filing, 7,809 individuals have opted into the case to assert FLSA claims. Id. (citing docket).

II.   **Standard of Review**

To succeed on its motion to compel arbitration, the movant "must demonstrate (1) that a valid agreement to arbitrate exists, (2) that they are entitled to invoke the arbitration clause, (3)

that the other party is bound by that clause, and (4) that the claim asserted comes within the clause's scope. <u>Bossé v. N.Y. Life Ins. Co.</u>, 992 F.3d 20, 27 (1st Cir. 2021) (cleaned up).

Section Two of the Federal Arbitration Act provides that a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy . . . arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. However, the Federal Arbitration Act's "'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules." <u>Morgan v. Sundance, Inc.</u>, 596 U.S. 411, 418 (2022). Accordingly, "[i]f an ordinary procedural rule—whether of waiver or forfeiture or what-have-you—would counsel against enforcement of an arbitration contract, then so be it. The federal policy is about treating arbitration contracts like all others, not about fostering arbitration." <u>Id.</u>

As to waiver, the First Circuit has "recognized that the very rationale for arbitration may be undercut if a party is permitted to pursue a claim through the courts and then later claim a right to arbitration." <u>In re Citigroup, Inc.</u>, 376 F.3d 23, 27 (1st Cir. 2004) (cleaned up). In determining whether waiver has occurred, courts employ a non-exclusive, factor-based test. These factors include:

> (1) Whether the parties participated in a lawsuit or took other action inconsistent with arbitration; (2) whether the litigation machinery has been substantially invoked and the parties are well into preparation of a lawsuit by the time an intention to arbitrate is communicated; (3) whether there has been a long delay and trial is near at hand; (4) whether the party seeking to compel arbitration has invoked the jurisdiction of the court by filing a counterclaim; (5) whether discovery not available in arbitration has occurred; and, (6) whether the party asserting waiver has suffered prejudice.

<u>FPE Found. v. Cohen</u>, 801 F.3d 25, 29 (1st Cir. 2015) (internal quotation marks and brackets omitted). All told, "[t]here is no bright-line rule for a waiver of arbitral rights, and each case is to

be judged on its particular facts." Hayes v. Conduent Com. Sols., LLC, No. 21-cv-11545, 2022

WL 1104622, at *6 (D. Mass. Apr. 13, 2022).

### III.     The 2023 Contract

Cultural Care Inc. states that beginning in January 2023, au pairs were required to sign an

agreement with Cultural Care Inc. (the "2023 Contract"). Jordan Decl. ¶ 12 [Doc. No. 310]. The

2023 Contract states that it is an agreement between "Cultural Care, Inc., located at One

Education Street, Cambridge, MA 02141 . . . and the individual named below"). Jordan Decl.,

Ex. E at 1[Doc. No. 310-5]. The copy of the 2023 Contract filed with the court has no individual

named and is unsigned. See id. at 7.

The 2023 Contract also contains an arbitration provision stating in relevant part:

> In connection with any claim, dispute, or proceeding arising out of or relating in
> any manner to this Agreement or my relationship with [Cultural Care Inc.], or any
> dispute or claim between me and [Cultural Care Inc.] whether in contract, tort, or
> otherwise, or at law or in equity, whether or not related to this Agreement, the
> parties hereby mutually agree to submit to mandatory, final, and binding
> arbitration on an individual basis.

Id. ¶ 27. Natalie Jordan, the Senior Vice President of Cultural Care Inc. averred that "[e]very au

pair selected to participate in the Program and beginning their placement with a host family in

the United States in 2023 has signed an identical" 2023 Contract. Jordan Decl. ¶12 [Doc. No.

310].

On its face, the 2023 Contract does not apply to the named Plaintiffs, who all began their

employment well before 2023. Plaintiffs note further that Cultural Care Inc. has not submitted

the 2023 Contract for any of the opt-in Plaintiffs, see Pl.'s Oppo. at 2 n.1 [Doc. No. 368]. In

response, Cultural Care Inc. asserts only that "[t]hose Contracts expressly delegate all issues of

arbitrability to the arbitrator, and explicitly provide that [Cultural Care Inc.] can enforce them as

a party" and that Cultural Care Inc. "cannot have waived its rights to enforce these Contracts

given that they did not exist before [2023]." Reply at 5 n.8 [Doc. No. 382]. But while Cultural

Care Inc. concludes that the court therefore should grant the motion to compel "as to any opt-ins

who began in 2023," id., Cultural Care Inc. still has not identified any such opt-in Plaintiff who

has joined the action. Without an identified opt-in Plaintiff, Cultural Care Inc. is seeking an

advisory opinion only and the court has no jurisdiction to address the matter in this posture.

Accordingly, the motion to compel is DENIED without prejudice as to the 2023 Contract.

## IV.    The International Care Contract

Cultural Care Inc. also asserts that between January 1, 2018, through December 31, 2022,

all au pairs selected for sponsorship by Cultural Care Inc., including the named Plaintiffs, signed

a contract (the "International Care Contract") with International Care, Ltd. ("International Care")

setting forth various terms and conditions of their participation in the au pair program. Jordan

Decl. ¶¶ 6-7 [Doc. No. 310].[1] International Care is a Swiss company that is a "separate and

distinct company from [Cultural Care Inc.]." 2023 Contract ¶ 6 [Doc. No. 310-5]; see Mem. ISO

Motion at 10 [Doc. No. 312]. International Care "provided [au pairs with] recruiting, screening,

and other pre-departure services." 2023 Contract ¶ 6 [Doc. No. 310-5]; Jordan Decl. ¶ 4 [Doc.

No. 310].

The International Care Agreement begins by defining "Cultural Care" as the "registered

business name of International Care, Ltd.," and further specifies that the references to "CC" in

---

[1] Plaintiffs assert that Cultural Care Inc. has not met its burden to show that the named Plaintiffs signed the International Care Contract. Pl.'s Oppo. at 18 [Doc. No. 368]. But Plaintiffs also acknowledge that Cultural Care Inc. has provided signed copies of the identical Contract for each of the named Plaintiffs, see International Care Contracts [Doc. Nos. 310-1 (Morales Posada Contract); 310-2 (Guimaraes Contract); 310-3 (Rocha Contract); 310-4 (Barrientos Contract)]; and Plaintiffs have not offered any contrary evidence or evidence that those documents are not authentic. Accordingly, for purposes of this motion, the court assumes that the named Plaintiffs have signed the International Care Contract.

that agreement are references to International Care "and its successors and assignees."
International Care Contract [Doc. No. 310-1]. The International Care Contract contains further
provisions relevant to the pending motion.

First, the arbitration clause of the International Care Contract provides:

> This Agreement shall take effect as a sealed instrument under and shall be
> governed by the laws of Switzerland. In the event of any claim, dispute, or
> proceeding arising out of the relationship of me and [International Care and its
> successors and assigns], or any claim which in contract, tort, or otherwise at law
> or in equity arises between the parties, whether or not related to this Agreement,
> the parties submit and consent to the exclusive jurisdiction and venue of the
> arbitrational tribunals of Switzerland.

Id. ¶ 15.

Second, Paragraph 13 of the Contract states that "[t]his agreement is made between me
and [International Care and its successors and assigns] . . . . Any disputes will be settled between
me and [International Care and its successors and assigns] or any legal entity bound to represent
us and *no other third party*." (emphasis added). Id. ¶ 13.

Cultural Care Inc. contends that it has the right to enforce this contract.[2] Plaintiffs oppose
the motion to compel on multiple grounds. The court need only address some of these
arguments.

---

[2] Cultural Care Inc. urges the court to adopt the reasoning in Kudlacz v. Cultural Care, Inc., et
al., No. CGC-20-584567 (Cal. Sup. Ct. Oct. 27, 2023), an unreported California Superior court
case reprinted as Ex. 2 to Hood Decl. [Doc. No. 369-2], on the issue of whether Cultural Care
Inc. may enforce the International Care Contract. Reply at 1 [Doc. No. 382]. But Kudlacz is
distinguishable on critical facts. First, International Care was a defendant in Kudlacz but is not a
party here. Second, no motion to dismiss was ever filed in Kudlacz, let alone an interlocutory
appeal of such a motion as has occurred here. And third, Plaintiffs in this case make independent
legal arguments that were not raised in the Kudlacz litigation: the Kudlacz Plaintiffs "d[id] not
take issue with whether Cultural Care [Inc.] can compel arbitration even though [International
Care] is the signatory defendant to the agreements." Kudlacz, Ex. 2 to Hood Decl. [Doc. No.
369-2] at 8.

A.  *Cultural Care Inc. Has Waived Any Right to Arbitrate Pursuant to the International Care Contracts*

The court finds the procedural history here weighs strongly against allowing Cultural Care Inc. to pursue arbitration. As detailed above, <u>supra</u> Section I, Cultural Care Inc. has "substantially invoked" the litigation machinery in this case. It fully litigated a <u>Motion to Dismiss</u>, claiming not only that it was entitled to derivative sovereign immunity, but also that the claims were preempted and that the Second Amended Complaint failed to state a claim.[3] In its interlocutory appeal, it made no mention of arbitration, instead asserting that the district court and First Circuit had jurisdiction to decide the issues presented, and appealed to the First Circuit to address not only the immunity question but also Cultural Care Inc.'s 12(b)(6) arguments. Cultural Care Inc. also filed an <u>Opposition to Conditional Class Certification</u>, in which it again put forth arguments on the merits of Plaintiffs' claims and objected to Plaintiffs' proposed notice for failing to tell potential opt-ins that they would have to travel to Boston, Massachusetts, for the litigation—without once raising the issue of arbitration. And Cultural Care Inc. has also filed a <u>Motion to Strike the Consents to Sue</u>, and argued there that putative class members would be unprepared to participate in active *litigation*—not arbitration—including depositions and trial.

These actions, taken together, are a far cry from "merely" filing a motion to dismiss, <u>see</u> Mem. ISO Motion at 16 [Doc. No. 312] (citing <u>Herrera Gollo v. Seaborne P.R., LLC</u>, No. 15-1771, 2017 WL 657430, at *4 (D.P.R. Feb. 17, 2017)); <u>cf.</u> <u>Creative Sols. Grp., Inc. v. Pentzer</u>

---

[3] Cultural Care disputes that its <u>Motion to Dismiss</u> reached the merits of the Plaintiffs' claims. But Sections III and IV of its <u>Memorandum</u> [Doc. No. 67] in support of that motion directly addressed whether Plaintiffs sufficiently alleged facts demonstrating Cultural Care was their employer, <u>id.</u> at 3-4, 28-29—the issue at the heart of the case—and facts showing Cultural Care violated relevant law, <u>id.</u> at 29-30. And while Cultural Care now asserts that its <u>Yearsley</u> defense was purely jurisdictional, it argued at the motion-to-dismiss stage that the doctrine's applicability turned on the *conduct alleged* by the Plaintiffs and "shielded [Cultural Care] from the *entirety* of this suit." <u>Id.</u> at 2 (emphasis added).

Corp., 252 F.3d 28, 30 (defendant filed motion to compel arbitration two months after filing

motion to dismiss, before district court had ruled on that motion). Both sides—and two courts—

have expended time and resources addressing arguments brought by Cultural Care Inc. on

numerous aspects of this case. Cultural Care Inc. has had ample opportunity to raise an

arbitration defense yet has waited until after it attempted a "full-throated attempt to win this case

on the merits in federal court" at both the district and appellate levels, see Forby v. One

Technologies, L.P., 909 F.3d 780, 784 (5th Cir. 2018).

The court therefore finds that Cultural Care Inc. has waived any potential right to

arbitrate pursuant to the International Care Contract. See In re Citigroup, 376 F.3d at 29 ("Given

the complexity of the litigation, knowing full well the wide-ranging implications for all parties

involved . . . , [Defendant] should have acted in a prompt manner to assert its right to arbitrate

claims in issue.").

B.  *Cultural Care Inc. May Not Enforce the International Care Contract*

Even if Cultural Care Inc. had not waived its right to arbitrate, as a nonsignatory, it may

not enforce the International Care Contract's arbitration clause.

As a threshold matter, Cultural Care Inc. asserts that the enforceability question may be

resolved only by an arbitrator and is not properly before the court. That is incorrect. In First

Options of Chi., Inc. v. Kaplan, the Supreme Court specified that "[c]ourts should not assume

that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence

that they did so." 514 U.S. 938, 944 (1995) (cleaned up). Thus, "absent a valid provision

specifically committing such disputes to an arbitrator," the issues of "enforceability or

applicability [of arbitration] to the dispute" are questions for the court to decide. Granite Rock

Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299 (2010); accord Henry Schein, Inc. v. Archer

and White Sales, Inc., 139 S.Ct. 524, 527 (2019) ("[T]he question of who decides arbitrability is itself a question of contract.").

The International Care Contract's arbitration clause does not contain a "clear and unmistakable" intent to delegate threshold questions of arbitrability to the arbitrator rather than the court. The arbitration clause covers disputes that "arise[] out of the relationship of [the au pair] and [International Care]," and legal or equitable claims that "arise between the parties." International Care Contract ¶ 15 [Doc. No. 310-1]. The arbitration clause makes no mention of the arbitrator resolving disputes about whether an entity is itself a party for the purposes of enforcement: It necessarily follows that the provision is only triggered once the court determines that these parties have agreed to arbitration.

The court therefore considers whether Plaintiffs agreed to resolve disputes with Cultural Care Inc. through arbitration. In so doing, the court applies basic principles of state contract law to determine the issue of enforceability. See Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630-631 ("State law, therefore, is applicable to determine which contracts are binding under [9 U.S.C.] § 2 and enforceable under [9 U.S.C.] § 3 if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.") (cleaned up); Landry v. Transworld Sys., Inc., 485 Mass. 334, 337, 149 N.E.2d 781 (Mass. 2020) ("Our interpretation of the arbitration provision in question is guided by decisions interpreting the Federal Arbitration Act, and by State contract law pertaining to enforcement of a contract by nonsignatories.").[4]

---

[4] The parties agree that state law governs these threshold inquiries. Plaintiffs assert that if the court determines Cultural Care Inc. may enforce the arbitration provision under state law, then Swiss choice-of-law must also be applied to the enforceability question. Pl.'s Oppo. at 15-16 [Doc. No. 368]. Because the court does not find that Cultural Care Inc. may enforce the arbitration provision under state law, see infra, it need not reach the disputed issue whether Swiss law would permit Cultural Care Inc. to enforce the International Care Contract as a nonsignatory. The court notes, however, that the issue has been briefed and preserved by both parties.

Cultural Care Inc., a nonsignatory to the International Care Contract, argues that it may enforce the contract as a third-party beneficiary or through the doctrine of equitable estoppel. The court considers each of these avenues in turn.

        1.  Third-Party Beneficiary

Third-party beneficiary status is "an exception to the general rule that a contract does not grant enforceable rights to nonsignatories." Hogan v. SPAR Grp., Inc., 914 F.3d 34, 39 (1st Cir. 2019) (internal quotation and citation omitted). "Under Massachusetts law, a nonsignatory seeking to enforce an arbitration agreement as a third-party beneficiary must point to 'clear[] and definite[]' evidence of the parties' intent that it benefit from the provision." Landry, 485 Mass. at 342; see Hogan, 914 F.3d at 39 (when a nonsignatory seeks to enforce an arbitration clause as a third-party beneficiary, they must demonstrate with "special clarity that the contracting parties intended to confer a benefit on [it]"). "In evaluating whether such 'special clarity' exists, a court should focus on the 'specific terms' of the agreement at issue, being mindful that it 'ought not to distort the clear intention of contracting parties or reach conclusions at odds with the unambiguous language of the contract.'" Hogan, 914 F.3d at 39 (citing EEOC v. Waffle House, Inc., 534 U.S. 279, 294 (2002)). Critically, "[f]or evidence of intent to include [a nonsignatory] as a third-party beneficiary to be considered 'clear and definite,' there must, at a minimum, be no ambiguity in the arbitration provision as to whether [the nonsignatory] could enforce it." Landry, 485 Mass. at 342; see also id. at 343 (direct reference to "agents" and "representatives" in the arbitration provision did not give rise to third-party beneficiary enforcement because such an interpretation was "by no means the only reasonable interpretation"); accord Steel-Rogers v. Glob. Life Scis. Sols. USA, LLC, 624 F. Supp. 3d 10, 17 (D. Mass. 2022) (defendant "not a

third-party beneficiary because it has not shown a total lack of ambiguity" in the arbitration clause).

Here, the arbitration provision does not even make an ambiguous reference that could be construed to include Cultural Care Inc. as a third-party beneficiary. By its terms, the International Care Contract does *not* grant third parties the right to arbitrate. The arbitration provision references International Care and its "successors and assigns" in one clause, and "the parties" in another. There is no express inclusion of affiliates, agents, beneficiaries, or any other category that might apply to Cultural Care Inc.

Hogan v. SPAR is also instructive on this issue. In that case, a staffing company engaged the plaintiff to provide services for a retail services provider. 914 F.3d at 36. The plaintiff and the staffing company entered into a contract (the "Master Agreement") to which the defendant retail services provider was not a signatory. Id. In considering whether the defendant could enforce a right to arbitrate as a third-party beneficiary, the First Circuit focused on the Master Agreement arbitration clause's language in isolation, without regard to whether the contract "confer[red] upon [the defendant] some benefit unrelated to arbitration." Id. at 40. The arbitration clause "specifically limit[ed] its applicability to 'the Parties.' It state[d] that: '[a]ny dispute between the Parties relating to this Master Agreement or otherwise arising out of their relationship under its terms . . . shall be determined by arbitration." Id. at 38 (emphasis in original). The court held that that language "limits [the arbitration clause's] applicability to the signatories by only covering disputes 'between the Parties,'" which made it "clear that it does not confer arbitration rights to [defendant] or any third party." Id. at 40.

The International Care Contract contains parallel language to the Hogan Master Agreement. Here, as there, the arbitration clause is limited to the "relationship of [the au pair]

and [International Care[5]]" and disputes that arise "between the parties." International Care

Contract ¶ 15 [Doc. No. 310-1]. The court therefore rejects Cultural Care Inc.'s perplexing

assertion that <u>Hogan</u> is "inapposite" because it covered only disputes "between the Parties,"

given that the International Care Contract contains nearly identical limiting language. <u>See</u> Reply

at 6 n.13 [Doc. No. 382]. Further, here, as in <u>Hogan</u>, the court's determination is reinforced by

the mention of "affiliates" and the "Cultural Care staff in the United States" in other portions of

the International Care Contract but not in the arbitration provision: "[G]iven 'the probable

sophistication of the drafters of the agreement, . . . the omission of defendants from the

arbitration clause must be regarded as purposeful.'" <u>See</u> 914 F.3d at 40 (quoting <u>Mowbray v.</u>

<u>Moseley, Hallgarten, Estabrook & Weeden, Inc.</u>, 795 F.2d 1111, 1118 (1st Cir. 1986)).

      For these reasons, the court rejects Cultural Care Inc.'s claim that it may enforce the

International Care Contract's arbitration clause as a third-party beneficiary.

      2.  Equitable Estoppel

      Under the doctrine of equitable estoppel, a nonsignatory may compel arbitration against a

signatory where that signatory (1) "must rely on the terms of the written agreement in asserting

its claims against the nonsignatory"; or (2) "raises allegations of substantially interdependent and

concerted misconduct by both the nonsignatory and one or more signatories to the contract."

<u>Machado v. System4 LLC</u>, 471 Mass. 204, 211, 28 N.E. 3d 401 (Mass. 2015).

      Cultural Care Inc. argues that the first prong of the equitable estoppel test is met here,

because "a finder of fact cannot determine Plaintiffs' status [as employees] without referring to

the contract[]. . . " Mem. ISO Motion at 12-13 [Doc. No. 312]. The court disagrees. The actions

---

[5] The reference to "CC" is indisputably a reference to International Care and its successors and assigns, <u>see</u> <u>supra</u> Section IV.

Plaintiffs allege established Cultural Care Inc. as their employer—and that serve as the crux of their claims—are not covered by the International Care Contract. The International Care Contract covers the au pairs' general conduct while participating in the program. The International Care Contract has no provisions identifying a stipend amount to be paid by Cultural Care Inc., setting or limiting overtime pay rates or specific hour requirements, articulating Cultural Care Inc.'s fee or cost structures, or specifying the nature of communications between Cultural Care Inc. and the au pairs' eventual host families.

The International Care Contract makes only two mentions of wage or hour-related concerns. First, it specifies that au pairs must "stay[] within the legal number of working hours per day and per week without exception." International Care Contract ¶ 3 [Doc. No. 310-1]. Plaintiffs do not contend they were forced to work outside of any legal hour maximum. Rather, they contend they were not paid for hours they legally worked. Second, the International Care Contract specifies that "[International Care] is not responsible for any financial disputes . . . with my host family." Id. ¶ 7. But Plaintiffs' financial dispute is not with their host families or International Care—it is with Cultural Care Inc. The thrust of Plaintiffs' allegations is that Cultural Care Inc. systematically misinformed host families regarding proper compensation; according to Plaintiffs, the onus is on Cultural Care Inc., not the families or International Care, to rectify the wage violations. Complaint ¶¶ 16-24 [Doc. No. 43]. Thus, is entirely possible that Plaintiffs' claims—which are all statutory in nature—could proceed without any reference to the International Care Contract. See Hogan, 914 F.3d at 42 ("Hogan's claims would exist even if the Master Agreement were declared void."); accord Ouadani v. TF Final Mile LLC, 876 F.3d 31, 40 (1st Cir. 2017) (no equitable estoppel because the plaintiff's "claims do not depend on the existence of a right guaranteed in the Agreement").

As a result, the court finds that Cultural Care Inc. may not enforce the International Care Contract's arbitration clause pursuant to the doctrine of equitable estoppel.

**V.      Conclusion**

For the foregoing reasons, Cultural Care Inc.'s <u>Motion to Compel Arbitration</u> [Doc. No. 309] is DENIED as to the International Care Contract and DENIED without prejudice as to the 2023 Contract.[6]

IT IS SO ORDERED

February 28, 2024                           /s/      Indira Talwani

                                            United States District Judge

---

[6] The court also declines to stay this action as to the California plaintiffs in favor of the <u>Kudlacz</u> litigation, <u>see</u> Mem. ISO Motion at 19-20 [Doc. No. 312], where <u>Kudlacz</u> brings California state-law Private Attorneys General Act (PAGA) claims alone and Plaintiffs in this action bring federal Fair Labor Standards Act claims and non-PAGA state claims.